JOHNSON & WEAVER, LLP
FRANK J. JOHNSON (SBN 174882)
frankj@johnsonandweaver.com
SHAWN E. FIELDS (SBN 255267)
shawnf@johnsonandweaver.com
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSH CRYSTAL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MEDBOX, INC., PEJMAN VINCENT MEHDIZADEH, BRUCE BEDRICK, THOMAS IWANSKI, GUY MARSALA, and DOUGLAS MITCHELL,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, Josh Crystal ("Plaintiff"), individually and on behalf of all others similarly situated, by his undersigned attorneys, has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Medbox, Inc. ("Medbox" or the "Company"), as well as media and financial analyst reports about the Company, conference call transcripts and certain court records. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION AND NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of the common stock of Medbox between November 20, 2013 and December 29, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Medbox, through its subsidiary Medicine Dispensing Systems, sells its patented vending machines that dispense medical marijuana, software and consulting services to pharmacies, alternative medicine dispensaries and local governments in the United States.

3.     Medbox was founded in 2010 by Defendant Pejman Vincent Mehdizadeh ("Mehdizadeh"), a mid-30s aged Iranian immigrant with a checkered history of business failures and criminal conduct, including grand theft in 2013.  At the start of the Class Period on November 20, 2013, Defendant Mehdizadeh was Medbox's controlling shareholder, owning approximately 65% of its common stock, and served as the Company's Chief Operating Officer ("COO") and Chairman of its Board of Directors ("Board").

4.     During the Class Period, Defendants issued materially false and misleading statements regarding the Company's financial results for the fiscal year ended December 31, 2013 ("FY 2013") and each of the interim financial periods ended September 30, 2013 ("3Q 2013"), December 31, 2013 ("4Q 2013"), March 30, 2014 ("1Q 2014"), June 30, 2014 ("2Q 2014") and September 30, 2014 ("3Q 2014").   Specifically, Defendants overstated Medbox's revenues by recognizing revenue on customer contracts before it had been earned.  As a result of these false statements, Medbox's stock traded at artificially inflated prices during the Class Period, reaching an intraday Class Period high of $93.50 on January 8, 2014.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

5.     While Defendants kept the full extent of their fraud concealed throughout the Class Period, the market learned bits of the truth through several partial disclosures.

6.     Initially, the price the Company's common stock declined partially in January 2014 when the Financial Industry Regulatory Authority ("FINRA") issued an advisory concerning risks related to investing in marijuana related stocks.   To keep the price of Medbox stock inflated, Defendants issued an immediate response reassuring the market that Medbox's financial reporting was sound, quoting Defendant Mehdizadeh emphasizing that: "Since day 1, our company has made its quarterly reports and financials available to the public, kept shareholders diligently informed about the company and its operating personnel at all times, offered ongoing support to its many clients, completed an audit of its financials, … and also demonstrated profitability while not deriving revenue from the cultivation or sale of the marijuana itself."

7.     Thereafter, on February 18, 2014, *Citron Research* issued a report accusing Medbox of keeping three sets of books and stating, among other things, that "systemic fraud" and stock promotion had facilitated the Company's $1 billion market capitalization.   Again to keep the stock price inflated, the same morning *Citron Research* issued its report, the Company issued a press release commending the Obama administration for new rules it said would ease the concerns of banks wanting to deal with businesses that legally sell marijuana.   In its release, the Company noted that its CEO would appear on CNBC's Closing Bell on Tuesday, February 18, and Fox Business on Wednesday, February 19.   Later in the day on February 18, 2014, following the issuance of the damning *Citron Research* report, the Company issued a rebuke of the *Citron Research* report quoting Defendant Mehdizadeh claiming that while it had discovered some past accounting "errors," Medbox was now "getting it right and being fully transparent with [its] shareholders at all times" and had "instituted better

controls over financial reporting to avoid further corrections." Following the news of the day, shares of Medbox decreased from an opening price of $33.42 per share to close at $29.80 per share on February 18, 2014, closing lower again on February 19, 2014 at $27.25 per share.

8.     On or about April 10, 2014, Defendant Mehdizadeh resigned as COO and as a director of Medbox, but was appointed as "Senior Strategist and Founder" of Medbox.

9.     Thereafter, the price of Medbox stock declined again, dropping from a closing price of $17.52 per share on May 16, 2014 to close down at $16.11 per share on May 19, 2014, following the Friday, May 16, 2014 issuance of a report by the SEC warning of "possible scams involving marijuana-related investments" and quoting Elisha Frank, co-chair of the SEC Enforcement Division's Microcap Fraud Task Force as stating "[w]henever we see incomplete or misleading disclosures, we act quickly to protect investors."

10.     However, with Medbox issuing press releases on July 1, 2014, claiming that it had become a "Fully Reporting Public Company" and on July 24, 2014, announcing that Defendant Guy Marsala ("Marsala"), who investors were assured had "a track record of driving exceptional results in both public and private companies by implementing Fortune 500 company best practices at early stage and middle market companies," had been named Chairman of Medbox's Board and was appointed as President and CEO of the Company, replacing Defendant Bruce Bedrick ("Bedrick"),[1] the price of Medbox stock remained artificially inflated, closing at $14.70 per share on July 24, 2014; the Company was also able to facilitate the sale of $5.5 million in convertible debentures in private placements during July and September 2014.

---

[1]  Following his resignation as CEO, in August 2014, Defendant Bedrick also resigned from Medbox's Board. Following his resignation from the Board, the Company announced that Defendant Bedrick would continue to serve as a consultant.

11.     On or about October 17, 2014, the Company disclosed that Defendant Mehdizadeh had resigned as an officer of Medbox but that he would continue to serve the Company as a consultant with the title of Founder and Senior Advisor.

12.     Then, on or about October 21, 2014, the Company disclosed that Medbox's Chief Financial Officer ("CFO") Thomas Iwanski ("Iwanski") – who was just hired in that capacity by the Company in February 2014 - was being replaced by Defendant Douglas Mitchell ("Mitchell"), though Iwanski too would stay on as a consultant.

13.     Thereafter, on October 31, 2014, the Company disclosed that it had appointed a special board committee to investigate a letter from a former Company employee to the SEC "alleging wrongdoing by a former officer of the Company who [was] a consultant to the Company" and that "a federal grand jury document subpoena [had been] served in August 2014 on the Company's accountants by the U.S. Department of Justice…."

14.     On November 3, 2014, a press release was issued stating it was released by Medbox entitled "Medbox Comments on Recent 8-K Filing" which claimed that the former employee who sent the letter to the SEC had done so in retribution for Medbox's refusal to pay him a cash settlement, quoting Defendant Mehdizadeh, and further stating that "[c]urrent management commented that the Company ha[d] not found any indications that the subject matter contained in the [former employee's] letter [was] true concerning the conduct of prior officers of the company."

15.     Meanwhile, shares of Medbox fell $1.50 per share from their October 31, 2014 closing price of $13.95 per share, or 10.8%, to close at $12.45 on November 3, 2014.  Shares fell another $2.75 per share on November 5, 2014 as the financial media reported on the ensuing SEC investigation and the market impacted the full import of the disclosures.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

16.     Then, on November 7, 2014, Medbox filed a Current Report on Form 8-K with the SEC stating the November 3, 2014 press release, which quoted Defendant Mehdizadeh, had not been "authorized by Medbox."

17.     Finally, on the morning of December 30, 2014, before the opening of trading, Medbox issued a press release disclosing that it would be forced to restate **the past five quarters** of financial reports and potentially its "financial statements for 2012 and for the first two quarters of 2013…as well."   The Company further disclosed that the earnings restatement had triggered a default on its debt covenants that had forced it to seek a forbearance from lenders.  The release stated that the "steps [being taken were] part of the continued initiative of [Medbox's] new board of directors and new management team to implement better controls and emphasize transparency."

18.     As a result of Defendants' false statements, Medbox stock traded at fraud-inflated levels during the Class Period.  However, as the market learned the truth, Medbox stock was hammered by massive sales, sending them down more than 95% from their Class Period high to trade as low as $4.50 per share in intraday trading on December 30, 2014.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

21.     Venue is proper in this district pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company maintains its principal executive offices in this District and the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**PARTIES**

22.     Plaintiff purchased Medbox common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages thereon.

23.     Medbox is headquartered at 8439 West Sunset Boulevard, Suite 101, West Hollywood, California 90069.   During the Class Period, Medbox had more than 30.4 million shares of common stock outstanding, which shares traded in an efficient market on the Over-the-Counter-Market under the ticker symbol "MDBX."   Medbox was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations to investor and analyst conferences.   Indeed, as Medbox itself highlighted during the Class Period, its founder, Defendant Mehdizadeh, "appeared in interviews with CNN, ABCNews, Reuters, Associated Press, NPR, and ha[d] been featured in articles appearing in Newsweek, Los Angeles Times, and the Wall Street Journal, as well as over 30 other news agencies around the world concerning [its] cutting-edge products and services."   Medbox also filed periodic public reports with the SEC, and regularly issued press releases to the financial press.

24.     Defendant Mehdizadeh founded Medbox in 2010 and served as a director and as its COO until April 2014, as its "Senior Strategist and Founder" until October 2014, following which he continued to serve as a consultant to the Company with the title of "Founder and Senior Advisor" through the remainder of the Class Period.

25.     Defendant Bedrick served as Medbox's President and CEO from the start of the Class Period until July 23, 2014, and as a director of Medbox until August 2014, following which Bedrick continued to serve as a consultant to the Company.

26. Defendant Iwanski served as Medbox's CFO from February 2014 until his resignation on or about October 16, 2014, following which Iwanski continued to serve as a consultant to the Company.

27. Defendant Marsala was named Chairman of the Board, President, and CEO of Medbox on or about July 23, 2014. Marsala is currently President and CEO of the Company. Marsala relinquished the Chairman of the Board position on December 17, 2014, but remains on the Board as a director.

28. Defendant Mitchell was named CFO of Medbox on or about October 21, 2014, replacing Defendant Iwanski, and currently holds that position.

29. Defendants Mehdizadeh, Bedrick, Iwanski, Marsala, and Mitchell are sometimes referred to herein as the "Individual Defendants." Collectively, with Medbox, the Individual Defendants are sometimes referred to herein as "Defendants."

30. During the Class Period, the Individual Defendants ran Medbox as "hands-on" managers overseeing Medbox's operations and finances and made the material false and misleading statements described herein. The Individual Defendants were intimately knowledgeable about all aspects of Medbox's financial and business operations, as they received daily reports and had access to computerized information regarding sales, costs and expenses, product demand and inventory management. They were also intimately involved in deciding which disclosures would be made by Medbox. Indeed the Individual Defendants made various public statements for Medbox during the Class Period, signed various filings with the SEC and participated in Class Period investor events.

## BACKGROUND TO THE CLASS PERIOD

31. Medbox, through its subsidiaries, provides patented biometrically controlled medicine storage and dispensing systems to the medical and retail

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

industries. The Company offers Medbox, a biometric medicine dispensing machine that dispenses herbal and prescription medications to individuals based on biometric identification primarily for pharmacies, assisted living facilities, prisons, hospitals, and doctors' offices. Its products also include Safe Access Storage Lockers that are used by medium to large mail-order chains; Medbox medicine storage machines; and Lockbox Rx, a storage/retrieval system that is used for prescription medication, over-the-counter medicines, and other pharmacy products. In addition, the Company provides Sample-Safe, a wall-mounted unit for use in doctors' offices; sells the point-of-sale system that includes a monitor, keyboard, credit card reader, and computer with interface; and offers Medbox OTC machines, a non-biometric machine for over-the-counter items, as well as sells various vaporizer and accessory products, such as miVape, through online and distribution partners.

32. The Company, which Defendant Mehdizadeh founded as MindfulEye Inc. in 2010 and changed its name to Medbox, Inc. in October 2011, was incorporated in 1977 and is headquartered in West Hollywood, California.

33. Defendant Mehdizadeh has a checkered history of business failures and criminal convictions, including grand theft in 2013. Specifically, in 2013, Defendant Mehdizadeh pled no-contest to a 15-count criminal complaint that was filed against him relating to a law firm Defendant Mehdizadeh managed as a non-lawyer. Defendant Mehdizadeh received probation and agreed to pay $450,000 as part of a plea agreement. Defendant Mehdizadeh also declared bankruptcy in July 2010, which was discharged in 2011.

34. During the Class Period, Defendant Mehdizadeh occupied various roles at Medbox including serving as its COO, as an officer with the title "Senior Strategist and Founder," and as a "consultant" to Medbox with the title "Founder and Senior Advisor."

35.     At the start of the Class Period, Mehdizadeh owned approximately 65% of Medbox's common stock and is still "the beneficial owner of the majority of the voting power of the Company[,]" owning or controlling approximately 58% of the Company's outstanding shares, according to the Schedule 14C Mehdizadeh filed, or caused to be filed, with the SEC on or about January 9, 2015.

## MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS[2]

36.     The Class Period starts on November 20, 2013.  On that morning, before the opening of trading, Medbox issued a press release announcing the Company's 3Q 2013 financial results for the period ended September 30, 2013, which stated in pertinent part as follows:

**Highlights of 3rd Quarter Financials include:**

- ***Revenues surged to over $5.046 million through three quarters, making 2013 the company's best revenue generating year in the company's history.***

- ***Revenues reported of $2.079 million for 3rd quarter of 2013, making it the highest grossing quarter in the company's history.***

\*     \*     \*

- ***Gross profit margin for the quarter was a healthy $833 thousand and EBITDA margin for the quarter was approximately 21%.***

- ***Income from operations through 3 quarters, before taxes, was a healthy $647 thousand.***

"***We have had another record breaking quarter, which provides further validation that our business plan is solid and our operating strategy is sound***," stated Dr. Bruce Bedrick, CEO of Medbox, Inc. "As we move forward, we will continue to seek out opportunities that provide growth for our company and added value for our shareholders."

***The company also announced that they have brought accounting functions in-house to help expedite preparation of statements and reports.***

---

[2]     All emphasis is added unless otherwise noted.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*"As we continue to mature and transition to being a fully reporting company, we need to be able to provide timely reports, status updates, and filings," Bedrick commented. "We have assembled an in-house team of accounting professionals. This team can devote more time to work seamlessly with our outside auditing firm so that we meet our deadlines and obligations, and provide the most accurate and timely information to the SEC and the general public."*

37.     On November 25, 2013, the Company issued a press release entitled "Medbox Issues Status Update to Company Shareholders," stating in pertinent part that "*Medbox posted record revenue figures for YTD 2013, amassing more than $5 million in consulting and equipment sales revenue through 9 months.*"

38.     In January 2014, FINRA issued an advisory concerning risks related to investing in marijuana-related stocks.  The FINRA advisory cautioned:

> Like many investment scams, pitches to invest in potentially fraudulent marijuana-related companies may arrive in a variety of ways — faxes, email or text message invitations to webinars, infomercials, tweets or blog posts. Regardless of how you first hear about them, the offers almost always contain hallmarks of "pump and dump" ploys. Specifically, fraudsters lure investors with aggressive, optimistic — and potentially false and misleading — statements or information designed to create unwarranted demand for shares of a small, thinly traded company with little or no history of financial success (the pump). Once share prices and volumes reach a peak, the cons behind the scam sell off their shares at a profit, leaving investors with worthless stock (the dump).

39.     On January 13, 2014, to blunt the effects of the FINRA advisory concerning the risks related to investing in marijuana-related stocks, the Company issued a press release entitled "Medbox Comments on FINRA Advisory Concerning Marijuana Stocks," which stated in pertinent part as follows:

> ... Medbox … commented on FINRA's renewed advisory concerning marijuana related stocks.  The advisory, released Friday, highlights what investors should be aware of when investing in marijuana related stocks.

> The [FINRA] advisory stated, in part:

> "We are reissuing this alert to warn investors not only about the potential for fraud in this arena, but also to reiterate the risks of

11

investing in thinly traded companies about which little is known…
One company, for example, promoted its move into the medical
cannabis space by issuing more than 30 press releases during the first
half of 2013. These releases publicized rosy financial prospects and
the growth potential of the medical marijuana market. The company
was also touted on the Internet through the use of sponsored links,
investment profiles and spam email, including one promotional piece
claiming the stock "could double its price SOON" and another
asserting the stock was "poised to light up the charts!" Yet the
company's balance sheet showed only losses, and the company stated
elsewhere that it was only beginning to formulate a business plan."

Other excerpts from the [FINRA] advisory stated, in part:

"For example, the CEO of one thinly traded, yet heavily touted,
company that purports to be in the medical marijuana business spent
nine years in prison for operating one of the largest drug smuggling
operations in U.S. history. The former CEO of a similar company was
recently indicted for his role in a multi-million dollar mortgage-based
Ponzi scheme."

Medbox executives were pleased that a stern advisory was re-issued
about the sector's stocks by FINRA and had the following comments:

"Some of the public companies in the marijuana sector are in the
business of selfpromotion with little or no substance or even an
executable business plan," stated Vincent Mehdizadeh, Chief
Operations Officer at Medbox, Inc. ***"Since day 1, our company has
made its quarterly reports and financials available to the public,
kept shareholders diligently informed about the company and its
operating personnel at all times,*** offered ongoing support to its many
clients, ***completed an audit of its financials,*** donated substantial
amounts to industry advocacy groups that support medical marijuana
patient rights to safe access of the medicine, ***and also demonstrated
profitability while not deriving revenue from the cultivation or sale
of the marijuana itself.*** As far as I know, we are the only company in
the space to have accomplished those feats. With that being said we
have stated in the past that investors should make informed decisions
when buying our stock as the volatility may not be something the
average retail investor can stomach."

Company executives also pointed out that most, if not all, of the other
marijuana related public companies in the sector spend the majority of
their operating budgets promoting their stocks through assorted
public/investor relations firms and as a result show operating losses
quarter after quarter. Medbox does not have an investor relations firm
and according to company executives its general preference has been
not to operate with one through this period in the company's
development until a reputable candidate is identified.

"Much of the investor interest in Medbox has occurred through
financial press, financial media, and general media coverage
chronicling advances in the medical marijuana industry, an industry in
which we feel we are the most reputable company," stated Dr. Bruce
Bedrick, Chief Executive Officer at Medbox, Inc. "Consequently, we

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

spent much of last year trying to find a reputable firm that would be a good fit to handle our investor relations consistent with best industry practices, and now feel we have found the right fit for our company. We expect to announce more details some time after our Form 10 registration statement is filed with the SEC this week, as that is our main priority at present."

40. On January 24, 2014, the Company issued a press release entitled "Medbox, Inc. Launches Proactive Investor Relations Program." The press release announced that the Company had engaged Hayden IR and RedChipCompanies, Inc., "***two independent firms to handle ongoing corporate messaging and investor relations***" and "***to raise the visibility of Medbox with the investment community.***" The press release continued, quoting Defendant Bedrick stating that the Company retained these firms who he referred to as "proven IR counsel" to "***help [the Company] raise [its] visibility in the investment community, communicate [its] investment thesis and broaden [its] shareholder base.***"

41. On February 13, 2014, the Company issued a press release announcing that Defendant Iwanski had been appointed CFO, stating in pertinent part that he had "approximately 10 years of public accounting experience with the Big 4 firm of KPMG LLP" and quoted Defendant Mehdizadeh stating that the Company had now "worked with … Tom for several months, and [that he] add[ed] *proven ... financial management and public company oversight….*"

42. On the morning of February 18, 2014, the Company issued a press release entitled "Medbox, Inc. Commends Obama Administration for New Guidelines Enabling Banks to Deal with Businesses that Legally Sell Marijuana," in which the Company lauded the Obama administration "for its forward-thinking action to ease the issues that banks currently have in doing business with dispensary operators which Medbox directly serves." The press release referenced recent rules issued by the Treasury and Justice Departments

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

which the Company said would open the door for "lawful marijuana businesses to have access to the American banking system." The press release also promoted upcoming appearances by Defendant Bedrick on CNBC's Closing Bell on Tuesday, February 18 at 4:40 p.m. Eastern Standard Time, and Fox Business on Wednesday, February 19 during the 4:00 p.m. hour, Eastern Standard Time.

43. Later on February 18, 2014, *Citron Research* issued a scathing report entitled "Busting Medbox," accusing Medbox of keeping three sets of books and stating, among other things, that "systemic fraud" and stock promotion had facilitated the Company's then $1 billion market capitalization.

44. Later that day, following the publication of the *Citron Research* report, on February 18, 2014, the Company issued a press release entitled "Medbox Responds to Critics and Issues Status Update to Company Shareholders," which stated in pertinent part as follows:

> Medbox … issued a status update to its shareholders on past, present, and future projects. ***Company executives also commented on bloggers looking to discredit the company for financial gain and law firms looking to capitalize on misinformation in order to solicit clients.***

> The following is a summary of key events occurring in recent weeks:

> • Medbox filed its Form 10 with the SEC in January ***and will be an SEC filer, with all the burdens and benefits that result from that status, as of mid-March 2014.***

> \* \* \*

> Company executives clarified their position on the restatement of financials that accompanied the Form 10 registration statement filed with the SEC as a maturation process in becoming an SEC filer.

> "The company undertook a project to bring all accounting functions in house and during that lengthy process we discovered some errors in accounting which we have since corrected in the latest financials included in the Form 10. ***The point is getting it right and being fully transparent with our shareholders at all times***," stated Vincent Mehdizadeh, Board Chairman at Medbox, Inc. ***"The company has, as part of those corrections, instituted better controls over financial reporting to avoid further corrections.*** In addition, it is important to note that revenues for the nine months of 2013 had increased over the comparative period of the prior year (as corrected) and we are continuing to add skilled people to accelerate our growth in 2014.

14

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Unfortunately, when you are the most visible company in the space, with a large market capitalization, you become a target."

*Company executives caution company shareholders that while the media has been extremely supportive of Medbox as one of the only viable medical marijuana related public companies, with success there will always be opponents that publish deceptive and misleading articles about the company and its executives.*

In addition, company executives clarified that the company offers support services to the medical marijuana sector on an arm's length basis. Often times in a state where applications are being accepted for marijuana dispensary licensing, some landlords would not lease to the newly formed non-profit entities formed for the company's clients. As a result, in some rare instances and simply as an absolute benefit to their clients, it was agreed that Medbox would lease the properties and assign all rights to the applicant, with the permission of the landlord.

"We go the extra mile for our clients and that is evident through our glowing testimonials displayed on our websites," stated Dr. Bruce Bedrick, CEO at Medbox, Inc. "Interestingly, with the recent banking policy guidance by the federal government, we can now start to develop an additional revenue stream of acquiring properties and leasing to our dispensary operator clients. This is one of many revenue streams that Medbox is actively developing given the current climate and relaxed federal posture."

45.     Following the news of the day, shares of Medbox decreased from an opening price of $33.42 per share to close at $29.80 per share on February 18, 2014.

46.     On March 10, 2014, the Company issued a press release entitled "Medbox Issues Shareholder Update – Board to Pursue Listing on Major National Exchange During 2014."   The release stated in pertinent part as follows:

… Medbox … today announced an update on pending projects, *SEC reporting status*, and other strategic items:

• The Company's Form 10 registration statement filed with the SEC will be effective as of March 22, 2014. The Company expects to respond to SEC comments and file audited 2013 year-end financials on a Form 10-K by the end of March.

• *The board of directors is seeking to list Medbox with the NASDAQ Capital Markets or another national exchange by the end of 2014.*

---

15

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- ***The Company added public company experience with the additions of Thomas Iwanski at CFO***, Matt Feinstein at Vice President, and also Mitch Lowe as the Company's first independent director.

\*     \*     \*

"The last 90 days have been highly productive, and Medbox continues to lead this burgeoning new industry," stated Vincent Mehdizadeh, Board Chairman at Medbox, Inc. "We continue to take the steps to set Medbox apart from others in the industry, ***ensuring that we have the appropriate controls and resources in place*** and adding seasoned talent to lead future growth."

Dr. Bruce Bedrick, Medbox President and CEO, added, ***"With the effectiveness of our Form 10 later this month, Medbox will be a fully reporting company. Our pending status as a future SEC filer, as well as key additions to our management team, are important steps for strengthening the legitimacy of Medbox and increasing our ability to reach new investors and clients. We look forward to continuing to exceed expectations in the coming months."***

47.    On March 26, 2014, the Company issued a press release entitled "Medbox Completes SEC Filing Requirements – Company's amended Form 10 registration statement and audited 2013 financials to be filed with SEC by March 31, 2014," which stated in pertinent part as follows:

… Medbox … today announced that it has ***completed the requisite steps to formally become a fully-reporting company*** as of March 24, 2014 and is now subject to the Securities and Exchange Commission reporting requirements.

On March 25, 2014, Medbox filed its requisite Form 3's. The Company expects to file its amended Form 10 registration statement, along with audited full-year 2013 financials, by March 31, 2014.

"This is a key step in our goal of listing our shares on a national exchange, and ***further evidence of our goal to maintain the highest standards for corporate governance and transparency***," stated Vincent Mehdizadeh, Chairman and COO of Medbox, Inc. "It is of special importance to me personally that ***we are one of the only fully reporting public companies*** that has generated considerable revenues in the marijuana ancillary services sector and demonstrated an executable business plan. ***Our main subsidiary, Medicine Dispensing Systems, has turned a profit every year since commencing operations in 2010.*** These key differences set us apart from our competitors."

48.    On March 31, 2014, the Company filed a Form 10 with the SEC purporting to report its fiscal 2013 financial results.  The Form 10 stated in

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

pertinent part that "[r]evenue increased $2,633,196, or 101.65%, to $5,223,775 for the twelve months ended December 31, 2013, from $2,590,579 for the twelve months ended December 31, 2012, primarily as a result of the completion of contracts for [its] Arizona customers" and that the "main reason for the increase in revenues was a change in volume, because there were no changes in pricing policies." The Form 10 was signed by Defendant Bedrick.

49.   On April 1, 2014, the Company issued a press release announcing its 4Q and fiscal 2013 financial results for the period ended December 31, 2013 entitled "Medbox Generates 102% Increase in Revenue for Fiscal 2013 – Company increases inventory, expands sales and marketing infrastructure, to set the stage for additional growth." The release stated in pertinent part as follows:

> … Medbox … today announced record full-year revenue. Medbox included its audited numbers for the year ended December 31, 2013 in its amended Form 10 filing with the Securities and Exchange Commission.
>
> **Recent Operational highlights:**
>
> - On March 24, 2014, the Form 10 registering Medbox's shares of common stock became effective with the Securities and Exchange Commission and ***Medbox is now a fully-reporting public company***.
>
> - ***The Company added public company experience, naming Thomas Iwanski as CFO***, Matt Feinstein at Vice President, and also Netflix co-founder and former Redbox president Mitch Lowe as the Company's first independent director.
>
> \*     \*     \*
>
> "This was a productive and exciting year for Medbox, and the first 90 days of 2014 have been even more productive," commented Dr. Bruce Bedrick, Chief Executive Officer of Medbox. "We have solidified our position as the industry leader, and ***in the last three months we have taken specific steps to improve corporate governance, expand transparency and deliver shareholder value***. During the rest of 2014 we will grow organically, taking advantage of the tremendous momentum in the industry. We will also leverage our reputation, presence in the industry, and our relationships to develop new revenue streams. ***This will be an exciting year for Medbox,*** its clients ***and its shareholders***."
>
> ***Full-year revenues were $5.2 million, a 101.7% increase compared to $2.6 million last year. The increase in revenues was due to***

*primarily the result of recognizing revenue deferred from 2012 related to the completion of contracts for Arizona customers which was delayed by court action that was not resolved until 2013. Gross profit for 2013 was $2.6 million, or 50.5% gross profit margin, compared to gross profit of $1.5 million, or 59.4% gross profit margin for 2012.* The change in gross profit margin was due to increased costs related to the build-out of locations for clients and delays in implementing the Arizona program related to the litigation.

Total selling, general and administrative expenses were $3.2 million, or 61.2% of total revenues, compared to total selling, general and administrative expenses of $1.9 million, or 72.5% of total revenues last year. *The loss from operations for the year was $(560,000), compared to a loss from operations of $(340,000) last year. Net loss for the year was $(557,000), or $(0.02) per basic and $(0.01) per diluted share, compared to a net loss last year of $(344,000), or $(0.01) per basic and diluted share, last year.*

While *the Company's largest operating subsidiary, Medicine Dispensing Systems, remained profitable with a pretax profit of $948,443*, the net loss for 2013 included $1.2 million in losses from the parent company's operations, related primarily to accounting and SEC attorney legal fees (related to the filing of, and subsequent withdrawing of, a Registration Statement on Form S-1, and the filing of a Form 10 registration statement in order to register the common stock of Medbox) and additional legal fees (related to litigation on behalf of Arizona clients to allow them to move forward with dispensary licenses the state of Arizona had awarded). In addition, the Company's Vaporfection subsidiary, acquired on April 1, 2013, recognized a net loss of $317,000 for nine months of operations.

*"Our primary subsidiary, Medicine Dispensing Systems, has been profitable each year since commencing operations in 2010, and remains profitable today,"* added Vincent Mehdizadeh, Chairman and Chief Operating Officer of Medbox, Inc. "However, public company costs, expenses related to financing efforts, and legal fees related to Arizona litigation resulted in a net loss for the public company. We do not expect these expenses to impact our 2014 results, however, we are growing our infrastructure in anticipation of future growth, and expect additional fees related to public company costs as the Company pursues a listing on a national exchange.

**Fourth Quarter Financial Results**

*Revenues for the fourth quarter ending December 31, 2013 increased to $423,000 compared to $47,250 for the same period of 2012. The increase in revenues was due to an increased number of contracts signed and initial non-refundable consulting fees. Gross profit for the quarter was $278,000, or 65.7% gross profit margin,* compared to a negative gross profit of $(508,000), or (10.8%) negative gross profit margin, in the fourth quarter of 2012. This was partially due to deferral of some revenue for Arizona contracts from 2012 to 2013 because of Arizona licensing stoppages by their authorities.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Total selling, general and administrative expenses significantly increased by $657,007 in the fourth quarter of 2013 compared to the same period of 2012, this is due to the fact that the Company incurred higher general and administrative expenses related to raising capital and regulatory compliance as described above.

**Net loss for the fourth quarter of 2013 was $(513,000) or $(0.02) per basic and $(0.01) per diluted share, compared to a net loss of $(533,000) or $(0.02) per basic and $(0.01) per diluted share for the fourth quarter of 2012.**

50.    On or about April 10, 2014, Defendant Mehdizadeh resigned as COO and as a director of the Company, but was appointed as "Senior Strategist and Founder" of Medbox.

51.    On May 15, 2014, the Company issued a press release announcing its 1Q 2014 financial results for the period ended March 31, 2014.  The release stated in pertinent part as follows:

**Recent Operational Highlights:**

\*        \*        \*

- On March 24, 2014, the Form 10 registering Medbox's shares of common stock became effective with the Securities and Exchange Commission and **Medbox is now a fully-reporting public company**.

\*        \*        \*

- Began providing company information via S&P Capital IQ Corporation Records Listing Program **to increase visibility to the institutional investment community**.

\*        \*        \*

"We continued to establish the company as the leader in the rapidly growing legitimate marijuana industry **while increasing our transparency to the investment community and position in the capital markets**," commented Dr. Bruce Bedrick, Chief Executive Officer of Medbox. "As this industry continues to evolve and redefine itself, Medbox is strategically positioned as the partner of choice with a growing array of solutions, technologies and services."

Dr. Bedrick continued, "Across the country, states and municipalities evolve regulations regarding medical and recreational marijuana, and often struggle with the best ways to manage this change and address reasonable concerns. The results we are reporting today are somewhat overshadowed by accounting provisions necessitated by changes in the business and legal environment in one of the markets in which we

19

operate. ***Medbox stands at the forefront of this industry, offering solutions that help dispensary operators and cultivators maintain compliance and records that exceed regulatory requirements.***"

**First Quarter Financial Results**

***First quarter gross revenues were $1.3 million, a 3.9% increase compared to $1.2 million in the first quarter of 2013.*** Due to changes in a final adopted ordinance in the San Diego market, the total number of licenses to be awarded by the city was reduced by over 75% as well as the likelihood of securing properly zoned locations. As a result of not being able to satisfy the demand of the company's clients in that market, Medbox recorded a provision for sales allowances of approximately $963,000, resulting in a reduction of revenues for the quarter.

*      *      *

***Net loss for the first quarter of 2014 was $(1.3) million or $(0.04) per basic and $(0.03) per diluted share, compared to a net loss of $(330,380) or $(0.01) per basic and $(0.01) per diluted share for the first quarter of 2013.***

52.    On May 15, 2014, the Company filed a quarterly financial report with the SEC on Form 10-Q reporting financial results significantly similar to those reported in the press release.  The Form 10-Q was signed by Defendants Bedrick and Iwanski.

53.    On Friday, May 16, 2014, the SEC issued a report warning of "possible scams involving marijuana-related investments" and quoting Elisha Frank, co-chair of the SEC Enforcement Division's Microcap Fraud Task Force as stating "[w]henever we see incomplete or misleading disclosures, we act quickly to protect investors."  Medbox would close down at $16.11 per share on Monday, May 19, 2014, from its previous close of $17.52 per share on May 16, 2014.

54.    On July 1, 2014, Medbox issued a press release entitled "Medbox Becomes a Fully Reporting Public Company – Company's Form 10 deemed effective by SEC," which stated in pertinent part as follows:

… Medbox … today announced that the company's Form 10 filing has been deemed effective by the Securities and Exchange Commission, with no outstanding comments left to address.

Dr. Bruce Bedrick, CEO of Medbox, commented, "This step is another milestone for our Company as we continue to build market leadership in the cannabis industry. ***We believe that compliance and transparency are important … for Medbox to grow as a public company.***"

55.     Later that month, on July 24, 2014, the Company announced that Defendant Bedrick was stepping down as the Company's President and CEO and that Defendant Marsala, who investors were assured had "a track record of driving exceptional results in both public and private companies by implementing Fortune 500 company best practices at early stage and middle market companies," would take his place.  The Company also announced that Defendant Marsala had been appointed to the Board and subsequently elected to serve as its Chairman.  Following his resignation as President and CEO of the Company, in August 2014, Defendant Bedrick also stepped down from Medbox's Board.  Defendant Bedrick, however, remained with the Company as a "consultant."

56.     In July and September 2014, the Company was able to facilitate the sale of $5.5 million in convertible debentures in private placements.

57.     On August 15, 2014, the Company issued a press release entitled "Medbox Files 10-Q and Announces Quarterly Conference Call."  The Form 10-Q Medbox filed with the SEC that day for the financial period ended June 30, 2014 was signed by Defendants Marsala and Iwanski and reported that the Company had achieved revenues of $434,448 and a net loss of $1.4 million in 2Q 2014.  The Management Discussion and Analysis ("MD&A") section of the Form 10-Q stated in pertinent part that "[r]evenue was down for the current period as delays in adoption of final regulations in certain states and the ultimate timing of the application process in states with final regulations reduced and delayed the opportunity to apply for new licenses and consequently delayed the notice of the results of any license application made."  The MD&A section also stated that "revenue was further reduced by additional sales allowances and

refunds recorded due to a legislative change in the San Diego market area which reduced the ability of certain clients to obtain licenses and triggered certain contract refunds."

58.    On or about October 17, 2014, the Company disclosed that Defendant Mehdizadeh had resigned as an officer of Medbox but that he would continue to serve the Company as a consultant with the title of "Founder and Senior Advisor."

59.    On or about October 21, 2014, the Company disclosed that Medbox's CFO, Defendant Iwanski – who was just hired in that capacity by the Company in February 2014 – was being replaced by Defendant Mitchell. Defendant Iwanski, like Defendants Mehdizadeh and Bedrick before him, would stay on as a consultant.

60.    Thereafter, on Friday, October 31, 2014, following market close, the Company filed a Form 8-K with the SEC disclosing that on October 27, 2014, the Board appointed a special board committee to investigate "(i) a letter from a former Company employee to the Securities and Exchange Commission alleging wrongdoing by a former officer of the Company who is currently a consultant to the Company, and (ii) a federal grand jury document subpoena served in August 2014 on the Company's accountants by the U.S. Department of Justice, to ascertain what implications, if any, the subpoena or the letter may have with respect to the Company."

61.    On Monday, November 3, 2014, before market open, the Company issued a press release entitled "Medbox Comments on Recent 8-K Filing."  The press release attempted to minimize the potential impact of the letter from the former employee to the SEC, quoting Defendant Mehdizadeh who stated that "[t]he former employee vowed to retaliate against the Company in any way he could after his illegal cash demands of the company were ignored.    It now appears that writing a letter to government agencies filled with factual

1   inaccuracies and blatant falsehoods was the most effective way to facilitate that

2   goal."   The press release continues noting that "[c]urrent management

3   commented that the Company ha[d] not found any indications that the subject

4   matter contained in the [former employee's] letter [was] true concerning the

5   conduct of prior officers of the company."  With respect to the subpoena served

6   in August 2014 on the Company's accountants by the U.S. Department of

7   Justice, the Company, in the press release "clarified that no subpoenas have been

8   served on the Company, it's current or former officers, or anyone affiliated to

9   the Company."  The press release ends by quoting Defendant Mehdizadeh, who

10  reassures that he:

11      "painstakingly put together the best management team and Board of
        Directors in our sector for a reason, and in their judgment this
12      voluntary disclosure is what good public companies that have nothing
        to hide should do. The company will continue to demonstrate to
13      shareholders, the investment community, and all other public
        company participants in the cannabis sector, how a well-run and
14      respectable public company should operate. Medbox has and will
        continue to be the gold-standard for accountability."

15

16  62.   Despite the pre-market press release on November 3, 2014, Medbox

17  stock still closed down at $12.45 per share for its previous close of $13.95 per

18  share on October 31, 2014.   Shares continued to fall as the financial media

19  reported on the ensuing SEC investigation and the market impacted the full

20  import of the disclosures, with the price of Medbox stock closing at $9.20 per

21  share on November 5, 2014.   However, the price of Medbox stock remained

22  artificially inflated.

23  63.   On November 7, 2014, Medbox filed a Current Report on Form 8-K

24  with the SEC stating, "[t]he news release issued Monday, November 3, 2014

25  under the headline "Medbox Comments on Recent 8-K Filing" **was not**

26  **authorized by Medbox, Inc.** (the "Company") for distribution. The 8-K filed by

27  the Company on Friday, October 31, 2014, should be used as a reference for

28

information regarding this matter. The filing is available on the website of the Securities and Exchange Commission."

64.     On November 12, 2014, the Company filed a quarterly financial report on Form 10-Q with the SEC reporting its financial results for its 3Q 2014 ended September 30, 2014.  The Form 10-Q, was signed by Defendants Marsala and Mitchell and stated that MedBox had achieved net revenues of $107,429 and a net loss of $3.2 million for the quarter.  The MD&A section of the Form 10-Q also stated in pertinent part as follows:

> Revenue was down for the current period partially due to delays in adoption of final regulations in certain states and delays in approving license applications.  Additionally, the Company's revenue model is significantly different in the third quarter of 2014 as compared to third quarter of 2013.  This difference is mainly due to the fact that the Company is moving away from the business model of obtaining licenses for clients for a one-time upfront fee.  The Company is in the process of modifying its business model to provide ongoing management and support services for clients so that the consulting contract would continue in perpetuity.  During the transition period to a new business model, expenses to secure new contracts and licenses are incurred and revenue is deferred principally until new licenses are obtained and new dispensaries and cultivation centers begin operating.

65.     The true facts, which were known by Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     Medbox was recognizing revenue before earned on certain customer contracts;

(b)     Medbox lacked effective internal controls;

(c)     Due to its false financial reporting, Medbox was not complying with Generally Accepted Accounting Principles or SEC rules and regulations during the Class Period and, as such, was not eligible for listing on a national stock exchange;

(d)     Due to its financial misstatements, Medbox was not in compliance with its debt covenants; and

(e)     As a result, Medbox was not on track to achieve its financial targets during the Class Period.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    66.    Before the opening of trading on December 30, 2014, the Company

2  issued a press release entitled "Medbox, Inc. to Amend and Restate Prior Period

3  Financial Statements."  The release disclosed in pertinent part as follows:

4       Medbox … today announced it will amend and restate its financial
        statements for the year ended December 31, 2013, the third and fourth
5       quarters of 2013 and the first three quarters of 2014.

6       In October, 2014, the Board of Directors of the Company appointed a
        special board committee (the "Special Committee") to investigate a
7       federal grand jury subpoena pertaining to the Company which was
        served upon the Company's accountants, as well as certain alleged
8       wrongdoing raised by a former employee of the Company. Thereafter,
        the Company received subpoenas from the federal grand jury and the
9       Securities and Exchange Commission. In connection with its
        investigation of these matters, the Special Committee, in conjunction
10      with the Audit Committee, initiated an internal review by
        management and by an outside professional advisor of certain prior
11      period financial reporting of the Company.

12      ***Medbox's audit committee, upon management's recommendations,
        has concluded that the consolidated financial statements for the
13      year ended December 31, 2013 and for the third and fourth quarters
        of 2013 as well as for the quarters ended March 31, 2014, June 30,
14      2014 and September 30, 2014, should no longer be relied upon and
        will be restated to correct the errors. As part of the investigative
15      process, Medbox will also examine the financial statements for 2012
        and for the first two quarters of 2013 and, if necessary, correct those
16      as well.*** The company intends to correct the errors in its financial
        statements to bring them into conformity with accounting principles
17      generally accepted in the United States of America (GAAP) and SEC
        regulations. Medbox plans to engage an independent CPA firm to
18      consult with and assist the Company's staff with preparing restated
        financial statements as soon as possible.

19
        ***Medbox stated that it appeared that revenue had been recognized too
20      soon on some customer contracts. The restated financial statements
        will recognize revenue at a later time as up-front payments are
21      recognized over the longer of the contract period or the customer
        relationship, revenue is deferred until key contingencies are
22      removed and it is clear the revenue has been earned in accordance
        with GAAP and SEC regulations.*** Other adjustments to its financial
23      statements are also possible in connection with the Company's on
        going review of its prior period financial statements.

24
        The Company's announcement that prior period financial statements
25      can no longer be relied upon ***permit the Company's existing lenders
        to trigger default remedies***, however, ***the Company's lenders have
26      agreed to forbearance on declaring a default pending conclusion of
        on-going discussions to refinance the Company***.

27

28
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Guy Marsala, CEO of Medbox commented, "The steps we are announcing today are part of the ***continued initiative of our new board of directors and new management team to implement better controls and emphasize transparency***. Improved processes and controls contributed to our ability to uncover these errors and bring them to the attention of our independent auditors and audit committee."

67.    On this news, the price of Medbox stock declined precipitously, trading as low as $4.50 per share during intraday trading on December 30, 2014 and closing at $6.39 per share, ***down $89 per share*** from its January 8, 2014 Class Period high of $93.50 per share – ***representing a loss market capitalization loss of more than $2.8 billion***.

## NO SAFE HARBOR

68.    Medbox's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

69.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Medbox who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

70.   As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Medbox, their control over, and/or receipt of modification of Medbox's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Medbox, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

71.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)   Plaintiff and other members of the Class purchased Medbox common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

72.     At all relevant times, the markets for Medbox common stock were efficient for the following reasons, among others:

(a)     Medbox filed periodic public reports with the SEC, claiming to be a "Fully Reporting Company" in July 2014;

(b)     Medbox regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, and its founder and former COO Defendant Mehdizadeh, as well as former President and CEO Defendant Bedrick, regularly appeared on financial media news outlets and was quoted in significant financial media;

(c)     On January 24, 2014, the Company issued a press release entitled "Medbox, Inc. Launches Proactive Investor Relations Program" which quoted Defendant Bedrick stating that the Company had "retain[ed] ***proven IR counsel to help [it] raise [its] visibility in the investment community, communicate [its] investment thesis and broaden [its] shareholder base.***"

73.     As a result of the foregoing, the market for Medbox common stock promptly digested current information regarding Medbox from publicly available sources and reflected such information in Medbox's stock price. Under these circumstances, all purchasers of Medbox common stock during the Class Period suffered similar injury through their purchase of Medbox common stock at artificially inflated prices, and a presumption of reliance applies.

**LOSS CAUSATION**

74.     During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Medbox's business fundamentals and engaged in a scheme to deceive the

market.  Defendants knowingly misstated the Company's then-present business metrics in order to improve the market's perception of Medbox's worth.

75.   By artificially inflating and manipulating Medbox's stock price, Defendants deceived Plaintiff and the Class and caused them losses when the truth was revealed.  When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market through partial disclosures throughout 2014, Medbox's stock price declined precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of Medbox securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

76.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of those who purchased or otherwise acquired Medbox common stock between November 20, 2013 and December 29, 2014, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

77.   Class members are so numerous that joinder of them is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Medbox or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice that is customarily used in securities class actions.

78.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class include whether Defendants:

> (a)    violated the Exchange Act;
>
> (b)    omitted and/or misrepresented material facts;
>
> (c)    knew or recklessly disregarded that their statements were false;
>
> (d)    artificially inflated the price of Medbox common stock; and
>
> (e)    the extent of and appropriate measure of damages.

79.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

80.    Plaintiff will adequately protect the interests of the Class and has retained counsel competent and experienced in class action, shareholder, and securities litigation.

81.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, prosecution of individual actions would create a risk of inconsistent adjudications.  Additionally, since the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against All Defendants**

82.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

83.    Throughout the Class Period, Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Medbox common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

84.    During the Class Period, Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Medbox common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Medbox common stock at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.    All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

85.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Medbox's operations and performance that would be material to

31

investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

86. Medbox and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

87. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Medbox common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Medbox common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Medbox and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Medbox stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

88. Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Medbox and the Individual Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Medbox shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

89.    By virtue of the foregoing, Medbox and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

### COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

90.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

91.    The Individual Defendants had control over Medbox and made the material false and misleading statements and omissions on behalf of Medbox within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their controlling shareholder statuses, executive positions, board memberships, and stock ownerships, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

92.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

93.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members

33

1  of the Class suffered damages in connection with their purchases of the
2  Company's common stock during the Class Period.

3  ## PRAYER FOR RELIEF

4  WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for
5  judgment as follows:

6  A.  Determining that this action is a proper class action, designating
7  Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under
8  Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead
9  Counsel;

10  B.  Awarding compensatory damages in favor of Plaintiff and the other
11  Class members against all Defendants, jointly and severally, for all damages
12  sustained as a result of Defendants' wrongdoing, in an amount to be proven at
13  trial, including interest thereon;

14  C.  Awarding Plaintiff and the Class their reasonable costs and
15  expenses incurred in this action, including counsel fees and expert fees; and

16  D.  Awarding such other and further relief as the Court may deem just
17  and proper.

18  ## JURY DEMAND

19  Plaintiff demands a trial by jury.

20

21  Dated:  January 21, 2015          JOHNSON & WEAVER, LLP
22                                    FRANK J. JOHNSON (174882)
                                      SHAWN E. FIELDS (255267)

23                                    _____
                                                *s/ Frank J. Johnson*
24                                    FRANK J. JOHNSON
25                                    110 West "A" Street, Suite 750
                                      San Diego, CA 92101
                                      Telephone: (619) 230-0063
26                                    Facsimile: (619) 255-1856
                                      frankj@johnsonandweaver.com
27                                    shawnf@johnsonandweaver.com

28                                    *Attorneys for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS