JOHNSON & WEAVER, LLP
Frank J. Johnson, Esq. (SBN 174882)
FrankJ@johnsonandweaver.com
Shawn E. Fields, Esq. (SBN 255267)
ShawnF@johnsonandweaver.com
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Lead Counsel for Lead Plaintiffs*

[Additional Counsel listed on signature page.]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSH CRYSTAL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MEDBOX, INC., PEJMAN VINCENT MEHDIZADEH, BRUCE BEDRICK, THOMAS IWANSKI, GUY MARSALA, and DOUGLAS MITCHELL,<br><br>Defendants. | Lead Case No.: 2:15-CV-00426-BRO (JEMx)<br><br><u>CLASS ACTION</u><br><br>**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION ... 1

II. BACKGROUND AND SUMMARY OF THE ACTION ... 2

III. JURISDICTION AND VENUE ... 7

IV. PARTIES ... 7

V. CLASS ACTION ALLEGATIONS ... 13

VI. BACKGROUND TO THE CLASS PERIOD ... 15

- A. The Emerging Marijuana Industry ... 15
- B. Medbox's Troubled History ... 17
- C. Mehdizadeh Hires "Professionals" With Their Own Shady Past ... 19
- D. Defendant Mehdizadeh's Checkered History ... 21
- E. Defendants Actively Conceal Mehdizadeh's Continued Control of Medbox's Operations ... 24
- F. Medbox's "Stroke of Luck" Success in Arizona with an Unsustainable Business Model Propels the Company Into the Limelight ... 26
- G. Defendants Improperly Recognize Revenue on Contracts ... 29
- H. Medbox Attempts to Become a Fully Listed Company Amid Numerous SEC Reprimands for Misleading Statements ... 30
- I. Medbox Launches a "Proactive Investor Relations Program" ... 32
- J. Government Agencies and Private Watchdogs Sound the Alarm About Medbox ... 35
  - 1. FINRA ... 35
  - 2. *Citron Research* ... 36
  - 3. United States Department of Justice ... 37
  - 4. The Securities and Exchange Commission ... 38
- K. The Truth is Revealed ... 38

VII. MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS ... 42

## TABLE OF CONTENTS


**Page**

VIII. THE TRUTH BEGINS TO EMERGE ..... 73

IX. THE TRUTH IS FULLY REVEALED ..... 75

X. Post-Class Period Revelations and Fallout ..... 80

XI. NO SAFE HARBOR ..... 82

XII. ADDITIONAL SCIENTER ALLEGATIONS ..... 83

A. Medbox is a Tiny Company With One Product ..... 83

B. Insider Trading ..... 84

1. Defendant Mehdizadeh's Suspicious Stock Sales ..... 93

2. Defendant Bedrick's Suspicious Stock Sales ..... 94

3. Defendant Lowe's Suspicious Stock Sales ..... 95

4. Defendant Siegel's Suspicious Stock Sales ..... 96

XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ..... 97

XIV. LOSS CAUSATION ..... 99

A. February 18, 2013 Disclosure ..... 102

B. October 31, 2014 Disclosure ..... 104

C. December 30, 2014 Disclosure ..... 105

COUNT I For Violation of Section 10(b) of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants ..... 107

COUNT II For Violation of §10(b) of The Exchange Act and Rule 10b-5 Against Defendants Mehdizadeh, Bedrick, Siegel, and Lowe ..... 109

COUNT III For Violation of §20(A) of The Exchange Act Against Defendants Mehdizadeh, Bedrick, Siegel, and Lowe ..... 111

COUNT IV For Violation of §20(a) of The Exchange Act Against the Individual Defendants ..... 116

PRAYER FOR RELIEF ..... 117

JURY DEMAND ..... 118

Court-appointed Lead Plaintiffs, Peter Phan and Paul Poon ("Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon an investigation conducted by and through Lead Plaintiffs' attorneys, which included, *inter alia*, a review of the United States Securities and Exchange Commission ("SEC") filings by Medbox, Inc. ("Medbox" or the "Company"), as well as other public filings made by the Company, media and financial reports about the Company, Company releases, conference calls, public statements issued by defendants, certain court records, and consultation with persons familiar with Medbox's business, including former employees of Medbox. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought against Medbox, seven of its current and former senior officers and directors, and former Medbox accountant, Q Accountancy Corporation ("Q Accountancy") and its founder, Timonthy Quintanilla ("Quintanilla") for violations of §§10b, 20(a), and 20(A) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. This action is brought on behalf of all purchasers of the common stock of Medbox between April 2, 2013 and December 29, 2014, inclusive (the "Class Period"). Plaintiffs bring this action against Medbox, its founder, former director, and former Chief Operating Officer ("COO"), Pejman Vincent Mehdizadeh, its former President, Chief Executive Officer ("CEO"), and director, Bruce Bedrick ("Bedrick"), its former Chief Financial Officer ("CFO"), Thomas Iwanski ("Iwanski"), its former Chairman of the Board of Directors ("Board"), former President, and former CEO, Guy Marsala ("Marsala"), its current CFO, C. Douglas Mitchell ("Mitchell"), current Board member, J.

Mitchell Lowe ("Lowe"), current Board member, Ned Siegel ("Siegel") (collectively, "Defendants"), and former Medbox accountant and Q Accountancy founder Timothy Quintanilla ("Quintanilla"). This action concerns Defendants' numerous and repeated false and misleading statements concerning Medbox's accounting, finances, internal controls, business, prospects, and outlook made throughout the Class Period.

## II. BACKGROUND AND SUMMARY OF THE ACTION

2. Medbox, through its subsidiary Medicine Dispensing Systems, sells its patented vending machines that dispense medical marijuana, software, and consulting services to pharmacies, alternative medicine dispensaries, and local governments in the United States.

3. Medbox was founded in 2011 by Defendant Mehdizadeh, a mid-30s aged Iranian immigrant with a checkered history of business failures and criminal conduct, including a felony grand theft conviction in 2013. At the start of the Class Period on April 2, 2013, Defendant Mehdizadeh was Medbox's controlling shareholder, owning approximately 65% of its common stock, and served as the Company's COO and Chairman of its Board.

4. During the Class Period, Defendants issued materially false and misleading statements regarding the Company's financial results for the fiscal year ended December 31, 2012 ("FY 2012"), December 31, 2013 ("FY 2013") and each of the interim financial periods ended March 31, 2013 ("1Q 2013"), June 30, 2013 ("2Q 2013"), September 30, 2013 ("3Q 2013"), December 31, 2013 ("4Q 2013"), March 30, 2014 ("1Q 2014"), June 30, 2014 ("2Q 2014") and September 30, 2014 ("3Q 2014"). Specifically, Defendants overstated Medbox's revenues by recognizing revenue on customer contracts before it had been earned.

5. During the Class Period, Defendants also issued materially false and misleading statements or omitted material facts to make such statements not false

and misleading concerning, *inter alia*: (1) Defendant Mehdizadeh's past criminal conduct; (2) the true extent of Defendant Mehdizadeh's control over Medbox's day-to-day operations; (3) the significant deficiencies and reckless auditing practices of the Company's accounting firm, Q Accountancy, and that, despite announcing in April 2013 that Q Accountancy was being replaced as the Company's auditor, in fact, Q Accountancy remained as the Company's auditor until February 2015; (4) Medbox's complete lack of internal financial and corporate governance controls; (5) Medbox's misleading stock promotion tactics; and (6) the various governmental investigations and subpoenas issued by the United States Department of Justice, ("DOJ") and SEC during the Class Period.

6. As a result of these materially false and misleading statements and omissions identified at ¶¶5-6 above, Medbox's stock traded at artificially inflated prices during the Class Period, reaching an intraday Class Period high of $93.50 on January 8, 2014.

7. While Defendants kept the full extent of their fraud concealed throughout the Class Period, the market learned bits of the truth through several partial disclosures.

8. Initially, the price of the Company's common stock declined partially in January 2014 when the Financial Industry Regulatory Authority ("FINRA") issued an advisory concerning risks related to investing in marijuana related stocks. To keep the price of Medbox stock inflated, Defendants issued an immediate response reassuring the market that Medbox's financial reporting was sound, quoting Defendant Mehdizadeh emphasizing that: "Since day 1, our company has made its quarterly reports and financials available to the public, kept shareholders diligently informed about the company and its operating personnel at all times, offered ongoing support to its many clients, completed an audit of its financials, … and also demonstrated profitability while not deriving revenue from the cultivation or sale of the marijuana itself."

9. Thereafter, on February 18, 2014, *Citron Research* issued a report accusing Medbox of keeping three sets of books and stating, among other things, that "systemic fraud" and stock promotion had facilitated the Company's $1 billion market capitalization. Again to keep the stock price inflated, the same morning *Citron Research* issued its report, the Company issued a press release commending the Obama administration for new rules it said would ease the concerns of banks wanting to deal with businesses that legally sell marijuana. In its release, the Company noted that its CEO, Defendant Bedrick, would appear on CNBC's Closing Bell on Tuesday, February 18, and Fox Business on Wednesday, February 19. Later in the day on February 18, 2014, following the issuance of the damning *Citron Research* report, the Company issued a rebuke of the *Citron Research* report quoting Defendant Mehdizadeh claiming that while it had discovered some past accounting "errors," Medbox was now "getting it right and being fully transparent with [its] shareholders at all times" and had "instituted better controls over financial reporting to avoid further corrections." Following the news of the day, shares of Medbox decreased from an opening price of $33.42 per share to close at $29.80 per share on February 18, 2014, closing lower again on February 19, 2014 at $27.25 per share.

10. On or about April 10, 2014, Defendant Mehdizadeh resigned as COO and as a director of Medbox, but was appointed as "Senior Strategist and Founder" of Medbox.

11. The next day, on April 11, 2014, the SEC sent Medbox a letter detailing over a dozen material deficiencies in its SEC filings, including inadequate disclosure of the Company's revenue recognition and goodwill accounting policies, and inadequate disclosure of Mehdizadeh's criminal past.

12. Thereafter, the price of Medbox stock declined again, dropping from a closing price of $17.52 per share on May 16, 2014, to close down at $16.11 per share on May 19, 2014, following the Friday, May 16, 2014 issuance

of a report by the SEC warning of "possible scams involving marijuana-related investments" and quoting Elisha Frank, co-chair of the SEC Enforcement Division's Microcap Fraud Task Force as stating "[w]henever we see incomplete or misleading disclosures, we act quickly to protect investors."

13. However, with Medbox issuing press releases on July 1, 2014, claiming that it had become a "Fully Reporting Public Company" and on July 24, 2014, announcing that Defendant Marsala, who investors were assured had "a track record of driving exceptional results in both public and private companies by implementing Fortune 500 company best practices at early stage and middle market companies," had been named Chairman of Medbox's Board and was appointed as President and CEO of the Company, replacing Defendant Bedrick,[1] the price of Medbox stock remained artificially inflated, closing at $14.70 per share on July 24, 2014; the Company was also able to facilitate the sale of $5.5 million in convertible debentures in private placements during July and September 2014.

14. On or about October 17, 2014, the Company disclosed that Defendant Mehdizadeh had resigned as an officer of Medbox but that he would continue to serve the Company as a consultant with the title of Founder and Senior Advisor.

15. Then, on or about October 21, 2014, the Company disclosed that Medbox's CFO, Iwanski – who was just hired in that capacity by the Company in February 2014 – was being replaced by Defendant Mitchell, though Iwanski too would stay on as a consultant.

16. Thereafter, on October 31, 2014, the Company disclosed that it had appointed a special board committee to investigate a letter from a former Company employee to the SEC "alleging wrongdoing by a former officer of the

[1] Following his resignation as CEO, in August 2014, Defendant Bedrick also resigned from Medbox's Board. Following his resignation from the Board, the Company announced that Defendant Bedrick would continue to serve as a consultant.

Company who [was] a consultant to the Company" ***and*** that "a federal grand jury document subpoena [had been] served in August 2014 on the Company's accountants by the U.S. Department of Justice…."

17. On November 3, 2014, a press release was issued stating it was released by Medbox entitled "Medbox Comments on Recent 8-K Filing" which claimed that the former employee who sent the letter to the SEC had done so in retribution for Medbox's refusal to pay him a cash settlement, quoting Defendant Mehdizadeh, and further stating that "[c]urrent management commented that the Company ha[d] not found any indications that the subject matter contained in the [former employee's] letter [was] true concerning the conduct of prior officers of the company."

18. Meanwhile, shares of Medbox fell $1.50 per share from their October 31, 2014 closing price of $13.95 per share, or 10.8%, to close at $12.45 on November 3, 2014. Shares fell another $3.25 per share on November 5, 2014 as the financial media reported on the ensuing SEC investigation and the market absorbed the full impact of the disclosures.

19. Then, on November 7, 2014, Medbox filed a Current Report on Form 8-K with the SEC stating the November 3, 2014 press release, which quoted Defendant Mehdizadeh, ***had not been*** "authorized by Medbox."

20. Finally, on the morning of December 30, 2014, before the opening of trading, Medbox issued a press release disclosing that it would be forced to restate ***the past five quarters*** of financial reports and potentially its "financial statements for 2012 and for the first two quarters of 2013…as well." The Company further disclosed that the earnings restatement had triggered a default on its debt covenants that had forced it to seek forbearance from lenders. The release stated that the "steps [being taken were] part of the continued initiative of [Medbox's] new board of directors and new management team to implement better controls and emphasize transparency."

21. As a result of Defendants' false statements, Medbox stock traded at fraud-inflated levels during the Class Period. However, as the market learned the truth, Medbox stock was hammered by massive sales, sending them down more than 95% from their Class Period high to trade as low as $4.50 per share in intraday trading on December 30, 2014.

## III. JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20(A) of the Exchange Act 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

24. Venue is proper in this district pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company maintains its principal executive offices in this District and the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

25. In addition, many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged herein, Defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## IV. PARTIES

26. Plaintiffs purchased Medbox common stock as set forth in the certifications attached as Exhibit B to the Declaration of Frank J. Johnson in Support of Peter Phan's and Paul Poon's Motion for Consolidation, Appointment as Lead Plaintiffs, and Approval of Selection of Lead Counsel (Dkt. No. 22-2) and which are incorporated herein by reference, and have been damaged thereby.

27. Defendant Medbox is headquartered at 600 Wilshire Boulevard, Suite 1500, Los Angeles, California 90017. Previously, during the Class Period, Medbox was headquartered at 8439 West Sunset Boulevard, Suite 101, West Hollywood, California 90069. During the Class Period, Medbox had more than 30.4 million shares of common stock outstanding, which shares traded in an efficient market on the Over-the-Counter-Market ("OTC Market") under the ticker symbol "MDBX." Medbox was constantly in communication with the markets and investors via Company press releases. Indeed, as Medbox itself highlighted during the Class Period, its founder, Defendant Mehdizadeh, "appeared in interviews with CNN, ABCNews, Reuters, Associated Press, NPR, and ha[d] been featured in articles appearing in Newsweek, Los Angeles Times, and the Wall Street Journal, as well as over 30 other news agencies around the world concerning [its] cutting-edge products and services." Medbox also filed periodic public reports with the SEC, and regularly issued press releases to the financial press.

28. Defendant Mehdizadeh founded Medbox in 2011 and served as a director and as its COO until April 2014, as its "Senior Strategist and Founder" until October 2014, following which he continued to serve as a consultant to the Company with the title of "Founder and Senior Advisor" through the remainder of the Class Period.

29. Defendant Bedrick served as Medbox's President and CEO from the start of the Class Period until July 23, 2014, and as a director of Medbox until August 2014, following which Bedrick continued to serve as a consultant to the Company until his consulting agreement was terminated on October 31, 2014.

30. Defendant Iwanski served as Medbox's CFO from February 2014 until his resignation on or about October 16, 2014, following which Iwanski continued to serve as a consultant to the Company.

31. Defendant Marsala was named Chairman of the Board, President, and CEO of Medbox on or about July 23, 2014. Marsala relinquished the Chairman of the Board position on December 17, 2014, but remained on the Board as a director. On July 6, 2015, the Company announced that Marsala was no longer President and CEO, and that he would no longer serve on the Company's Board.

32. Defendant Mitchell was appointed as CFO of Medbox on or about October 16, 2014, replacing Defendant Iwanski, and currently holds that position.

33. Defendant Lowe has been a director of Medbox since March 2014.

34. Defendant Siegel has been a director of Medbox since April 2014, and Chairman of the Board of Medbox since December 31, 2014.

35. Defendant Quintanilla was the founder of Q Accountancy and the primary auditor for Medbox during the Class Period. Quintanilla audited and attested to the truthfulness and accuracy of Medbox's audited financial statements in SEC filings throughout the Class Period. Quintanilla was sued by the SEC in 2012 for issuing misleading audits based on "reckless or deficient work." Then, in January 2013, Quintanilla was named as a defendant in a federal securities fraud class action, alleging violations of the Exchange Act.[2] Both the SEC action and the securities fraud class action remain pending.

36. Defendant Q Accountancy is a California corporation located at 16140 Sand Canyon Avenue, Suite 101, Irvine, California 92618. Q Accountancy was founded by Quintanilla in February 2010. As is detailed more fully herein, Quintanilla was sued by the SEC in 2012 for issuing misleading audits based on "reckless or deficient work," and then in January

---

[2] The securities fraud class action lawsuit is entitled *Penny Pace v. Timothy Quintanilla et al.*, Case No. 14-cv-02067-DOC-RNB (C.D. Cal.). The lawsuit, currently pending in this district, was initially filed in the United States District Court for the Southern District of New York.

2013, Quintanilla was named as a defendant in a federal securities fraud class action, alleging violations of the Exchange Act. Q Accountancy served as Medbox's independent auditor throughout the Class Period. Medbox replaced Q Accountancy with Marcum LLP as its independent auditor in February 2015. Following Q Accountancy's dismissal as Medbox's independent auditor, Medbox announced that it would have to restate its consolidated financial statements for the year ended December 31, 2012, together with all three, six, and nine month financial information contained therein, and the quarterly information for the first two quarters of the 2013 fiscal year.

37. Defendants Mehdizadeh, Bedrick, Iwanski, Marsala, Mitchell, Lowe, Siegel, and Quintanilla are sometimes referred to herein as the "Individual Defendants." Collectively, with Medbox and Q Accountancy, the Individual Defendants are sometimes referred to herein as "Defendants."

38. During the Class Period, the Individual Defendants, as senior executive officers, directors, and/or agents of Medbox, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning, among other things, Medbox's reckless and deficient accounting practices, Defendant Mehdizadeh's past criminal conduct and control over Medbox, lack of financial and governance controls, misleading stock promotion practices, and governmental investigations, as discussed in detail below. Because of their positions with Medbox, the Individual Defendants had access to non-public information about Medbox's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in

connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

39. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Medbox's business.

40. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and managerial positions with Medbox, each of the Individual Defendants had access to the adverse undisclosed information about Medbox's business prospects, financial condition, and performance as particularized herein, and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about Medbox and its business issued or adopted by the Company materially false and misleading.

41. The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their

issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

42. Each of the above officers and/or directors of Medbox, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, and financial condition, as alleged herein. These Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that these false and misleading statements were being issued regarding the Company and omitted material adverse facts regarding the Company, and approved or ratified these statements and failed to disclose these facts, in violation of the federal securities laws.

43. As senior executive officers and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the OTC Market and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Medbox's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Medbox's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

44. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Medbox's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the Company's business prospects and the intrinsic value of Medbox common stock, causing Plaintiffs and other members of the Class to purchase Medbox common stock at artificially inflated prices.

45. Defendants are liable for: (i) making false and misleading statements; and/or (ii) failing to disclose adverse facts known to them about Medbox. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Medbox common stock was a success, as it: (i) deceived the investing public regarding the Company's business prospects; (ii) artificially inflated the price of Medbox common stock; and (iii) caused Plaintiffs and other members of the Class to purchase Medbox common stock at artificially inflated prices.

## V. CLASS ACTION ALLEGATIONS

46. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of those who purchased or otherwise acquired Medbox common stock between April 2, 2013 and December 29, 2014, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

47. Class members are so numerous that joinder of them is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery,

Plaintiffs are informed and believe that there are hundreds or thousands of members in the proposed Class. During the Class Period, Medbox common stock was actively traded on the OTC Market, with approximately 30.4 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Medbox or by its transfer agent, Action Stock Transfer Corporation, and may be notified of the pendency of this action by mail, using the form of notice that is customarily used in securities class actions.

48. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class include:

(a) whether Defendants violated the Exchange Act;

(b) whether Defendants' publicly disseminated press releases, statements, and filings during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(e) whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(f) whether the market prices of Medbox's common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of Medbox's common stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

49. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein. In particular, Plaintiffs, and all other members of the Class, were fraudulently induced through Defendants' wrongful conduct – including the issuance of publicly available materially false and misleading statements – to purchase Medbox common stock at artificially inflated prices. While Plaintiffs and other individual members of the Class may have suffered different amounts of damages from Defendants' wrongful conduct, the type of conduct perpetrated by Defendants against Plaintiffs, the type of harm suffered by Plaintiffs, and the theories and substantive types of relief sought by Plaintiffs are all typical of and identical with those of the rest of the Class.

50. Plaintiffs will adequately protect the interests of the Class and have retained counsel competent and experienced in class action, shareholder, and securities litigation.

51. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, prosecution of individual actions would create a risk of inconsistent adjudications. Additionally, since the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. BACKGROUND TO THE CLASS PERIOD

### A. The Emerging Marijuana Industry

52. Although the sale and possession of marijuana has been illegal at the state and federal level for nearly a century, today legal cannabis is the fastest growing industry in the United States. The current value of the legal marijuana

market is estimated at $3 billion, a market which grew 74% in 2014. This rapid growth of an industry still in its nascent stages can largely be attributed to three causes:

(1) State Legalization Efforts: Currently, 23 states have legalized the sale and use of medical marijuana, and 11 more states have legislation pending in 2015. In addition, four states (Alaska, Colorado, Oregon, and Washington) have legalized the sale and possession of marijuana for recreational use.

(2) Shifting Public Attitudes: In 2014, the Pew Research found that 52% of Americans support marijuana legalization, the first time in over forty years that a majority of Americans have favored legalization.

(3) Changes in Federal Enforcement: Marijuana remains illegal under federal law and businesses selling marijuana for any purpose are subject to raids by the Drug Enforcement Agency and legal action, regardless of state law. However, in 2009, President Obama issued an executive order halting federal raids of marijuana dispensaries and otherwise significantly relaxing enforcement and prosecution of most federal marijuana laws.

53. As a result, thousands of medical and recreational marijuana dispensaries have opened around the country in the last decade. However, despite state laws legalizing the industry, these companies have continued to face significant problems ranging from allegations of selling marijuana to minors or for nonmedical purposes, failing to adhere to strict verification, control, and compliance guidelines associated with selling marijuana, and failing to maintain sufficient data for state and federal regulatory oversight.

54. In remarking on the results of the Pew Research survey, Defendant Bedrick acknowledged the need for products and services to address these

myriad issues, stating that, "At Medbox, we have created innovative methods of providing controls, verification, transparency, and compliance, so that regulations are carefully adhered to in this rapidly evolving industry."

**B. Medbox's Troubled History**

55. Medbox, through its subsidiaries, provides patented biometrically controlled medicine storage and dispensing systems to the medical and retail industries. The Company offers Medbox, a biometric medicine dispensing machine that dispenses herbal and prescription medications to individuals based on biometric identification primarily for pharmacies, assisted living facilities, prisons, hospitals, and doctors' offices. Its products also include Safe Access Storage Lockers that are used by medium to large mail-order chains; Medbox medicine storage machines; and Lockbox Rx, a storage/retrieval system that is used for prescription medication, over-the-counter medicines, and other pharmacy products. In addition, the Company provides Sample-Safe, a wall-mounted unit for use in doctors' offices; sells the point-of-sale system that includes a monitor, keyboard, credit card reader, and computer with interface; and offers Medbox OTC machines, a non-biometric machine for over-the-counter items, as well as sells various vaporizer and accessory products, such as miVape, through online and distribution partners.

56. The Medbox we know today evolved through a dizzying labyrinth of transactions beginning more than three decades ago, and involving individuals with rap sheets that would make Jordan Belfort, the "Wolf of Wall Street," blush.

57. Indeed, Medbox began life in 1977 as a Nevada corporation named Robatco, Inc. While it was originally described as a mining company, Robatco was inactive from 1982 to 1998, only to emerge in 1998 as a company seeking to "acquire computer related technology." It relocated to Bellingham, Washington,

and in 1999 Attorney Carmine Bua ("Bua") became the company's president, secretary, and a director.[3]

58. In January 2000, John Meyer replaced Bua and commenced negotiations to acquire MindfulEye.com Systems Inc. ("MindfulEye"), a publicly traded company. The transaction was completed in March 2000 and Robatco changed its name to MindfulEye. Among other things, MindfulEye sold downloadable movies through a network of shopping mall kiosks.

59. MindfulEye never reported a profitable fiscal year, and by July 2004 it had terminated its duty to file reports and schedules with the SEC. It continued to be traded as a public company on OTC Markets, but its corporate charter soon lapsed. On June 21, 2005, Peter E. Berney ("Berney") reinstated the corporate charter and took control of the dormant company. Berney, an attorney with a criminal record of securities fraud and incest, became widely known for "box jobs," in which he "would create fraudulent companies, often by hijacking dormant shells, and install nominee officers who would put much of the companies' stock into the hands of promoters. Once the stage was set, a pump and dump operation would follow." The term "pump and dump," referring the fraudulent practice of falsely promoting a company to inflate its stock price while insiders sell their shares for a profit, would later be used in 2014 to describe Mehdizadeh's actions with Medbox.

60. Berney sold the MindfulEye shell corporation to Steven Prior, who then sold it to Shannon Illingworth ("Illingworth") in 2010. Illingworth is the CEO of AVT, Inc., the company that makes Medbox's marijuana vending machines.[4] Mehdizadeh bought 50% of MindfulEye's penny stock shares in

---

[3] Bua was barred from practicing before the SEC in 2008 as a result of misconduct related to his acquisition of small "penny stock" companies.

[4] Illingworth himself served time in prison following his 1992 arrest for possession of methandrostenolone, an anabolic steroid. In recent years AVT has been the subject of

November 2011 immediately after his tax debts had been discharged in bankruptcy, and acquired the rest of the shares in August 2012 in exchange for 10 million shares of common and 3 million shares of preferred stock in the new company. Mehdizadeh then changed the company's name to Medbox. While Illingworth's ownership was noted in Medbox's Form 10 filing on April 10, 2013, Mehdizadeh's acquisition of the company was never disclosed.

**C. Mehdizadeh Hires "Professionals" With Their Own Shady Past**

61. Apparently, one of the early requirements to work for Medbox was to have a rap sheet of your own and/or a history of questionable personal financial dealings.

62. According to an article entitled "A Convicted Thief And A Chiropractor Claim Their Pot Company Isn't A One-Hit Wonder," published by the *Phoenix New Times*, Defendant Bedrick, brought on by Mehdizadeh to serve as Medbox's CEO, was arrested in New Mexico and was indicted in 1992 by the federal government for possession of marijuana with intent to sell, though Defendant Bedrick escaped prosecution when the indictment was dismissed following the court's ruling suppressing evidence finding it was illegally obtained.

63. Like Mehdizadeh, Defendant Bedrick has had issues with the IRS, with a federal tax lien being filed against him in 2008 for approximately $88,000 in unpaid taxes from 2002 and 2004.

64. For its audits and filing preparation, Medbox hired Q Accountancy, an Irvine, California based accounting firm. "But Q Accountancy had a problematic history of its own with regulators and a legacy of troubled clients. In 2012, a congressionally appointed industry watchdog group – the Public Company Accounting Oversight Board – uncovered a sweeping array of

---

enforcement actions and has seen shares of its stock tumble as a result of repeated missed filing deadlines and outsized stock sales by Illingworth's father, John.

deficiencies in Q Accountancy's auditing practices."[5] In November 2012 "the SEC sued Q's founder, Defendant Quintanilla, for issuing misleading audits based on "reckless and deficient work." *Id.* Then, in January 2013, Quintanilla was named as a defendant in a federal securities fraud class action alleging violations of the Exchange Act. Both the SEC action and the securities fraud class action remain pending. *Id.*

65. Indeed, on April 3, 2013, Medbox issued a press release via PR Newswire announcing that "***it will engage a new public company accounting and oversight board (PCAOB) auditing firm to review the previously audited financials***."[6] The Company press release continues, stating "The new firm's engagement is underway for purposes of providing audited financials for the filing of the Form 10 ***and on an ongoing basis thereafter***." With respect to Q Accountancy, the Company press releases specifically notes that, "While Q Accountancy Corporation's audit delivered an acceptable set of financial statements, ***management believes a firm more focused and supportive of emerging microcap public companies would be best suited for long term operations***" and that "***Management believes it is in the best interest of the shareholders and the company . . . to make this change***. . .." Defendant Bedrick is specifically quoted in the article stating "The point is getting the job done with the right people. ***We have identified a firm and we look forward to announcing their engagement shortly***." Despite Q Accountancy's track record of "reckless and deficient work," and despite the fact that Medbox announced that it was switching to a new auditing firm in April 2013, Medbox continued to use Q Accountancy to review and approve its financial filings with the SEC ***until February 2015***.

---

[5] Southern Investigative Reporting Foundation, "Tinkerer, Lawyer, Hustler, Lies: One Man's Path to a Dope Fortune," September 30, 2013 (available at http://sirf-online.org/2013/09/30/tinkerer-lawyer-hustler-lies-one-mans-path-to-a-dope-fortune/).

[6] All emphasis is added unless otherwise noted.

66. Mehdizadeh also hired William Smith III ("Smith") and charged him with launching a mergers and acquisitions department. At the time, Smith was the chairman of a pet insurance venture called Ensurapet, Inc. ("Ensurapet"), which the SEC removed from market listings because it failed to file annual and quarterly reports. Previously, in 2009, the Arkansas Securities Commission filed an enforcement action against Ensurapet and Smith for selling unregistered promissory notes to retail investors. The SEC also barred Ensurapet's general counsel for two years from advising publicly traded clients in 2010 for drafting misleading filings for another client.

**D. Defendant Mehdizadeh's Checkered History**

67. Defendant Mehdizadeh himself has a long, troubled history of business failures, personal financial problems, and criminal conduct, all of which Defendants actively attempted to conceal throughout the Class Period.

68. A September 30, 2013 article by the Southern Investigative Reporting Foundation, a financial investigative journalism company, summarized much of Defendant Mehdizadeh's fifteen plus year history of criminal conduct: "A search of Los Angeles area criminal records databases shows that from 1997 to 2007, Mehdizadeh was arrested or pleaded no contest for breaking and entering, solicitation, trespassing and credit card fraud."

69. For example, in 2006 Mehdizadeh was arrested for solicitation of a prostitute and criminal trespassing with intent to injure. He pled "no contest to both charges, was given two years probation and paid thousands of dollars to retrieve his impounded car." *Id.*

70. The following year, in 2007, Mehdizadeh ran into legal trouble again after "he failed to produce a clear title to a car he was selling yet accepted a credit card payment for the vehicle anyway." *Id.*

71. Perhaps most troubling is Defendant Mehdizadeh's penchant for fraudulently advertising himself as a licensed attorney. Throughout the 2000s,

while running a medical marijuana dispensary company named Herbal Nutrition Center, Mehdizadeh repeatedly represented himself in promotional literature as "Vincent Mehdizadeh, J.D." and stated that "I have a law degree and made managing partner in my firm before the age of 26." *Id.* Mehdizadeh has never attended law school and neither possesses a law degree nor a license to practice law. In 2007, the Drug Enforcement Agency raided Herbal Nutrition Center, and shut it down in part because of Mehdizadeh's false portrayal as an attorney.

72. During approximately the same period, Mehdizadeh was sued in connection with a medical dispensary transaction "in which he was accused of posing as a lawyer and a real estate agent at different times." *Id.* He eventually paid $350,000 to the plaintiffs to resolve the action. *Id.*

73. In addition, from approximately 2002 to 2009, Mehdizadeh and his father ran a company calling itself "Active Lawyers Referral Service," whereby Mehdizadeh fraudulently represented himself as a lawyer and took legal fees from individuals in exchange for providing quasi-legal advice. As the Southern Investigative Reporting Foundation explained:

> In the spring of 2010, exasperated police detectives from all over Los Angeles began phoning the county's consumer affairs department to complain that an outfit calling itself the Active Lawyers Referral Service had misled its working-class customers from 2005 to 2008 by referring them to a law firm that billed them for work—but never finished the job. Their tales got positively woolly: Several claimed that Pejman Vincent Mehdizadeh, the founder of the referral service and the manager of the law firm, had posed as a lawyer and his father, Parviz, had given them legal advice as they sought work visas. (Pejman and Parviz use the names Vincent and Paul, respectively, for business.)

*Id.*

74. Mehdizadeh and his father were eventually arrested on fifteen felony counts, including two counts of grand theft, in connection with their actions running the Active Lawyers Referral Service. On June 21, 2013, the Los Angeles County District Attorney's Office shed some light on the case. The

press release, titled, "Father, Son Plead to Criminal Charges in $450,000 Unauthorized Practice of Law Case," stated in pertinent part:

> A father and son accused of stealing $450,000 from more than a dozen victims by offering unlicensed legal services pleaded no contest today, the Los Angeles County District Attorney's Office announced.
>
> Pejman Mehdizadeh, 35, of Los Angeles, told victims he was a licensed attorney or that he worked with one and that he could provide a variety of services – including obtaining green cards, loan modifications and divorces. His father, Parvis Mehdizadeh, 78, of Calabasas, assisted. Between 2002 and 2009, they took payments from 15 victims ranging from $2,000 to $200,000.
>
> . . .
>
> The younger Mehdizadeh pleaded no contest to two counts of felony grand theft and admitted a special allegation of engaging in a pattern of related felony conduct involving takings in excess of $100,000. Los Angeles County Superior Court Judge Robert J. Perry immediately sentenced him to four years in state prison, suspended, and five years of formal probation.

75. Remarkably, after pleading no contest to two counts of grand theft and specially admitting to "engaging in a pattern of related felony conduct involving takings in excess of $100,000," Mehdizadeh issued a defiant press release on July 29, 2013 claiming that, '"[a]fter three years of intense scrutiny into my personal and business life, the District Attorney's office finally gave up and conceded that I wasn't the person that they portrayed me to be.'"[7] As discussed below, this self-serving and wildly misleading press release foreshadowed Mehdizadeh's approach when issuing materially false and misleading statements on behalf of Medbox.

76. Mehdizadeh has not done better with honesty and transparency in his personal financial dealings. In 2010, he filed for bankruptcy protection stemming from "just under $2 million in back taxes owed the IRS for the 2003 to 2007 tax years."

[7] The Dispensing Solution, "Target of LA Criminal Investigation Has 13 Felony Counts Dismissed and Walks Away Vindicated" (available at http://www.thedispensingsolution.com/wp-content/uploads/2013/07/Vincent-PR.pdf).

77. In addition to making questionable hiring decisions shortly after acquiring Medbox, Mehdizadeh has also made massive unscrupulous and self-serving Medbox stock transactions in the Company's short history. Calling it "the share transfer incident," the Southern Investigative Reporting Foundation explained:

> When Mehdizadeh and the Los Angeles district attorney's office negotiated a plea in the legal advisory firm case, Mehdizadeh transferred Vincent Chase Inc., a holding company possessing more than 7 million shares of company stock, to Bedrick, Medbox's chief executive. (Mehdizadeh had named the holding company after the lead character in the HBO series *Entourage* — an interesting choice, given the character's drug habit and prodigious love life.)
>
> In effect for only two months and disclosed only briefly in the S-1, the move appeared to have little precedent. Mehdizadeh denied there was a problem, saying the sale was performed "for the good of the shareholders."
>
> How shareholders were protected is not clear, though, and the Southern Investigative Reporting Foundation could find no instance of a corporate executive temporarily deeding his holdings to a colleague.
>
> . . .
>
> What the move did accomplish, however, was to keep the shares—potentially worth potentially hundreds of millions of dollars when they are registered—out of any settlement negotiations.

### E. Defendants Actively Conceal Mehdizadeh's Continued Control of Medbox's Operations

78. Throughout the Class Period, Defendants were well aware of Mehdizadeh's history of criminal conduct and unscrupulous dealings, and actively worked to make it appear to Medbox shareholders that a convicted felon neither controlled nor ran day-to-day operations of the Company. However, neither was true.

79. According to a Confidential Witness ("CW"), who worked for Medbox in 2014[8] and reported directly to Medbox Vice-President and then

[8] According to the Company's 2014 Form 10-K, filed with the SEC on or about March 26, 2015, as of December 31, 2014, Medbox had just five full-time employees and three

Board member Matt Feinstein ("Feinstein"), Defendant Marsala was appointed by the Board to serve as CEO in order to give the appearance that Mehdizadeh was not in control of the company. CW stated that there were several conversations at the office regarding Mehdizadeh's title and that his title was changed several times to make it appear that he had no control over the company. CW was told by Feinstein that Mehdizadah did not have an official title with the Company because of his sketchy past and because no one at Medbox wanted shareholders to know that Mehdizadah was still in control.

80. This statement is confirmed by Medbox's public filings with the SEC. For example, on April 11, 2014, Defendants caused Medbox to state in a Form 8-K that Mehdizadeh had resigned as Chief Operating Officer and a director, and was instead appointed as "Senior Strategist and Founder" of Medbox. The filing did not explain what responsibilities this previously nonexistent position entailed. But it appears from later filings that it was at least an officer level position, because on October 17, 2014, Medbox announced that Mehdizadeh had resigned as an officer but would continue to serve the Company as a consultant with the title "Founder and Senior Advisor."

81. Despite these changes in title, Mehdizadeh remained in control, both financially and operationally. Financially, at the start of the Class Period, Mehdizadeh owned approximately 65% of Medbox's common stock. This continued throughout the Class Period, with Mehdizadeh "the beneficial owner of a majority of the voting power of the Company," owning of controlling approximately 62% of the Company's outstanding shares as of December 31, 2014.

82. Mehdizadeh also maintained daily operational control of the Company throughout the Class Period. As one example, CW stated that any

---

independent contractors, making CW one of just a handful of employees and contractors at Medbox during CW's tenure.

applications for approval to do business and sell dispensing machines in a state was reviewed and approved by Mehdizadeh. CW also explained Mehdizadeh's "morally gray" conduct in this process. CW stated that application fees for one state were $500,000 and each application also required proof of another $500,000 to be used as a security deposit if the application was approved. CW stated that Medbox didn't have the money for all of the security deposits. In order to produce the deposit slips as evidence of the $500,000 security deposits, Mehdizadeh engaged in a practice of depositing funds, getting a deposit slip, then withdrawing the money to be used for other applications. CW said this was very fishy and that wiring of money was involved.

83. Mehdizadeh himself falsely claimed to investors during the Class Period that: "I have no financial interest in any of these dispensaries other than making sure that the clients that we have been hired to represent obtain licensing." But applications for licenses in Massachusetts directly contradict this statement. According to one article, "In various Phase 1 application filings with the Department of Public Health – which is overseeing medical marijuana in Massachusetts – Mehdizadeh wrote in a form letter that he has 'over $62 million in available assets, and pledges $1 million for setting up dispensaries.'" In addition, two license applicants in Massachusetts "listed Mehdizadeh's company Vincent Chase LLC as their financier …."

**F. Medbox's "Stroke of Luck" Success in Arizona with an Unsustainable Business Model Propels the Company Into the Limelight**

84. Officially, during the Class Period, Medbox did not engage directly in the marijuana business, but rather offered products and services to candidates for dispensaries. These services included legal advice, construction build-out support, and assistance completing state dispensary licensing applications for clients seeking to use Medbox's vending machines at their dispensaries.

Customers were obligated to purchase a vending machine from Medbox only if they are granted a license by the state.

85. Medbox's first (and by far its largest) success came in November 2012, when the Company was able to procure 20 of 97 licenses for its clients in Arizona. Though never disclosed by Defendants, this success was not the result of Medbox's superior qualifications or credentials, "because the licenses were awarded by blind lottery, without regard to the credentials of the applicants, or how many applications were submitted." One local Arizona newspaper referred to Medbox's success as a "stroke of luck" given the lack of merits-based selection for licenses.

86. Another fact never disclosed by Defendants was that Defendant Bedrick opened several Arizona corporations in his name and then amended corporate filings with the names of clients for the purpose of applying for as many licenses as possible. This fraudulent attempt to buy as many "lottery tickets" as possible was a primary reason why Medbox received 20 licenses. Ignoring these facts, Defendants Mehdizadeh and Bedrick immediately began touting Medbox's success in Arizona, saying that most of their Arizona clients ended up with dispensary licenses.

87. What Defendants did not – and have not – disclosed about Medbox's success in Arizona was the remarkably limited usefulness of Medbox's products to its clients, a systemic problem that threatens the very existence of the Company. As Medbox client BC Wellness Center (a small retail shop in Black Canyon City, Arizona) explained to a local newspaper on May 8, 2014, "[o]ne drawback of [Medbox's] devices, as the unit at BC Wellness Center demonstrates, is that customers can't use them legally. . . . Patients can't access the machines themselves, even though 'when we met up with Medbox, that was one of the selling points of the box,' sa[id] Jon Ferneau ("Ferneau"), one of the dispensary's owners."

88. As Ferneau explained, when a state official came to BC Wellness Center and saw one of the machines publicly on display in the store, "'They said, 'No, no, no – behind the counter!' . . . Ferneau told the officers that putting it behind the counter would be 'breaking the purpose of the machine. They said, 'We don't care.' I said, 'You're kidding me, aren't you? We spent all this money for the machine, and the customer can't use it.'"

89. Bill Sutterlin, who helps run the dispensary for BC Wellness Center, remarked that given the limitations of the machine, it "isn't crucial to the dispensary's operation . . . 'We could do without it.'"

90. Indeed, as a result of the vending machine's limited usefulness, Medbox's purported "success rate [in Arizona] is complicated by the fact that nearly half of the licenses it helped obtain so far are unused." Another journalist for the *Phoenix New Times* observed, "It's doubtful that states with some form of legalized marijuana will allow customers to use Medbox machines directly – Arizona long has prohibited liquor stores and bars from dispensing beer in vending machines."

91. The problem of patient access – the very selling point touted by Medbox when selling vending machines – has caused the number of companies seeking Medbox's products and services to drop significantly since the Company's limited success in Arizona in 2012. Moreover, those companies who do seek Medbox's services to procure a license based on credentials and qualifications (rather than a lottery) have almost unanimously been denied a license. For example, Medbox filed seven applications for dispensaries on behalf of clients in Massachusetts in 2014, which "selected dispensary companies based on the quality of their businesses and applications," and "Medbox clients got skunked . . . none was selected out of more than 100 reviewed."

**G. Defendants Improperly Recognize Revenue on Contracts**

92. After securing 20 licenses for clients in Arizona in late 2012, Defendants began to engage in a pattern of improperly recognizing revenue on these client contracts before revenue was actually earned. In doing so, Defendants did not have to wait for performance of the contract to be completed – which included the procurement of a license, the sale of a vending machine, follow up support services, and other terms of service – they could immediately recognize revenue on contracts upon the procurement of a license and the expectation of actual revenue in the future. This practice violated Generally Accepted Accounting Principles ("GAAP") and various SEC regulations.

93. The effect of this practice was that Medbox's financial statements throughout the Class Period were materially misleading and overstated because the Company's actual revenues were materially overstated. Defendants admitted as much on December 30, 2014, when they explained in a press release, at minimum, Medbox's financial statements for all of 2013 and the first three quarters of 2014 could no longer be relied upon. In the press release, Defendants stated that:

> Medbox stated that it appeared that revenue had been recognized too soon on some customer contracts. The restated financial statements will recognize revenue at a later time as up-front payments are recognized over the longer of the contract period or the customer relationship, revenue is deferred until key contingencies are removed and it is clear the revenue has been earned in accordance with GAAP and SEC regulations.

94. Defendants also acknowledged their role in the scheme by actively falsifying financial statements (in the case of Defendant Mehdizadeh) and by failing to implement adequate financial controls which would prevent a recently convicted felon with no relevant financial experience from misrepresenting Medbox's financial statements (in the case of the other Individual Defendants).

95. In particular, on January 16, 2015, Medbox filed an action against Mehdizadeh claiming that he had so much control over the Company's financial

reporting practices that he "engaged in manipulation of Medbox's revenue recognition and other financial disclosures," and "ignored and/or attempted to hide significant accounting and other financial control and oversight issues existing at Medbox."

### H. Medbox Attempts to Become a Fully Listed Company Amid Numerous SEC Reprimands for Misleading Statements

96. At the start of the Class Period, on April 2, 2013, Medbox issued a press release entitled "Medbox Completes Financial Audit . . . Company is cleared to file Form 10 to become fully reporting with the SEC."[9] Medbox filed this Form 10 on April 10, 2013, only to withdraw it and resubmit it several times throughout 2013.

97. The Form 10 was riddled with materially misleading statements and omissions about, among other things, Defendant Mehdizadeh's past. On February 14, 2014, the SEC sent a letter to Medbox stating that, *inter alia*, the Company failed to properly disclose Defendant Mehdizadeh's criminal history. In the letter, the SEC stated in pertinent part: "We also refer you to the Los Angeles County District Attorney's Office June 21, 2013 press release. *Please ensure that your disclosure here encompasses all aspects of Mr. Mehdizadeh's plea, including the payment of fees in restitution.*"

98. In total, the February 14, 2014 SEC letter identified 11 material defects with the Company's Form 10, including:

1) incorrect pagination;
2) misleading descriptions of Medbox's business and "geographic reach;"
3) failure to identify key terms;
4) failure to include necessary attachments;
5) inconsistent description of territories where Medbox served consulting clients (i.e. noting Oregon on one list while omitting Illinois, Nevada, and Oregon on another);

[9] As noted above, this financial audit was completed by Q Accountancy.

6) failure to provide a basis for the disclosed belief that Medbox was "positioned to be the leader in compliance and inventory control;"

7) failure to properly discuss revenue recognition;

8) in some places the Company stated it sold a certain number of machines during a certain quarter and in others the Company stated that it sold, that same number, for the entire year;

9) inexplicably recording $190,400 in marketable securities as a liability;

10) disclosures stating there were no material changes in consolidated statement of cash flows during a certain period, but disclosing significant changes in net cash from investing and financing activities during the same period; and

11) failure to explain a substantial salary increase for then-CEO Bedrick, in addition to numerous other problems. The letter also states "please ensure that your disclosure [regarding Defendant Mehdizadeh's criminal history] encompasses all aspects of Mr. Mehdizadeh's plea, including the payment of fees in restitution."

99. Again, later, on April 11, 2014, the SEC sent a letter to Medbox stating once again that, among other things, the Company failed to properly disclose Defendant Mehdizadeh's criminal history. The SEC's letter stated in pertinent part:

> Please revise your disclosure to significantly reduce or remove disclosure relating to Mr. Lee since he was not a party to the case. Further revise your disclosure to state that Mr. Mehdizadeh pleaded "no contest to two counts of felony grand theft and admitted a special allegation of engaging in a pattern of related felony conduct involving takings in excess of $100,000" and that he was ordered to pay back $450,000 in restitution. We refer you to the Los Angeles County District Attorney's Office June 21, 2013 press release. Please tell us whether Mr. Mehdizadeh has already paid the $450,000 and if not, please revise the disclosure accordingly. Also, please remove the last sentence beginning with "Mr. Mehdizadeh maintains his innocence…"

100. As discussed in detail below in Section VII, "Materially False and Misleading Class Period Statements," Defendants continued a pattern of making materially false and misleading statements to investors in subsequent Form 10s and in other public filings with the SEC. In particular, Defendants actively

concealed and failed to disclose significant ongoing problems with the Company's financial reporting and reporting controls.

101. As but one example, on November 19, 2013, Defendants Mehdizadeh and Bedrick published Medbox's quarterly report for the quarter ended September 30, 2013 on OTCmarkets.com, but did not file it with the SEC. The quarterly report stated that Medbox's financial results for the entire year ended December 31, 2012 were "restated." The quarterly report did not provide an explanation for the restatement. Moreover, when Medbox filed its Form 10A on January 21, 2014, Defendants completely failed to disclose that the Company's financial results for the year 2012 – which had previously been published and reported numerous times in SEC filings – had been restated.

**I. Medbox Launches a "Proactive Investor Relations Program"**

102. On January 24, 2014, the Company issued a press release entitled "Medbox, Inc. Launches Proactive Investor Relations Program." The press release announced that the Company had engaged Hayden IR and RedChipCompanies, Inc., "***two independent firms to handle ongoing corporate messaging and investor relations***" and "***to raise the visibility of Medbox with the investment community.***" The press release continued, quoting Defendant Bedrick stating that the Company retained these firms who he referred to as "proven IR counsel" to "***help [the Company] raise [its] visibility in the investment community, communicate [its] investment thesis and broaden [its] shareholder base.***"

103. This "Proactive Investor Relations Program" was designed for the sole purpose of aggressively promoting Medbox stock to potential investors, and relied on misleading optimistic statements and fake testimonials on Medbox's website. For example, the two firms hired to promote the stock repeatedly claimed that Medbox's success was evident by having been granted 20 dispensary licenses for customers in Arizona. But the firms never disclosed

that Medbox received the licenses in a blind lottery and as a result of Defendant Bedrick's fraudulent creation of shell corporations to secure licenses.

104. In addition, these firms created a promotional video about the "Medbox Lockbox Express" on Medbox's corporate home page, the first shot of which says: "Medbox The Leader in Safe, Secure and Automated Pharmaceutical Systems." Lockboxes and related security technologies are part of an intensely lucrative and competitive business in the medical marijuana industry. But at the time of the video, Medbox had not even created a Lockbox Express system. At the close of the Class Period, Medbox had not sold a single Lockbox Express system. Moreover, the firms inserted the statement "Our Company has a strong national and international presence" on the Company's home page, despite the fact that Medbox had no international presence and its domestic presence was limited to a few P.O. boxes maintained in West Hollywood, California.

105. In addition, these investor relations firms manufactured over the top testimonials purportedly from investors that appeared to be transparently fake. Among the testimonials were the following:

> "Medbox made me feel comfortable and confident about investing, and I did. They made no false promises nor guarantees of riches; they told it straight....Well, several years later, my investment has paid off, and it may turn out to be life-changing for my family."

> "As one of the earliest and one of the largest Outside Investors of Medbox, I have a very strong statement to make. Medbox is the best thing to ever come into my investment life."

> "If I could turn back time I would have invested all my liquid resources in their business. Quite simply, Medbox has proven (to be) the single best investment for myself and my family. We are reaping the rewards of their intuition and ability to react properly as they break ground in an explosive market. If you are looking for a real investment in an emerging market, look no further, the facts surrounding Medbox speak for themselves."

> "This is a letter of recommendation for Medbox and Vincent Mehdizadeh as it relates to my business interactions with him. I find Vince to be honest and forthright in every aspect of our business relationship in the past four years. I am currently involved with Vince in another business venture and I would not hesitate to enter into future business ventures with him. Vince is hard working and has

> fantastic communication skills with all of his clients. Never once has Vince left me in the dark regarding any issues and he always returned my inquiries in a timely manner. Please feel free to have potential clients contact me if they have any questions regarding Vince and his character."

> "I contacted what was then Vincent's private company, Medicine Dispensing Systems, back in 2011 so I could get started in the MMJ industry with a leader. Vincent has ushered me through every step of my desire to operate a new business and I credit him and Medbox with getting my small group of partners a dispensary license in Arizona. I couldn't have done it without him and his expert team. In fact, when the Arizona government challenged the dispensary program and licensing was halted for a year, **Vincent gave me a personal loan of $7,000** in order to help me and my family out as we had invested most of our money into the new business and were not expecting the circumstances beyond everyone's control occurring at that moment. Vincent didn't have to do that but that's why Vincent is as successful as he is. He always tells me that in life people should pay it forward and not expect anything in return. Well, I can safely say that Vincent deserves all the success. He has worked hard for it!"[10]

106. When describing these testimonials, market watchdog *Citron Research* observed that "we admit the word 'Madoff' has become a completely overused cliché when invoked to compare to another financial scam. But then when we read the 'testimonials' on the Medbox webpage, we can't help but resurrect this comparison. All of these testimonials will one day be used as evidence in the eventual stock fraud case against Medbox and its executives."

107. The investor relations firms also misleadingly claimed that Medbox had declared a "stock split" in December 2013 in an effort to induce shareholders to invest. A "stock split" occurs when a company increases the number of shares in a public company and adjusts the stock price to ensure that market capitalization remains the same and dilution does not occur. However, the purported 2-for-1 "stock split" took the form of a restricted special dividend which, unlike a stock split, merely rewarded existing shareholders (including majority owner Defendant Mehdizadeh) with a dividend while not actually

---

[10] This testimonial, if legitimate, admits to a prohibited related party transaction between Mehdizadeh and a Medbox customer, and directly contradicts Mehdizadeh's many public statements disavowing any financial interest in the business dealings of Medbox's customers.

increasing the number of shares in the Company. As *Citron Research* noted, "this was a clear attempt to manipulate the stock through either a short squeeze, a rogue broker operation, or a simple 'something for nothing' scheme . . . an investor who buys [Medbox] shares today is going to receive half the ownership of someone who bought shares prior to December 18, 2013."

108. At precisely the same time that Defendants launched the investor relations stock promotion program (the pump) and rewarded themselves with a special stock dividend, Defendants Mehdizadeh and Bedrick were selling significant percentages of their personally held Medbox stock via private placements in highly unusual trading patterns and at an enormous profit (the dump).

### J. Government Agencies and Private Watchdogs Sound the Alarm About Medbox

109. Throughout 2014, while Defendants continued to conceal Mehdizadeh's continued control of the Company, use Q Accountancy to audit Medbox's financial statements, secretly restate financial results in non-SEC filings, and publicly tout Medbox's financial health with misleading data, government agencies and private market watchdogs began sounding the alarm about Medbox.

#### 1. FINRA

110. In January 2014, FINRA issued an advisory concerning risks related to investing in marijuana-related stocks. The FINRA advisory cautioned:

> Like many investment scams, pitches to invest in potentially fraudulent marijuana-related companies may arrive in a variety of ways — faxes, email or text message invitations to webinars, infomercials, tweets or blog posts. Regardless of how you first hear about them, the offers almost always contain hallmarks of "pump and dump" ploys. Specifically, fraudsters lure investors with aggressive, optimistic — and potentially false and misleading — statements or information designed to create unwarranted demand for shares of a small, thinly traded company with little or no history of financial success (the pump). Once share prices and volumes reach a peak, the cons behind the scam sell off their shares at a profit, leaving investors with worthless stock (the dump).

111. Though the FINRA advisory was general in nature, there can be no mistaking that Medbox was one of the companies – if not the company – targeted by this warning. At approximately the time FINRA issued its advisory, Medbox dominated the medical marijuana publicly traded company landscape. It rated at the very top of the Marijuana Index, an information source for investors on pot-related companies. It was the only company on that index valued at a billion dollars. Its stock had just reached $93.50 per share. And Medbox had just announced the launch of a "Proactive Investor Relations Program" designed for the sole purpose of aggressively promoting the Company's stock (the pump). Yet Medbox boasted no previous record of significant financial success. It had only seven full time employees. And Defendant Bedrick had just sold 60,000 shares of his personally held Medbox shares at an enormous profit (the dump).

### 2. *Citron Research*

112. Then, on February 18, 2014, investigative market watchdog *Citron Research* published a damning report about Medbox's financial manipulations, false and misleading public statements, and other undisclosed illegal activity committed by Defendants on behalf of the Company.

113. In the report, *Citron Research* accused Medbox of "systemic fraud throughout [the] company" propped up by "the stock promotion behind the fraud that has brought this worthless company to a $1 bil + market cap." It claimed that Medbox maintained at least "two sets of financials," one artificially inflated set of financials for public consumption and a second, more sobering set for internal use. *Citron Research* noted Defendants' practice of publishing the more optimistic set of financial data in promotional press releases, only to bury significantly reduced amended financials months later in filings with no disclosure that an amendment had been made or an explanation for the change.

114. For example, *Citron Research* quoted the Company's April 15, 2013 press release stating that "Medbox is proud to report that Q1 2013 was the highest revenue quarter in the company's history at more than $2 million booked as revenue . . ." One month later, on May 21, 2013, Medbox reported revenues for Q1 2013 were actually over $1.7 million, but neither disclosed that an amendment had been made or explained the $300,000 difference. Then, on May 15, 2014, Defendants again restated Q1 2013 revenues without disclosure of the restatement or an explanation. Instead, buried in the financial summary of Medbox for 2013, the Company simply stated: "Revenues $1,245,522." This revised number reflected a 40% drop in revenues from what was initially stated nine months earlier, during which time Defendants raised millions of dollars for Medbox through common stock issuances.

115. *Citron Research* also quoted Massachusetts dispensary licensing applications to prove that Defendant Mehdizadeh was personally involved in the financing of customer licensing applications, despite Company prohibitions against such transactions and despite Defendant Mehdizadeh's own repeated denials that he had any "financial interest in any of these dispensaries." Similarly, *Citron Research* cited documents confirming that in 2014 Medbox was successful in securing only one license in Massachusetts for a client, and did so by illegally signing over its own dispensary lease to the client. Such lease transfers are not allowed in Massachusetts but was required for Medbox to demonstrate any success in Massachusetts for 2014.[11]

**3. United States Department of Justice**

116. Then, in August 2014, the DOJ served grand jury subpoenas on Q Accountancy and Alex Anguiano, CPA, the accountant that assisted Defendant Mehdizadeh with his IRS woes and that performed at least some auditing work

[11] *Citron Research* also identified misleading and manipulative stock promotion tactics employed by Defendants, including falsifying investor testimonials and falsely portraying a special dividend as a stock split. *See supra* ¶¶103-107.

for Medbox, related to wrongdoing by Defendant Mehdizadeh. Medbox received a copy of the subpoenas, which requested "all documents related to financial transactions involving Medbox."

**4. The Securities and Exchange Commission**

117. On November 10, 2014, Medbox disclosed that:

> On November 10, 2014, the Los Angeles Regional Office of the Securities and Exchange Commission (the "SEC") notified the Company that it is conducting an investigation pertaining to the Company and issued a subpoena to the Company for documents from December 1, 2011 to the present relating to the matters it is reviewing. The Company plans to cooperate fully with the SEC staff to complete the investigation on a timely basis.

**K. The Truth is Revealed**

118. Finally, in a series of disclosures beginning on December 30, 2014, Defendants caused Medbox to acknowledge that: (1) Medbox's financial statements for, ***at minimum,*** all of 2013 and the first three quarters of 2014 were materially overstated and unreliable; (2) Medbox had continued to employ Q Accountancy until February 6, 2015, despite previously disclosing ***two years prior*** that they had retained a different auditing firm; (3) Defendant Mehdizadeh remained in a significant operational control capacity at Medbox during the Class Period despite Defendants efforts to mask that fact; and (4) with this control, Defendant Mehdizadeh had improperly recognized revenue, manipulated financial disclosures, committed securities fraud, and attempted to hide significant accounting issues from investors.

119. Indeed, on December 30, 2014, Medbox disclosed that it was restating financial statements for all of 2013 and for the first three quarters of 2014, and that those statements "should no longer be relied upon," in part because "revenue had been recognized too soon on some customer contracts." The Company also stated that the restatements would cause Medbox to default on existing lender agreements, but that the lenders had "agreed to forbearance on

declaring a default pending conclusion of on-going discussions to refinance the Company."

120. In response to this disclosure, Defendant Mehdizadeh attempted corporate coup. On the evening of January 8, 2015, he filed a Schedule 14C with the SEC stating that instead of holding a special stockholders' meeting, a majority of Medbox's stockholders (i.e. Defendant Mehdizadeh himself) had executed a written consent that day to replace all of Medbox's current directors with a slate of directors chosen by and including him.

121. In response to Defendant Mehdizadeh's January 9, 2015 filing with the SEC, on January 16, 2015, the Company filed a lawsuit in Los Angeles County Superior Court (the "January 16, 2015 Lawsuit") naming Defendant Mehdizadeh, the two entities he controls and through which Defendant Mehdizadeh holds significant amounts of Medbox stock – PVM International, Inc., and Vincent Chase Incorporated, as well as Does 1 through 10, as defendants. The January 16, 2015 Lawsuit claimed that the written consent was not legally effective and that the current Board had discovered "significant" evidence related to Defendant Mehdizadeh's conduct while employed in various capacities at Medbox. The January 16, 2015 Lawsuit stated that Defendant Mehdizadeh engaged in at least six instances of misconduct both before and during the Class Period:

(1) engaged in manipulation of Medbox's revenue recognition and other financial disclosures;

(2) made public statements related to Medbox that contained false and/or misleading information;

(3) potentially violated numerous securities laws;

(4) engaged in what appear to be improper transactions involving third-party affiliates;

(5) made material misrepresentations to Medbox investors and/or potential investors; and

(6) ignored and/or attempted to hide significant accounting and other financial control and oversight issues existing at Medbox.

122. However, despite Defendants' knowledge that Defendant Mehdizadeh was not authorized to file the Form 14C and the obvious materiality of Medbox's decision to sue the man who claimed he was replacing the entire Board, Defendants did not disclose these facts until January 26, 2015 – a full sixteen days after Defendant Mehdizadeh's filing. This disclosure merely stated that Medbox and Defendant Mehdizadeh had reached "an agreement" whereby Defendant Mehdizadeh would refrain from issuing press releases or making SEC filings, and in exchange he would be permitted to name a fifth director to the Board.

123. Then, on February 6, 2015, Defendants disclosed that Medbox had finally replaced Q Accountancy, revealing for the first time that Q Accountancy had remained at the Company for nearly two years after Defendants' April 3, 2013 promise to replace the accounting firm.

124. Then, on March 9, 2015, Medbox filed a Form 8-K with the SEC in which it announced the results of its investigation into financial statements for 2012, 2013, and 2014. The relevant part of the Form 8-K stated:

> ***As a result of certain errors described below, discovered in connection with such comprehensive review, the Audit Committee, upon management's recommendation, concluded on March 6, 2015 that, in addition to the restatements announced in the Original 8-K, the consolidated financial statements for the year ended December 31, 2012, together with all three, six and nine month financial information contained therein, and the quarterly information for the first two quarters of the 2013 fiscal year, should no longer be relied upon and will be restated to correct the errors. Therefore, all earnings press releases and similar prior communications issued by the Company as well as other prior statements made by or on behalf of the Company relating to financial reporting or results for those periods should not be relied upon.***
>
> Management and its professional advisor have completed the review of revenues recognized and related contracts for the years 2012 and 2013 and interim period for the nine months ended September 30, 2014. Conclusions thus far from the review include:

1) revenue on some contracts with customers was recognized before all required revenue recognition criteria were met, resulting in an overstatement of revenue in ranges of approximately $1,300,000 to $1,500,000, $3,000,000 to $3,200,000 and $600,000 to $900,000 for the years 2012, 2013 and the nine months ended September 30, 2014, respectively;

2) certain transactions with related parties in ranges of approximately $500,000 to $600,000 and $800,000 to $900,000, for 2012 and 2013, respectively were improperly recorded as revenue instead of additional paid in capital in stockholders' equity; and

3) certain inventory costs were capitalized improperly resulting in an understatement of cost of sales. Costs of approximately $600,000 and in a range of approximately $1,300,000 to $1,400,000, for 2013 and the nine months ended September 30, 2014, respectively previously reported in inventory in 2013 and 2014, respectively, will be recorded as cost of sales in the statement of operations for 2013 and the nine months ended September 30, 2014, respectively. These costs incurred prior to executing a contract with a customer, seeking licenses and locations and closing on real estate to operate a dispensary or cultivation center should have been recorded as current period expense.

125. Finally, on March 11, 2015 and March 16, 2015, Medbox filed multiple amendments to previous financial statements with the SEC. First, Medbox filed a Form 10-12G/A with the SEC, which amended the Form 10 the Company originally filed on January 21, 2014.

126. Second, the Company filed a Form 10-Q/A (Amendment No. 1) that amended the Form 10-Q Medbox had initially filed with the SEC on November 11, 2014.

127. Third, Medbox filed a Form 10-Q/A (Amendment No. 1) that amended the Form 10-Q that the Company had originally filed on August 14, 2014.

128. Lastly, Medbox filed a Form 10-Q/A (Amendment No. 3), which amended the Form 10-Q the Company filed originally back on May 15, 2014.

129. In total, the price of Medbox common stock declined precipitously, trading as low as $4.50 per share during intraday trading on December 30, 2014 and closing at $6.39 per share, down $89 per share from its January 8, 2014 Class Period high of $93.50 per share – representing a loss market capitalization

of more than $2.8 billion. Indeed, as of July 27, 2015, Medbox stock traded at just $.10 per share, leaving Plaintiffs and shareholders with devastating losses, all the while, as is detailed further herein, several of the Individual Defendants, collectively, reaped millions in illicit insider trading.

## VII. MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

130. The Class Period starts on April 2, 2013. On that date, Medbox issued a press release entitled "Medbox Completes Financial Audit…Company is cleared to file Form 10 to become fully reporting with the SEC." That press release falsely stated that Medbox earned over $2 million in revenues for the quarter ended March 31, 2013. The press release stated in relevant part:

> Medbox, Inc. (OTC Markets: MDBX) (www.medboxinc.com), announced it has cleared a financial audit of its prior 2 years of operations. Q Accountancy Corporation of Irvine, California headed up the audit as a public company accountancy and oversight board (PCAOB) certified firm that specializes in complex audits of this size and scope.
>
> . . .
>
> Of the $2,397,000 in receivables owed, $345,000 was written off by Medbox as discounts that were voluntarily given to the clients in question for materials and labor expended by said clients, that the company would have had to expend anyway, in pursuit of finalizing the contracted building of the dispensing locations. Those items were deducted from revenue at the discretion of the Auditor as opposed to being booked as revenue and offset as expenses, leaving a total receivables balance of $2,052,000. Of that amount, $673,250 was labeled as deferred income and not counted as revenue for the period ending 12/31/12. Between the $345,000 in voluntary discounts given to clients and the $673,250 in deferred revenue, Medbox's 2012 revenue was reduced to $3,525,636. However, Medbox reports that all $673,000 in deferred revenue was paid in Q1 2013 and as a result added to that quarter's revenue figures making Q1 2013 revenue well in excess of $2 million – a company record. In addition, the clients whom Medbox gave discounts have reengaged the company for additional equipment and services exceeding $350,000 booked in Q1 2013 to be paid in Q2 2013.
>
> . . .
>
> ***"We are absolutely thrilled that we have cleared this proverbial hurdle in our company's history," stated Dr. Bruce Bedrick, CEO of Medbox, Inc.*** "We anticipate filing our Form 10 by Friday and

> 60 days thereafter the filing shall be deemed effective. We want to thank all of our supporters that helped us in becoming a viable public company."

131. The April 2, 2013 press release identified in ¶130 was materially false and misleading or omitted material facts to make such statements not false and misleading for the following reasons: (1) The press release failed to disclose Medbox's revenues were overstated since the Company was recognizing revenues on customer contracts before it was earned, making the statement that Medbox earned over $2 million in revenues for the quarter ended March 31, 2013 false and misleading; and (2) The press release failed to disclose that its auditor – Q Accountancy – had a checkered past including the facts that the firm was ***actually reprimanded*** by the PCAOB despite the fact that the press release specifically touted Q Accountancy as an "***oversight board (PCAOB) certified firm that specializes in complex audits of this size and scope***" and that SEC sued Q Accountancy's CEO and founder, Quintanilla, who at the time was (and still is) a defendant in a securities fraud class action lawsuit.

132. On April 3, 2013, Medbox issued a press release entitled "Medbox to Engage 2nd Auditing firm," and disclosed that Q Accountancy – the firm – audited their financials for the quarter ended March 31, 2013 was inadequate. The press release stated:

> Medbox, Inc. (OTC Markets: MDBX) (www.medboxinc.com) announced that it will engage a new public company accounting and oversight board (PCAOB) auditing firm to review the previously audited financials. The new firm's engagement is underway for purposes of providing audited financials for the filing of the Form 10 and on an ongoing basis thereafter.
>
> While Q Accountancy Corporation's audit delivered an acceptable set of financial statements, management believes a firm more focused and supportive of emerging microcap public companies would be best suited for long term operations. Management believes it is in the best interest of the shareholders and the company, as a whole, to make this change, although it will delay the filing of its Form 10 to the latter part of April.
>
> "The point is getting the job done with the right people. We have identified a firm and we look forward to announcing their

> engagement shortly," stated Dr. Bruce Bedrick, CEO of Medbox, Inc. ***"Corporate governance is paramount and the company will do what is needed for the Form 10 to be viewed as favorably as possible by the SEC."***

133. The April 3, 2013 press release identified in ¶132 was materially false and misleading or omitted material facts to make such statements not false and misleading for the following reasons: (1) The press release failed to disclose Q Accountancy's checkered past detailed in ¶¶64, 131; and (2) because it gave the false impression that Medbox was going to replace Q Accountancy as its auditor imminently when, in fact, Q Accountancy served as the Company's auditor through and including February 2015.

134. On April 10, 2013, Medbox filed its financial statements for fiscal years ending December 31, 2012 and December 31, 2011, on Form 10 with the SEC. With respect to Defendant Mehdizadeh's criminal history, the April 10, 2013 Form 10 stated, in relevant part:

> Mr. Mehdizadeh was the Director of Client Relations for the following law offices at various times from 2003 through 2008: Law Office of Donald J. Townley; Law Offices of Frank E. Miller; Law Offices of Thomas R. Lee, Rexford Law Group; and the Moheban Law Firm.
>
> In 2007, Mr. Mehdizadeh was involved in the sale of his automobile to a private party. The transaction terms were in dispute by the parties and Mr. Mehdizadeh pled no-contest to using an access card (credit card) without the owner's consent. The matter was resolved with Mr. Mehdizadeh receiving probation. Mehdizadeh is still currently on probation for that offense.

135. The April 10, 2013 Form 10 identified in ¶134 was materially false and misleading or omitted material facts to make such statements not false and misleading as it hid from investors the extent of Defendant Mehdizadeh's criminal history.

136. On April 15, 2013, Medbox issued a press release entitled "Medbox Positions Itself as the Leader on Wall Street in the Legalized Marijuanna Industry." The April 15, 2013 press release stated, in relevant part:

HOLLYWOOD, Calif., April 15, 2013 /PRNewswire/ Medbox, Inc. (OTC Markets: MDBX) (www.medboxinc.com), a leader in providing industry specific consulting services and patented systems to various medical and retail related industries worldwide, ***seeks to be the standard bearer of corporate governance and transparency*** in the mushrooming legal marijuana industry and has issued a progress report to its shareholders concerning the status of past, present, and future projects.

Company CEO, Dr. Bruce Bedrick, added, "Without a doubt the filing of our Form 10 is the most significant milestone for the company since its acquisition of Medicine Dispensing Systems and its related patent. In less than 60 days, our filing will be deemed effective and Medbox, Inc. will be a fully reporting company, subject to both the burdens and benefits thereof." Bedrick added, "Management welcomes the increased scrutiny and accountability that comes with our share registration. Doing so sets us apart from some of the more questionable groups in our industry, both in the minds of the investment community and the public at large."

*******

Dr. Bruce Bedrick explained, "The very same capacity for creating transparency that has made Medbox the gold standard in terms of tracking inventory from seed-to-sale and dispensing in real time is ***the same level of transparency that will now be implemented internally. Going forward, Medbox will literally be an open book, with verifiable contracts, revenue, and share count information, in stark contrast to other companies in our sector.***

"Our new status as the sole fully-reporting company in the 'Green Rush' solidifies our role as an industry leader. ***Medbox investors now have the security of knowing management has voluntarily put the company in the position of demonstrating the highest level of transparency in the industry.*** Moving to fully-reporting status was a natural step in our evolution as a company. It will afford us access to the capital we need to grow Medbox to the next level. Wall Street wisely wants in on the legal marijuana boom, through a safe and reliable conduit. As a fully-reporting SEC registered company, we will be in a unique position to fill that role."

The company also has issued a progress report on any and all outstanding matters. The following is a summary as reported by the company:

**********

Hiring of fulltime CFO, Thomas Iwanski, as of April 15, 2013. Mr. Iwanski is a CPA with over 10 years of public company accounting experience. According to Iwanski and backed by his impeccable resume, he is well versed in accounting, auditing, forecasting, corporate strategic development, legal, HR, and IT disciplines. Accordingly, his diverse background touches virtually every aspect of business.

*********

> ***Medbox is proud to report that Q1 2013 was its highest revenue quarter in the company's history at more than $2 million booked as revenue and over $1.5 million booked as deferred revenue.*** The company paid down existing debts from $869,038 to $415,000. The company also reduced its receivables of $2,052,000 million dollars at year end 2012 and collected on $1,867,000, leaving a balance of $185,000 as of 4/15/2013. The company also reported that although aggressively targeting and executing on 3 acquisitions during Q1 2013, cash on hand remained at over $1 million dollars at 4/1/13.

137. The April 15, 2013 press release identified in ¶136 was materially false and misleading or omitted material facts to make such statements not false and misleading for the following reasons: (1) Despite statements to the contrary, the Company completely lacked internal financial and corporate governance controls; and (2) failed to disclose Medbox's revenues were overstated since the Company was recognizing revenues on customer contracts before it was earned, making the statement that Medbox earned over $2 million in revenues for the quarter ended March 31, 2013 false and misleading.

138. On May 21, 2013, Medbox filed its quarterly report for the period ended March 31, 2013 with OTCmarkets.com (the "OTC 2013 1Q Quarterly Report"). The OTC 2013 1Q Quarterly Report stated that the Company earned revenues in the amount of $1,749,554.93 during the first quarter of 2013. Indeed, the OTC 2013 1Q Quarterly Report actually revealed the materially false statements made in Medbox's press release issued on April 2, 2013, and April 15, 2013 identified above at ¶¶130, 132 with respect to the statements that Medbox earned more than $2 million in revenues during the first quarter of 2013.

139. The OTC 2013 1Q Quarterly Report was also materially false and misleading or omitted material facts to make such statements not false and misleading as it failed to disclose that the Company's revenues were overstated since the Company recognized revenues of customer contracts before it had been earned.

140. Then, on June 3, 2013, Medbox filed another quarterly report for the period ended March 31, 2013 with OTCmarkets.com (the "June 3, 2013 OTC 2013 Quarterly Report"), signed by Defendant Bedrick. The June 3, 2013 OTC 2013 Quarterly Report was also materially false and misleading or omitted material facts to make such statements not false and misleading as it echoed the OTC 2013 Quarterly Report reporting that the Company earned revenues in the amount of $1,749,554.93 during the first quarter of 2013.

141. The June 3, 2013 OTC 2013 Quarterly Report was also materially false and misleading or omitted material facts to make such statements not false and misleading for the following, additional reasons: (1) it failed to disclose that the Company's revenues were overstated since the Company recognized revenues of customer contracts before it had been earned; and (2) although it does disclose that in 2007 Defendant Mehdizadeh ran into legal trouble with respect to the sale of his automobile in a private party transaction for using a credit card without the owner's consent, the June 3, 2013 OTC 2013 Quarterly Report utterly failed to disclose any of Defendant Mehdizadeh's other criminal activities.

142. On June 5, 2013, Medbox filed a letter with the SEC pleading to withdraw its Form 10 it filed with the SEC on April 10, 2013 because the Company would "not have time to complete certain financial statement updates and address the [SEC] Staff's comments on the Registration Statement as set forth in its letter to the Company dated May 7, 2013."

143. On June 21, 2013, the Los Angeles County District Attorney's Office shed some light on Defendant Mehdizadeh's criminal history. The press release titled, "Father, Son Plead to Criminal Charges in $450,000 Unauthorized Practice of Law Case," stated in pertinent part:

> A father and son accused of stealing $450,000 from more than a dozen victims by offering unlicensed legal services pleaded no contest today, the Los Angeles County District Attorney's Office announced.

> Pejman Mehdizadeh, 35, of Los Angeles, told victims he was a licensed attorney or that he worked with one and that he could provide a variety of services – including obtaining green cards, loan modifications and divorces. His father, Parvis Mehdizadeh, 78, of Calabasas, assisted. Between 2002 and 2009, they took payments from 15 victims ranging from $2,000 to $200,000.
>
> . . .
>
> The younger Mehdizadeh pleaded no contest to two counts of felony grand theft and admitted a special allegation of engaging in a pattern of related felony conduct involving takings in excess of $100,000. Los Angeles County Superior Court Judge Robert J. Perry immediately sentenced him to four years in state prison, suspended, and five years of formal probation.

144. Then, on August 21, 2013, Medbox filed a quarterly report for the period ended June 30, 2013 with OTCmarkets.com (the "August 21, 2013 OTC 2013 Quarterly Report"). The August 21, 2013 OTC 2013 Quarterly Report claimed that the Company had $1,196,951.52 in revenues for the three months ended June 30, 2013, and $2,946,506.45 for the six months ended June 30, 2013.

145. The August 21, 2013 OTC 2013 Quarterly Report was signed by Defendant Mehdizadeh, who certified as follows:

> 10) Issuer Certification
>
> The issuer shall include certifications by the chief executive officer and chief financial officer of the issuer (or any other persons with different titles, but having the same responsibilities).
>
> The certifications shall follow the format below:
>
> I, P. Vincent Mehdizadeh, certify that:
>
> 1. I have reviewed this Quarterly disclosure statement of Medbox, Inc.
>
> 2. Based on my knowledge, ***this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement***; and
>
> *3.* ***Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of***

***the issuer as of, and for, the periods presented in this disclosure statement.***

August 20, 2013 /s/ P. Vincent Mehdizadeh
By: P. Vincent Mehdizadeh
Its: Director

146. The August 21, 2013 OTC 2013 Quarterly Report was materially false and misleading or omitted material facts to make such statements not false and misleading for the following reasons: (1) it failed to disclose that the Company's revenues were overstated since the Company recognized revenues of customer contracts before it had been earned; and (2) although it does disclose that in 2007 Defendant Mehdizadeh ran into legal trouble with respect to the sale of his automobile in a private party transaction for using a credit card without the owner's consent, the August 21, 2013 OTC 2013 Quarterly Report utterly failed to disclose any of Mehdizadeh's other criminal activities.

147. On November 13, 2013, Medbox filed a Form S-1/A-1 with the SEC. The Form S-1/A-1 is signed by Defendants Bedrick and Mehdizadeh. With respect to revenues, the Form S-1/A-1 "Revenue increased $380 thousand or 46%, to $1.20 million during the quarter ended June 30, 2013, . . .." The Form S-1/A-1 also incorporated the Company's August 21, 2013 OTC 2013 Quarterly Report which reported the Company's revenues as $2,946,506.45 for the six months ended June 30, 2013. The Form S-1/A-1 also includes a "Report of Independent Registered Public Accounting Firm" prepared by none other than Q Accountancy, dated April 9, 2013. The Form S-1/A-1 also states that "The financial statements of Medbox, Inc. as of December 31, 2012 and 2011 and for each of the years in the two-year period ended December 31, 2012 included in this prospectus and in the registration statement ***have been so included in reliance upon the report of Q Accountancy Corporation, an independent registered public accounting firm, appearing elsewhere herein and in the***

***registration statement, given on the authority of said firm as experts in auditing and accounting.***"

148. The Form S-1/A-1 was materially false and misleading or omitted material facts to make such statements not false and misleading as it failed to disclose that the Company's revenues for the quarter ended June 30, 2013 reported therein and the revenues incorporated therein for the six months ended June 30, 2013 were overstated since the Company recognized revenues of customer contracts before it had been earned.

149. The Form S-1/A-1 is also materially false and misleading or omitted material facts to make such statements not false and misleading as it failed to disclose Q Accountancy's checkered past of shoddy audits, the fact that it was reprimanded by the PCAOB, and that the SEC sued Q Accountancy's CEO and founder, Quintanilla, for issuing misleading audits based on "reckless and deficient work," and that Quintanilla was (and still is) a defendant in a securities fraud class action lawsuit.

150. On November 19, 2013, Defendants Mehdizadeh and Bedrick published Medbox's quarterly report for the quarter ended September 30, 2013 on OTCmarkets.com (the "November 19, 2013 OTC 2013 Quarterly Report"), but did not file it with the SEC. The quarterly report stated that Medbox's financial results for the year ended December 31, 2012 were "restated." The quarterly report did not provide an explanation for the restatement. The November 19, 2013 OTC 2013 Quarterly Report contains a nearly identical certification as is referenced in ¶145. The November 19, 2013 OTC 2013 Quarterly Report claimed that the Company had $2,079,454 in net revenues for the three months ended September 30, 2013, and $5,046,634 in net revenues for the six months ended September 30, 2013.

151. The November 19, 2013 OTC 2013 Quarterly Report was materially false and misleading or omitted material facts to make such statements not false

and misleading as it failed to disclose that the Company's revenues for the three months ended September 30, 2013 and the six months ended September 30, 2013 reported therein were overstated since the Company recognized revenues of customer contracts before it had been earned.

152. On the morning of November 20, 2013, before the opening of trading, Medbox issued a press release announcing the Company's 3Q 2013 financial results for the period ended September 30, 2013. The press release stated in part:

> **Highlights of 3rd Quarter Financials include:**
>
> - ***Revenues surged to over $5.046 million through three quarters, making 2013 the company's best revenue generating year in the company's history.***
> - ***Revenues reported of $2.079 million for 3rd quarter of 2013, making it the highest grossing quarter in the company's history.***
>
> * * *
>
> - ***Gross profit margin for the quarter was a healthy $833 thousand and EBITDA margin for the quarter was approximately 21%.***
> - ***Income from operations through 3 quarters, before taxes, was a healthy $647 thousand.***

153. These statements were materially false and misleading when made or omitted material facts to make such statements not false and misleading because the touted revenues were artificially inflated due to Defendant Mehdizadeh's improper early recognition of revenue on contracts, which Defendants failed to prevent or correct by allowing Defendant Mehdizadeh to control the Company. Defendants acknowledged this fact on December 30, 2014, when they caused Medbox to report that the Q3 2013 financial statements could not be relied upon because "revenue had been recognized too soon on some contracts," and again on January 16, 2015, when Medbox brought an action against Mehdizadeh for artificially inflating the Company's revenues. These

statements were also materially false and misleading when made or omitted material facts to make such statements not false and misleading because they failed to disclose that Medbox's financial statements were inherently unreliable due to the fact that they were audited by Q Accountancy, a firm recently exposed for having a sweeping array of deficiencies in its auditing practices and which founder was sued by the SEC for issuing misleading audits based on "reckless and deficient work," and that Quintanilla was (and still is) a defendant in a securities fraud class action lawsuit.

154. The November 20, 2013 press release also contained the following statement by Defendant Bedrick:

> ""***We have had another record breaking quarter, which provides further validation that our business plan is solid and our operating strategy is sound***," stated Dr. Bruce Bedrick, CEO of Medbox, Inc. "As we move forward, we will continue to seek out opportunities that provide growth for our company and added value for our shareholders.""

155. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading because: (a) Medbox's success was not due to a solid business plan or sound operating strategy, but to its procurement of licenses in a blind lottery in Arizona, which Defendant Bedrick manipulated by starting numerous shell corporations and removing his name from the companies; (b) Medbox's business plan was not solid because, as demonstrated in Arizona throughout 2013, the Company's customers were prevented from using the vending machines for their intended purpose (direct patient access); and (c) as a result of the foregoing, at least half of Medbox's customers in Arizona had not even used their license to sell marijuana through a Medbox vending machine.

156. The November 20, 2013 press release also contained the following statement:

> ***The company also announced that they have brought accounting functions in-house to help expedite preparation of statements and reports.***
>
> ***"As we continue to mature and transition to being a fully reporting company, we need to be able to provide timely reports, status updates, and filings," Bedrick commented. "We have assembled an in-house team of accounting professionals. This team can devote more time to work seamlessly with our outside auditing firm so that we meet our deadlines and obligations, and provide the most accurate and timely information to the SEC and the general public."***

157. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading because it misleadingly portrayed this change as an improvement in financial oversight but: (a) failed to disclose that the "outside auditing firm" working with Medbox's in-house accountants was still Q Accountancy, a firm recently exposed for having a sweeping array of deficiencies in its auditing practices and which founder was sued by the SEC for issuing misleading audits based on "reckless and deficient work," and that its founder was (and still is) a defendant in a securities fraud class action lawsuit; and (b) failed to disclose that Defendant Mehdizadeh retained control over the financial reporting process, which promised that any financial statements would be artificially inflated.

158. On November 25, 2013, the Company issued a press release entitled "Medbox Issues Status Update to Company Shareholders," stating in pertinent part that "***Medbox posted record revenue figures for YTD 2013, amassing more than $5 million in consulting and equipment sales revenue through 9 months.***"

159. This statement was materially false and misleading or omitted material facts to make such statements not false and misleading for the same reasons discussed in ¶153.

160. In January 2014, FINRA issued an advisory concerning risks related to investing in marijuana-related stocks. The FINRA advisory cautioned:

> Like many investment scams, pitches to invest in potentially fraudulent marijuana-related companies may arrive in a variety of ways — faxes, email or text message invitations to webinars, infomercials, tweets or blog posts. Regardless of how you first hear about them, the offers almost always contain hallmarks of "pump and dump" ploys. Specifically, fraudsters lure investors with aggressive, optimistic — and potentially false and misleading — statements or information designed to create unwarranted demand for shares of a small, thinly traded company with little or no history of financial success (the pump). Once share prices and volumes reach a peak, the cons behind the scam sell off their shares at a profit, leaving investors with worthless stock (the dump).

161. On January 13, 2014, to blunt the effects of the FINRA advisory concerning the risks related to investing in marijuana-related stocks, the Company issued a press release entitled "Medbox Comments on FINRA Advisory Concerning Marijuana Stocks," which stated in pertinent part as follows:

> ... Medbox … commented on FINRA's renewed advisory concerning marijuana related stocks. The advisory, released Friday, highlights what investors should be aware of when investing in marijuana related stocks.
>
> The [FINRA] advisory stated, in part:
>
> "We are reissuing this alert to warn investors not only about the potential for fraud in this arena, but also to reiterate the risks of investing in thinly traded companies about which little is known… One company, for example, promoted its move into the medical cannabis space by issuing more than 30 press releases during the first half of 2013. These releases publicized rosy financial prospects and the growth potential of the medical marijuana market. The company was also touted on the Internet through the use of sponsored links, investment profiles and spam email, including one promotional piece claiming the stock "could double its price SOON" and another asserting the stock was "poised to light up the charts!" Yet the company's balance sheet showed only losses, and the company stated elsewhere that it was only beginning to formulate a business plan."
>
> Other excerpts from the [FINRA] advisory stated, in part:
>
> "For example, the CEO of one thinly traded, yet heavily touted, company that purports to be in the medical marijuana business spent nine years in prison for operating one of the largest drug smuggling operations in U.S. history. The former CEO of a similar company was recently indicted for his role in a multi-million dollar mortgage-based Ponzi scheme."

> Medbox executives were pleased that a stern advisory was re-issued about the sector's stocks by FINRA and had the following comments:
>
> “Some of the public companies in the marijuana sector are in the business of selfpromotion with little or no substance or even an executable business plan,” stated Vincent Mehdizadeh, Chief Operations Officer at Medbox, Inc. ***“Since day 1, our company has made its quarterly reports and financials available to the public, kept shareholders diligently informed about the company and its operating personnel at all times,*** offered ongoing support to its many clients, ***completed an audit of its financials,*** donated substantial amounts to industry advocacy groups that support medical marijuana patient rights to safe access of the medicine, ***and also demonstrated profitability while not deriving revenue from the cultivation or sale of the marijuana itself.*** As far as I know, we are the only company in the space to have accomplished those feats. With that being said we have stated in the past that investors should make informed decisions when buying our stock as the volatility may not be something the average retail investor can stomach.”
>
> Company executives also pointed out that most, if not all, of the other marijuana related public companies in the sector spend the majority of their operating budgets promoting their stocks through assorted public/investor relations firms and as a result show operating losses quarter after quarter. Medbox does not have an investor relations firm and according to company executives its general preference has been not to operate with one through this period in the company's development until a reputable candidate is identified.
>
> “Much of the investor interest in Medbox has occurred through financial press, financial media, and general media coverage chronicling advances in the medical marijuana industry, an industry in which we feel we are the most reputable company,” stated Dr. Bruce Bedrick, Chief Executive Officer at Medbox, Inc. “Consequently, we spent much of last year trying to find a reputable firm that would be a good fit to handle our investor relations consistent with best industry practices, and now feel we have found the right fit for our company. We expect to announce more details some time after our Form 10 registration statement is filed with the SEC this week, as that is our main priority at present.”

162. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading because it was designed to suggest to investors that the FINRA warning was neither about nor relevant to Medbox even though: (a) Medbox “promoted its move into the medical cannabis space by issuing more than 30 press releases during the first half of 2013,” which “publicized rosy financial prospects and the growth potential of the medical marijuana market”; and (b) Defendant Mehdizadeh, like

the CEOs of companies referred to in the FINRA advisory, has a long history of criminal conduct, including a felony conviction just six months prior to the issuance of this statement.

163. This statement was also materially false and misleading when made or omitted material facts to make such statements not false and misleading because it claimed Medbox had "made its quarterly reports and financials available to the public, [and] kept shareholders diligently informed about the company and its operating personnel at all times," when in fact: (a) Medbox failed to disclose in any SEC filing that it had restated its financial statements for Q3 2013; and (b) Medbox did not disclose material information about its operating personnel, including Defendant Mehdizadeh's criminal history and continued control of the Company, Defendant Bedrick's personal incorporation of numerous Arizona shell companies to manipulate the licensing lottery system for Medbox, and Defendant Mehdizadeh's personal related party transactions and financial interest in customer businesses.

164. Additionally, the statement that Medbox had "completed an audit of its financials . . . and also demonstrated profitability" was materially false and misleading when made or omitted material facts to make such statements not false and misleading because it attempted to portray the Company as financially sound and managed but failed to disclose that: (a) the audit was completed by Q Accountancy, which was exposed as having significant deficiencies in its auditing practices; and (b) any profitability demonstrated by the Company was the result of artificially inflated revenues due to improper revenue recognition.

165. On January 21, 2014, Medbox filed a Form 10 with the SEC that represented Defendant Bedrick's 2012 compensation as $34,729 and Defendant Mehdizadeh's 2012 compensation as $262,500.

166. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading because

it failed to disclose why the January 21, 2014 Form 10 contradicted the November 13, 2013, Form S-1/A-1. Specifically, it failed to disclose why the Form S-1/A-1 stated that Defendant Mehdizadeh made $410,706 (56% higher than reported on the Form 10) and Defendant Bedrick made $65,000 (87% higher than reported on the Form 10) in 2012 compensation which was materially higher than reported on January 21, 2014.

167. The January 21, 2014 Form 10 was materially false and misleading when made or omitted material facts to make such statements not false and misleading for the additional reason that it failed to acknowledge the material fact that the Company had restated certain of its 2013 financial results it originally submitted to OTCmarkets.com.

168. In addition to the above, the January 21, 2014 Form 10 was deficient and materially false and misleading for the reasons articulated by the SEC in its February 14, 2014 letter to Medbox. In the letter, the SEC highlighted at least eleven defects with Medbox's Form 10, as listed *supra* at ¶98.

169. On January 24, 2014, the Company issued a press release entitled "Medbox, Inc. Launches Proactive Investor Relations Program." The press release announced that the Company had engaged Hayden IR and RedChipCompanies, Inc., "***two independent firms to handle ongoing corporate messaging and investor relations***" and "***to raise the visibility of Medbox with the investment community.***" The press release continued, quoting Defendant Bedrick stating that the Company retained these firms who he referred to as "proven IR counsel" to "***help [the Company] raise [its] visibility in the investment community, communicate [its] investment thesis and broaden [its] shareholder base.***"

170. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading because it failed to disclose that the IR firms were hired to promote Medbox through false

and misleading tactics, including misrepresenting the Company's business model and successes to date (¶103), publishing fake investor testimonials (¶105), publishing a false investor video on Medbox's website concerning the Lockbox Express (¶104), and misrepresenting a stock dividend as a stock split (¶107).

171. On February 13, 2014, the Company issued a press release announcing that Defendant Iwanski had been appointed CFO, stating in pertinent part that he had "approximately 10 years of public accounting experience with the Big 4 firm of KPMG LLP" and quoted Defendant Mehdizadeh stating that the Company had now "worked with … Tom for several months, and [that he] add[ed] ***proven … financial management and public company oversight***…."

172. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading because: (1) It suggested that Defendant Iwanski's appointment would provide enhanced oversight of Medbox's internal financial controls, when in fact Defendants allowed Defendant Mehdizadeh to continue controlling significant aspects of the financial reporting process without oversight; and (2) because any purported enhanced oversight would be mitigated by the "reckless and deficient work" of Q Accountancy, who was still Medbox's auditor at the time Iwanski was hired as CFO, and would remain so until February 2015 – almost two years after Q Accountancy was to be replaced.

173. In fact later, on February 14, 2014, the SEC sent a letter to Medbox stating that, *inter alia*, the Company failed to properly disclose Defendant Mehdizadeh's criminal history. In the letter, the SEC stated in pertinent part: "We also refer you to the Los Angeles County District Attorney's Office's June 21, 2013 press release. ***Please ensure that your disclosure here encompasses all aspects of Mr. Mehdizadeh's plea, including the payment of fees in restitution.***" Specifically, the SEC highlighted at least eleven defects with Medbox's Form 10, including:

1) incorrect pagination;

2) misleading descriptions of Medbox's business and "geographic reach;"

3) failure to identify key terms;

4) failure to include necessary attachments;

5) inconsistent description of territories where Medbox served consulting clients (i.e. noting Oregon on one list while omitting Illinios, Nevada, and Oregon on another);

6) failure to provide a basis for the disclosed belief that Medbox was "positioned to be the leader in compliance and inventory control;"

7) failure to properly discuss revenue recognition;

8) in some places the Company stated it sold a certain number of machines during a certain quarter and in others the Company stated that it sold, that same number, for the entire year;

9) inexplicably recording $190,400 in marketable securities as a liability;

10) disclosures stating there were no material changes in consolidated statement of cash flows during a certain period, but disclosing significant changes in net cash from investing and financing activities during the same period; and

11) failure to explain a substantial salary increase for then-CEO Bedrick, in addition to numerous other problems. The letter also states "please ensure that your disclosure [regarding Defendant Mehdizadeh's criminal history] encompasses all aspects of Mr. Mehdizadeh's plea, including the payment of fees in restitution."

174. On the morning of February 18, 2014, the Company issued a press release entitled "Medbox, Inc. Commends Obama Administration for New Guidelines Enabling Banks to Deal with Businesses that Legally Sell

Marijuana," in which the Company lauded the Obama administration "for its forward-thinking action to ease the issues that banks currently have in doing business with dispensary operators which Medbox directly serves." The press release referenced recent rules issued by the Treasury and Justice Departments which the Company said would open the door for "lawful marijuana businesses to have access to the American banking system . . .." The press release also promoted upcoming appearances by Defendant Bedrick on CNBC's Closing Bell on Tuesday, February 18 at 4:40 p.m. Eastern Standard Time, and Fox Business on Wednesday, February 19 during the 4:00 p.m. hour, Eastern Standard Time.

175. Later on February 18, 2014, *Citron Research* issued a scathing report entitled "Busting Medbox for Multiple Frauds – Stock is Worthless," accusing Medbox of keeping three sets of financial books and stating, among other things, that "systemic fraud" and stock promotion had facilitated the Company's then $1 billion market capitalization.

176. Later that day, following the publication of the *Citron Research* report, on February 18, 2014, the Company issued a press release entitled "Medbox Responds to Critics and Issues Status Update to Company Shareholders," which stated in pertinent part as follows:

> Medbox … issued a status update to its shareholders on past, present, and future projects. ***Company executives also commented on bloggers looking to discredit the company for financial gain and law firms looking to capitalize on misinformation in order to solicit clients.***
>
> The following is a summary of key events occurring in recent weeks:
>
> - Medbox filed its Form 10 with the SEC in January ***and will be an SEC filer, with all the burdens and benefits that result from that status, as of mid-March 2014.***
>
> * * *
>
> Company executives clarified their position on the restatement of financials that accompanied the Form 10 registration statement filed with the SEC as a maturation process in becoming an SEC filer.

> "The company undertook a project to bring all accounting functions in house and during that lengthy process we discovered some errors in accounting which we have since corrected in the latest financials included in the Form 10. ***The point is getting it right and being fully transparent with our shareholders at all times***," stated Vincent Mehdizadeh, Board Chairman at Medbox, Inc. ***"The company has, as part of those corrections, instituted better controls over financial reporting to avoid further corrections.*** In addition, it is important to note that revenues for the nine months of 2013 had increased over the comparative period of the prior year (as corrected) and we are continuing to add skilled people to accelerate our growth in 2014. Unfortunately, when you are the most visible company in the space, with a large market capitalization, you become a target."
>
> ***Company executives caution company shareholders that while the media has been extremely supportive of Medbox as one of the only viable medical marijuana related public companies, with success there will always be opponents that publish deceptive and misleading articles about the company and its executives.***
>
> In addition, company executives clarified that the company offers support services to the medical marijuana sector on an arm's length basis. Often times in a state where applications are being accepted for marijuana dispensary licensing, some landlords would not lease to the newly formed non-profit entities formed for the company's clients. As a result, in some rare instances and simply as an absolute benefit to their clients, it was agreed that Medbox would lease the properties and assign all rights to the applicant, with the permission of the landlord.
>
> "We go the extra mile for our clients and that is evident through our glowing testimonials displayed on our websites," stated Dr. Bruce Bedrick, CEO at Medbox, Inc. "Interestingly, with the recent banking policy guidance by the federal government, we can now start to develop an additional revenue stream of acquiring properties and leasing to our dispensary operator clients. This is one of many revenue streams that Medbox is actively developing given the current climate and relaxed federal posture."

177. Following the news of the day, shares of Medbox decreased from an opening price of $33.42 per share to close at $29.80 per share on February 18, 2014.

178. These statements in response to the *Citron Research* report were materially false and misleading when made or omitted material facts to make such statements not false and misleading because: (1) Defendants were not '"being fully transparent with our shareholders at all times,"' but instead were actively concealing materially adverse facts about the Company's finances, business model, executives, and internal controls; and (2) had not '"instituted

better controls over financial reporting to avoid further corrections,"' but instead continued to utilize Q Accountancy as its auditor until February 2015 despite knowing that Q Accountancy's founder was sued by the SEC for issuing misleading audits based on "reckless and deficient work," was named in a securities fraud class action lawsuit, and despite promising investors as early as April 2013 that Medbox would replace Q Accountancy as its auditor.

179. On March 10, 2014, the Company issued a press release entitled "Medbox Issues Shareholder Update – Board to Pursue Listing on Major National Exchange During 2014." The release stated in pertinent part as follows:

> … Medbox … today announced an update on pending projects, ***SEC reporting status***, and other strategic items:
>
> - The Company's Form 10 registration statement filed with the SEC will be effective as of March 22, 2014. The Company expects to respond to SEC comments and file audited 2013 year-end financials on a Form 10-K by the end of March.
> - ***The board of directors is seeking to list Medbox with the NASDAQ Capital Markets or another national exchange by the end of 2014.***
> - ***The Company added public company experience with the additions of Thomas Iwanski at CFO***, Matt Feinstein at Vice President, and also Mitch Lowe as the Company's first independent director.
>
> * * *
>
> "The last 90 days have been highly productive, and Medbox continues to lead this burgeoning new industry," stated Vincent Mehdizadeh, Board Chairman at Medbox, Inc. "We continue to take the steps to set Medbox apart from others in the industry, ***ensuring that we have the appropriate controls and resources in place*** and adding seasoned talent to lead future growth."
>
> Dr. Bruce Bedrick, Medbox President and CEO, added, ***"With the effectiveness of our Form 10 later this month, Medbox will be a fully reporting company. Our pending status as a future SEC filer, as well as key additions to our management team, are important steps for strengthening the legitimacy of Medbox and increasing our ability to reach new investors and clients. We look forward to continuing to exceed expectations in the coming months."***

180. These statements were materially false and misleading when made or omitted material facts to make such statements not false and misleading for the same reasons discussed in ¶178.

181. On March 26, 2014, the Company issued a press release entitled "Medbox Completes SEC Filing Requirements – Company's amended Form 10 registration statement and audited 2013 financials to be filed with SEC by March 31, 2014," which stated in pertinent part as follows:

> … Medbox … today announced that it has ***completed the requisite steps to formally become a fully-reporting company*** as of March 24, 2014 and is now subject to the Securities and Exchange Commission reporting requirements.
>
> On March 25, 2014, Medbox filed its requisite Form 3's. The Company expects to file its amended Form 10 registration statement, along with audited full-year 2013 financials, by March 31, 2014.
>
> "This is a key step in our goal of listing our shares on a national exchange, and ***further evidence of our goal to maintain the highest standards for corporate governance and transparency***," stated Vincent Mehdizadeh, Chairman and COO of Medbox, Inc. "It is of special importance to me personally that ***we are one of the only fully reporting public companies*** that has generated considerable revenues in the marijuana ancillary services sector and demonstrated an executable business plan. ***Our main subsidiary, Medicine Dispensing Systems, has turned a profit every year since commencing operations in 2010.*** These key differences set us apart from our competitors."

182. These statements were materially false and misleading when made or omitted material facts to make such statements not false and misleading for the same reasons discussed in ¶178.

183. On March 31, 2014, the Company filed a Form 10-12G/A (Amendment No. 1) with the SEC, which contained the following statement: "[r]evenue increased $2,633,196 or 101.65%, to $5,223,775 for the twelve months ended December 31, 2013, from $2,590,579 for the twelve months ended December 31, 2012, primarily as a result of the completion of contracts for [its] Arizona customers" and that the "main reason for the increase in revenues was a

change in volume, because there were no changes in pricing policies." The Form 10-12G/A (Amendment No. 1) was signed by Defendant Bedrick.

184. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading because: (a) the revenues indicated for 2012 and 2013 were artificially inflated; (b) it failed to disclose that a primary reason for the increase was not just a change in volume, but also the continued practice of improperly recognizing revenue on this increased volume; and (c) it failed to disclose the "contracts for [its] Arizona customers" was the result of a one-time license procurement through a lottery system that did not provide a reasonable basis for continued revenue increases in the future.

185. On April 11, 2014, the SEC sent a letter to Medbox stating that the Form 10 A-1 filed by the Company on March 31, 2014 contained, among others, the following deficiencies:

1) Incorrect pagination;
2) The Form 10's description of the Company's business did "not accurately describ[e] the current state of your business operations" and was inconsistent with the description on Medbox's website;
3) Lack of disclosure regarding a patented product called "Secure Safe," which Medbox had touted in an April 3, 2014 press release;
4) Inadequate disclosure regarding '"location resale revenue' in the amount of $755,000";
5) Lack of support for the expectation that the '"recent fast-based growth . . . will continue";
6) Lack of disclosure regarding the statement that Medbox issued '"2,115,100 shares . . . retroactively stated for [y]our 2:1 forward stock split"';
7) Inadequate disclosure regarding revenue recognition practices; and
8) Inadequate disclosure regarding critical accounting policies for determining goodwill, given "the significance of goodwill to your balance sheet . . .."

186. The SEC letter also stated that disclosure of Defendant Mehdizadeh's criminal history remained significantly inadequate. In sum, the March 31, 2014 Form 10, which was a critical document to investors as it served as the final application for the Company's full listing on NASDAQ, was materially false and misleading when made or omitted material facts to make such statements not false and misleading for the same reasons discussed in ¶173.

187. On April 1, 2014, the Company issued a press release announcing its 4Q and fiscal 2013 financial results for the period ended December 31, 2013 entitled "Medbox Generates 102% Increase in Revenue for Fiscal 2013 – Company increases inventory, expands sales and marketing infrastructure, to set the stage for additional growth." The release stated in pertinent part as follows:

> … Medbox … today announced record full-year revenue. Medbox included its audited numbers for the year ended December 31, 2013 in its amended Form 10 filing with the Securities and Exchange Commission.
>
> **Recent Operational highlights:**
>
> - On March 24, 2014, the Form 10 registering Medbox's shares of common stock became effective with the Securities and Exchange Commission and ***Medbox is now a fully-reporting public company***.
> - ***The Company added public company experience, naming Thomas Iwanski as CFO***, Matt Feinstein at Vice President, and also Netflix co-founder and former Redbox president Mitch Lowe as the Company's first independent director.
>
> * * *
>
> "This was a productive and exciting year for Medbox, and the first 90 days of 2014 have been even more productive," commented Dr. Bruce Bedrick, Chief Executive Officer of Medbox. "We have solidified our position as the industry leader, and ***in the last three months we have taken specific steps to improve corporate governance, expand transparency and deliver shareholder value***. During the rest of 2014 we will grow organically, taking advantage of the tremendous momentum in the industry. We will also leverage our reputation, presence in the industry, and our relationships to develop new revenue streams. ***This will be an exciting year for Medbox,*** its clients ***and its shareholders***."

***Full-year revenues were $5.2 million, a 101.7% increase compared to $2.6 million last year. The increase in revenues was due to primarily the result of recognizing revenue deferred from 2012 related to the completion of contracts for Arizona customers which was delayed by court action that was not resolved until 2013. Gross profit for 2013 was $2.6 million, or 50.5% gross profit margin, compared to gross profit of $1.5 million, or 59.4% gross profit margin for 2012.*** The change in gross profit margin was due to increased costs related to the build-out of locations for clients and delays in implementing the Arizona program related to the litigation.

Total selling, general and administrative expenses were $3.2 million, or 61.2% of total revenues, compared to total selling, general and administrative expenses of $1.9 million, or 72.5% of total revenues last year. ***The loss from operations for the year was $(560,000), compared to a loss from operations of $(340,000) last year. Net loss for the year was $(557,000), or $(0.02) per basic and $(0.01) per diluted share, compared to a net loss last year of $(344,000), or $(0.01) per basic and diluted share, last year.***

While ***the Company's largest operating subsidiary, Medicine Dispensing Systems, remained profitable with a pretax profit of $948,443***, the net loss for 2013 included $1.2 million in losses from the parent company's operations, related primarily to accounting and SEC attorney legal fees (related to the filing of, and subsequent withdrawing of, a Registration Statement on Form S-1, and the filing of a Form 10 registration statement in order to register the common stock of Medbox) and additional legal fees (related to litigation on behalf of Arizona clients to allow them to move forward with dispensary licenses the state of Arizona had awarded). In addition, the Company's Vaporfection subsidiary, acquired on April 1, 2013, recognized a net loss of $317,000 for nine months of operations.

***"Our primary subsidiary, Medicine Dispensing Systems, has been profitable each year since commencing operations in 2010, and remains profitable today,"*** added Vincent Mehdizadeh, Chairman and Chief Operating Officer of Medbox, Inc. "However, public company costs, expenses related to financing efforts, and legal fees related to Arizona litigation resulted in a net loss for the public company. We do not expect these expenses to impact our 2014 results, however, we are growing our infrastructure in anticipation of future growth, and expect additional fees related to public company costs as the Company pursues a listing on a national exchange.

**Fourth Quarter Financial Results**

***Revenues for the fourth quarter ending December 31, 2013 increased to $423,000 compared to $47,250 for the same period of 2012. The increase in revenues was due to an increased number of contracts signed and initial non-refundable consulting fees. Gross profit for the quarter was $278,000, or 65.7% gross profit margin,*** compared to a negative gross profit of $(508,000), or (10.8%) negative gross profit margin, in the fourth quarter of 2012. This was partially due to deferral of some revenue for Arizona contracts from

2012 to 2013 because of Arizona licensing stoppages by their authorities.

Total selling, general and administrative expenses significantly increased by $657,007 in the fourth quarter of 2013 compared to the same period of 2012, this is due to the fact that the Company incurred higher general and administrative expenses related to raising capital and regulatory compliance as described above.

***Net loss for the fourth quarter of 2013 was $(513,000) or $(0.02) per basic and $(0.01) per diluted share, compared to a net loss of $(533,000) or $(0.02) per basic and $(0.01) per diluted share for the fourth quarter of 2012.***

188. These statements were materially false and misleading when made or omitted material facts to make such statements not false and misleading for the same reasons discussed in ¶153.

189. On April 11, 2014, Medbox filed a Form 8-K with the SEC that stated Defendant Mehdizadeh had resigned as COO and as a director of the Company, but was appointed as "Senior Strategist and Founder" of Medbox. The April 11, 2014 Form 8-K was materially false and misleading when made or omitted material facts to make such statements not false and misleading because it falsely portrayed Defendant Mehdizadeh as relinquishing his officer-level position and with it giving up control over the Company's day-to-day operations, when in fact Defendant Mehdizadeh remained an officer-level employee with significant control over the Company's operations and financial statements.

190. Again, later, on April 11, 2014, the SEC sent a letter to Medbox stating once again that, among other things, the Company failed to properly disclose Defendant Mehdizadeh's criminal history. The SEC's letter stated in pertinent part:

Please revise your disclosure to significantly reduce or remove disclosure relating to Mr. Lee since he was not a party to the case. Further revise your disclosure to state that Mr. Mehdizadeh pleaded "no contest to two counts of felony grand theft and admitted a special allegation of engaging in a pattern of related felony conduct involving takings in excess of $100,000" and that he was ordered to pay back $450,000 in restitution. We refer you to the Los Angeles County District Attorney's Office June 21, 2013 press release. Please tell us whether Mr. Mehdizadeh has already paid the $450,000 and if not,

> please revise the disclosure accordingly. Also, please remove the last sentence beginning with "Mr. Mehdizadeh maintains his innocence…"

191. On May 15, 2014, the Company issued a press release announcing its 1Q 2014 financial results for the period ended March 31, 2014. The release stated in pertinent part as follows:

> **Recent Operational Highlights:**
>
> * * *
>
> - On March 24, 2014, the Form 10 registering Medbox's shares of common stock became effective with the Securities and Exchange Commission and ***Medbox is now a fully-reporting public company***.
>
> * * *
>
> - Began providing company information via S&P Capital IQ Corporation Records Listing Program ***to increase visibility to the institutional investment community***.
>
> * * *
>
> "We continued to establish the company as the leader in the rapidly growing legitimate marijuana industry ***while increasing our transparency to the investment community and position in the capital markets***," commented Dr. Bruce Bedrick, Chief Executive Officer of Medbox. "As this industry continues to evolve and redefine itself, Medbox is strategically positioned as the partner of choice with a growing array of solutions, technologies and services."
>
> Dr. Bedrick continued, "Across the country, states and municipalities evolve regulations regarding medical and recreational marijuana, and often struggle with the best ways to manage this change and address reasonable concerns. The results we are reporting today are somewhat overshadowed by accounting provisions necessitated by changes in the business and legal environment in one of the markets in which we operate. ***Medbox stands at the forefront of this industry, offering solutions that help dispensary operators and cultivators maintain compliance and records that exceed regulatory requirements***."
>
> **First Quarter Financial Results**
>
> ***First quarter gross revenues were $1.3 million, a 3.9% increase compared to $1.2 million in the first quarter of 2013.*** Due to changes in a final adopted ordinance in the San Diego market, the total number of licenses to be awarded by the city was reduced by over 75% as well as the likelihood of securing properly zoned locations. As a result of not being able to satisfy the demand of the company's clients in that market, Medbox recorded a provision for sales allowances of

approximately $963,000, resulting in a reduction of revenues for the quarter.

* * *

***Net loss for the first quarter of 2014 was $(1.3) million or $(0.04) per basic and $(0.03) per diluted share, compared to a net loss of $(330,380) or $(0.01) per basic and $(0.01) per diluted share for the first quarter of 2013.***

192. These statements were materially false and misleading when made or omitted material facts to make such statements not false and misleading for the same reasons discussed in ¶153.

193. On May 15, 2014, the Company filed a quarterly financial report with the SEC on Form 10-Q reporting financial results significantly similar to those reported in the press release. The Form 10-Q was signed by Defendants Bedrick and Iwanski. This Form 10-Q was materially false and misleading when made or omitted material facts to make such statements not false and misleading for the same reasons identified at ¶153.

194. Both the May 15, 2014 press release and Form 10-Q were materially false and misleading when made for an additional reason. Without explanation, these documents stated Medbox's Q1 2013 revenues as "1,245,522," an amount 40% lower than the $2 million revenue number reported on April 15, 2013. This restatement of revenues was materially false and misleading because it omitted the fact that a restatement was being made and omitted any explanation for why revenues were being restated.

195. On Friday, May 16, 2014, the SEC issued a report warning of "possible scams involving marijuana-related investments" and quoting Elisha Frank, co-chair of the SEC Enforcement Division's Microcap Fraud Task Force as stating "[w]henever we see incomplete or misleading disclosures, we act quickly to protect investors." Medbox would close down at $16.11 per share on Monday, May 19, 2014, from its previous close of $17.52 per share on May 16, 2014.

196. On June 27, 2014, Medbox filed a Form 10Q/A (Amendment No. 2) with the SEC ("Q1 2014 10-Q/A") that included amended financial results for the quarter ended March 31, 2014. The Q1 2014 10-Q/A announced revenue of $1,294,550 for the first quarter of 2014. The Q1 2014 10-Q/A and accompanying Sarbanes-Oxley Certifications were signed by Defendants Bedrick and Iwanski.

197. The Q1 2014 10-Q/A and accompanying Sarbanes-Oxley Certifications signed by Defendants Bedrick and Iwanski were materially false and misleading when made or omitted material facts to make such statements not false and misleading for the same reasons identified at ¶153.

198. On July 1, 2014, Medbox issued a press release entitled "Medbox Becomes a Fully Reporting Public Company – Company's Form 10 deemed effective by SEC," which stated in pertinent part as follows:

> … Medbox … today announced that the company's Form 10 filing has been deemed effective by the Securities and Exchange Commission, with no outstanding comments left to address.
>
> Dr. Bruce Bedrick, CEO of Medbox, commented, "This step is another milestone for our Company as we continue to build market leadership in the cannabis industry. ***We believe that compliance and transparency are important … for Medbox to grow as a public company.***"

199. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading for the same reasons discussed in ¶178.

200. Later that month, on July 24, 2014, the Company announced that Defendant Bedrick was stepping down as the Company's President and CEO and that Defendant Marsala, who investors were assured had "a track record of driving exceptional results in both public and private companies by implementing Fortune 500 company best practices at early stage and middle market companies," would take his place. The Company also announced that Defendant Marsala had been appointed to the Board and subsequently elected to

serve as its Chairman. Following his resignation as President and CEO of the Company, in August 2014, Defendant Bedrick also stepped down from Medbox's Board. Defendant Bedrick, however, remained with the Company as a "consultant."

201. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading because it suggested that Medbox's results and operating oversight controls would be enhanced through "Fortune 500 company best practices," when in fact, as CW described at ¶¶79, 82, Defendants continued to allow Defendant Mehdizadeh to have significant control over the Company's operations and financial reporting even after the arrival of Defendant Marsala.

202. In July and September 2014, while the price of Medbox stock was trading at fraud-inflated prices, the Company was able to facilitate the sale of $5.5 million in convertible debentures in private placements.

203. On August 15, 2014, the Company issued a press release entitled "Medbox Files 10-Q and Announces Quarterly Conference Call." The Form 10-Q Medbox filed with the SEC on the day before for the financial period ended June 30, 2014 was signed by Defendants Marsala and Iwanski and reported that the Company had achieved revenues of $434,448 and a net loss of $1,480,259 million in 2Q 2014. The Management Discussion and Analysis ("MD&A") section of the Form 10-Q stated in pertinent part that "[r]evenue was down for the current period as delays in adoption of final regulations in certain states and the ultimate timing of the application process in states with final regulations reduced and delayed the opportunity to apply for new licenses and consequently delayed the notice of the results of any license application made." The MD&A section also stated that "revenue was further reduced by additional sales allowances and refunds recorded due to a legislative change in the San

Diego market area which reduced the ability of certain clients to obtain licenses and triggered certain contract refunds."

204. This statement was materially misleading when made or omitted material facts to make such statements not false and misleading for the same reasons discussed in ¶153.

205. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading for the additional reason that it failed to disclose that the Company had learned that the DOJ had served grand jury subpoenas on Q Accountancy, and Anguiano. Specifically, the Company failed to disclose to investors that the subpoenas sought "all documents related to financial transactions involving Medbox."

206. On or about October 17, 2014, the Company disclosed that Defendant Mehdizadeh had resigned as an officer of Medbox but that he would continue to serve the Company as a consultant with the title of "Founder and Senior Advisor."

207. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading because it falsely portrayed Defendant Mehdizadeh as relinquishing any officer-level position and giving up control over the Company's day-to-day operations, when in fact he continued to have significant control over the Company's operations and financial statements.

208. On or about October 20, 2014, the Company disclosed that Medbox's CFO, Defendant Iwanski – who was just hired in that capacity by the Company in February 2014 – was being replaced by Defendant Mitchell. Defendant Iwanski, like Defendants Mehdizadeh and Bedrick before him, would stay on as a consultant.

## VIII. THE TRUTH BEGINS TO EMERGE

209. Thereafter, on Friday, October 31, 2014, following market close, the Company filed a Form 8-K with the SEC disclosing that on October 27, 2014, the Board appointed a special board committee to investigate "(i) a letter from a former Company employee to the Securities and Exchange Commission alleging wrongdoing by a former officer of the Company who is currently a consultant to the Company, and (ii) a federal grand jury document subpoena served in August 2014 on the Company's accountants by the U.S. Department of Justice, to ascertain what implications, if any, the subpoena or the letter may have with respect to the Company." The unnamed consultant in this release was Defendant Mehdizadeh, who was suspected of engaging in insider trading and securities fraud.

210. On Monday, November 3, 2014, before market open, the Company issued a press release entitled "Medbox Comments on Recent 8-K Filing." The press release attempted to minimize the potential impact of the letter from the former employee to the SEC, quoting Defendant Mehdizadeh who stated that '"[t]he former employee vowed to retaliate against the Company in any way he could after his illegal cash demands of the company were ignored. It now appears that writing a letter to government agencies filled with factual inaccuracies and blatant falsehoods was the most effective way to facilitate that goal."' The press release continues noting that "[c]urrent management commented that the Company ha[d] not found any indications that the subject matter contained in the [former employee's] letter [was] true concerning the conduct of prior officers of the company." With respect to the subpoenas served in August 2014 on the Company's accountants by the U.S. Department of Justice, the Company, in the press release "clarified that no subpoenas have been served on the Company, it's current or former officers, or anyone affiliated to the

Company." The press release ends by quoting Defendant Mehdizadeh, who reassures that he:

> "painstakingly put together the best management team and Board of Directors in our sector for a reason, and in their judgment this voluntary disclosure is what good public companies that have nothing to hide should do. The company will continue to demonstrate to shareholders, the investment community, and all other public company participants in the cannabis sector, how a well-run and respectable public company should operate. Medbox has and will continue to be the gold-standard for accountability."

211. This statement was materially false and misleading when made or omitted material facts to make such statements not false and misleading for the same reasons discussed in ¶178.

212. Despite the pre-market press release on November 3, 2014, Medbox stock still closed down at $12.45 per share for its previous close of $13.95 per share on October 31, 2014. Shares continued to fall as the financial media reported on the ensuing SEC investigation and the market impacted the full import of the disclosures, with the price of Medbox stock closing at $9.20 per share on November 5, 2014. However, the price of Medbox stock remained artificially inflated.

213. On November 7, 2014, Medbox filed a Current Report on Form 8-K with the SEC stating, "[t]he news release issued Monday, November 3, 2014 under the headline 'Medbox Comments on Recent 8-K Filing' ***was not authorized by Medbox, Inc. (the "Company") for distribution***. The 8-K filed by the Company on Friday, October 31, 2014, should be used as a reference for information regarding this matter. The filing is available on the website of the Securities and Exchange Commission."

214. On November 12, 2014, the Company filed a quarterly financial report on Form 10-Q with the SEC reporting its financial results for its 3Q 2014 ended September 30, 2014 (the "3Q 2014 Form 10-Q"). In addition to the DOJ grand jury subpoenas on Medbox's accountants, the 3Q 2014 Form 10-Q

disclosed that the SEC was conducting an investigation concerning Medbox and that it had served a subpoena on Medbox. The 3Q 2014 10-Q thus stated in pertinent part:

> On November 10, 2014, the Los Angeles Regional Office of the ***Securities and Exchange Commission (the "SEC") notified the Company that it is conducting an investigation pertaining to the Company and issued a subpoena to the Company*** for documents from December 1, 2011 to the present relating to the matters it is reviewing. The Company plans to cooperate fully with the SEC staff to complete the investigation on a timely basis.

215. Additionally, the 3Q 2014 Form 10-Q stated that MedBox had achieved net revenues of $107,429 and a net loss of $3.2 million for the quarter. The 3Q 2014 Form 10-Q was signed by Defendants Marsala and Mitchell. Finally, the MD&A section of the Form 10-Q also stated in pertinent part as follows:

> Revenue was down for the current period partially due to delays in adoption of final regulations in certain states and delays in approving license applications. Additionally, the Company's revenue model is significantly different in the third quarter of 2014 as compared to third quarter of 2013. This difference is mainly due to the fact that the Company is moving away from the business model of obtaining licenses for clients for a one-time upfront fee. The Company is in the process of modifying its business model to provide ongoing management and support services for clients so that the consulting contract would continue in perpetuity. During the transition period to a new business model, expenses to secure new contracts and licenses are incurred and revenue is deferred principally until new licenses are obtained and new dispensaries and cultivation centers begin operating.

216. The 3Q 2014 Form 10-Q was materially false and misleading or omitted material facts to make such statements not false and misleading for the reasons discussed in ¶153.

## IX. THE TRUTH IS FULLY REVEALED

217. Before the opening of trading on December 30, 2014, the Company issued a press release entitled "Medbox, Inc. to Amend and Restate Prior Period Financial Statements." The release disclosed in pertinent part as follows:

> Medbox … ***today announced it will amend and restate its financial statements for the year ended December 31, 2013***, the third and fourth quarters of 2013 and the first three quarters of 2014.
>
> In October, 2014, the Board of Directors of the Company appointed a special board committee (the "Special Committee") to investigate a federal grand jury subpoena pertaining to the Company which was served upon the Company's accountants, as well as certain alleged wrongdoing raised by a former employee of the Company. Thereafter, the Company received subpoenas from the federal grand jury and the Securities and Exchange Commission. In connection with its investigation of these matters, the Special Committee, in conjunction with the Audit Committee, initiated an internal review by management and by an outside professional advisor of certain prior period financial reporting of the Company.
>
> ***Medbox's audit committee, upon management's recommendations, has concluded that the consolidated financial statements for the year ended December 31, 2013 and for the third and fourth quarters of 2013 as well as for the quarters ended March 31, 2014, June 30, 2014 and September 30, 2014, should no longer be relied upon and will be restated to correct the errors. As part of the investigative process, Medbox will also examine the financial statements for 2012 and for the first two quarters of 2013 and, if necessary, correct those as well.*** The company intends to correct the errors in its financial statements to bring them into conformity with accounting principles generally accepted in the United States of America (GAAP) and SEC regulations. Medbox plans to engage an independent CPA firm to consult with and assist the Company's staff with preparing restated financial statements as soon as possible.
>
> ***Medbox stated that it appeared that revenue had been recognized too soon on some customer contracts. The restated financial statements will recognize revenue at a later time as up-front payments are recognized over the longer of the contract period or the customer relationship, revenue is deferred until key contingencies are removed and it is clear the revenue has been earned in accordance with GAAP and SEC regulations.*** Other adjustments to its financial statements are also possible in connection with the Company's on going review of its prior period financial statements.
>
> The Company's announcement that prior period financial statements can no longer be relied upon ***permit the Company's existing lenders to trigger default remedies***, however, ***the Company's lenders have agreed to forbearance on declaring a default pending conclusion of on-going discussions to refinance the Company***.
>
> Guy Marsala, CEO of Medbox commented, "The steps we are announcing today are part of the ***continued initiative of our new board of directors and new management team to implement better controls and emphasize transparency***. Improved processes and controls contributed to our ability to uncover these errors and bring them to the attention of our independent auditors and audit committee."

218. In connection with the December 30, 2014 press release announcing the restatement, later that day the Company also filed a Form 8-K with the SEC that disclosed that the Company's Audit Committee discovered evidence of the falsity of the statements about the Company's financial results that it had previously disclosed. The Form 8-K stated in pertinent part:

> [T]he consolidated financial statements for the year ended ***December 31, 2013 and for the third and fourth quarters therein, as well as for the quarters ended March 31, 2014, June 30, 2014 and September 30, 2014, together with all three, six and nine month financial information contained therein, should no longer be relied upon and will be restated to correct the errors***. ***Therefore, all earnings press releases and similar prior communications issued by the Company as well as other prior statements made by or on behalf of the Company relating to financial reporting or results for those periods should not be relied upon***. Lastly, as part of the investigation process, the Company will also examine its financial statements for 2012 and the first two quarters of 2013 and if necessary correct those as well.

219. Following the Company's December 30, 2014 announcement that it would be restating at least its financial statements for the year ended December 31, 2013, the third and fourth quarters of 2013 and the first three quarters of 2014, in an effort to limit the damage caused by the Company's restatement announcement to the stock price, Defendant Mehdizadeh issued a press release via Marketwired at 2:02 PM ET on December 30, 2014 stating that "Founder and Majority Shareholder of Medbox, Inc. (OTCQB: MDBX) issued a letter to fellow shareholders today regarding the vision for the future of the company and insight into recent developments affecting the company." The press release then continues with the text of the purported letter, the content of which stated:

> *Dear Medbox Shareholders:*
>
> *It has truly been an interesting journey during the last 2 years. When I commenced operations of the private company in 2010 that later became Medbox, I never anticipated that the company would be as noteworthy and relevant as we are today. The company has a rare blend of consulting and patented technology that gives entrepreneurs a jumpstart on realizing their dreams of operating a business in a newly emerging industry. I have thoroughly enjoyed watching our*

*client's dreams be realized, along with our shareholders that have watched our company grow and prosper over these years.*

*Medbox rocketed to stardom and notoriety amidst a positive outlook for the marijuana industry in November of 2012 based on favorable election results and highlighted by several media sources, including the Wall Street Journal, which ushered in what many have called the 'Green Rush.' In the days that followed, the company's stock price saw unprecedented increases that was said to have resulted from investors looking to participate in 'The Next Great American Industry.'* ***Up until 3 months ago, I was involved in almost every decision the company made****, and my decision at that time was to caution investors about investing in any company in the marijuana industry because of the inherent risks. We also publicly cautioned investors to temper their expectations about our stock and to make informed investment decisions. The company fielded criticism in doing so, but we felt that separating ourselves from other public company industry participants in our sector and focusing on protecting investors as best we could was a beneficial direction for the company. In my opinion, one of the keys to Medbox's success has been superior corporate messaging and timely dissemination of information to our shareholders.*

*Since that point in time a little over two years ago, I have made it my mission to take the company from being a non-reporting pinksheet to being a fully reporting SEC Filer. I took it upon myself to set these goals and achieve them for the benefit of the company and its shareholders.* ***We did this to have an increased level of transparency so that investors can think of Medbox as the public company standard for respectability and reliability in the newly emerging marijuana industry that was taking shape. As a result, we engaged a Public Company Accounting and Oversight Board (PCAOB) registered auditor, Q Accountancy Corporation, and also hired a full-time Chief Financial Officer, Thomas Iwanski, a CPA with excellent references and extensive public company experience.***

***Since the company engaged Mr. Iwanski and Q Accountancy Corporation, I also recruited a star-studded board and together we appointed Guy Marsala to lead the company as the Chief Executive Officer. As it was explained to me, in situations where a new CEO is brought on, they typically look to appoint their own Chief Financial Officer. Thus, when Mr. Marsala decided to replace Mr. Iwanski as CFO, I did not give it a second thought, although I was sad to see him go since his experience with public company oversight was superb.***

*Today, the company's current management issued a statement regarding the company's financials. Prior management, including Mr. Iwanski and the company's current auditor, both disagree with current management's position on the matter. Both the current auditor and prior CFO have made their opinions known to current management, to no avail. Both have stated that they had support for recognizing revenue in the periods in which they were recognized. However, the company's current CFO has a difference of opinion on that aspect and believes that the revenue in question should be recognized in later periods, which has now resulted in a proposed*

*restatement set to occur. This fact along with the fact that the revenue items in dispute amount to less than 10% of the total revenue booked for 2013, was not accurately discussed in the disclosure released this morning.*

*As stated previously in this letter,* ***corporate messaging and communication to shareholders is one of the many aspects that made Medbox a great company.*** *I now feel the company is not doing enough to accurately disclose matters in a manner that is easy to understand and digest by the public. Stating that the current CFO has a difference of opinion with the prior CFO and current auditor would have gone a long way to explaining the situation properly. Instead, we have the inaccurate and incomplete disclosure that was released today that leaves the public with more questions than giving them the answers they need to understand the situation.*

*As we were on a path to transition to NASDAQ and had filed an application to be listed on that exchange, I felt that since I had a checkered past that was disclosed in company filings it would tarnish the Medbox brand if I stayed involved in any capacity other than as a consultant to the company. Although these offenses were non-violent, non-securities related offenses, all of which resulted in probation and all occurring prior to Medbox, I still felt that the company would always be a target of 'short and distort' campaigns by financial bloggers if I remained an Officer or Director.* ***To that end, I recently gave full control to the board and current management to steer the ship and navigate the company properly.*** *Recent events have caused me to call into question whether current management and the board of directors has enough industry experience to properly run this company. It is for this reason that I will be adding industry-experienced members to the board to work with the current board members to more effectively operate the company. I will also be taking a more active role with the company again to ensure our short-term and long-term goals can be achieved.*

*I believe that a founder's passion separates a typical company from a company that achieves the utmost success. The company needs my help now more than ever, and I intend to fill that need to the best of my ability going forward. I look forward to a strong and prosperous future for Medbox.*

*Regards,*
*P. Vincent Mehdizadeh"*

(Italics in original, bold emphasis added)

220. On this news, the price of Medbox stock declined precipitously, trading as low as $4.50 per share during intraday trading on December 30, 2014, ultimately closing at $5.58 per share on December 31, 2014, ***down significantly*** from its January 8, 2014 Class Period high of $93.50 per share – with the Company shedding ***billions*** in lost market capitalization.

## X. POST-CLASS PERIOD REVELATIONS AND FALLOUT

221. On December 31, 2014, the Company issued a press release announcing that Defendant Siegel had been appointed as Chairman of the Board, replacing Defendant Marsala, who would remain on the Board as a director.

222. On January 9, 2015, Defendant Mehdizadeh field a DEFC14C (Schedule 14C) with the SEC stating that instead of holding a special stockholders' meeting, the majority of Medbox's stockholders executed a written consent that day to replace all of Medbox's current directors.

223. The January 16, 2015 Lawsuit claimed the January 9, 2015 written consent was not legally effective. The complaint stated that the current board of directors had discovered "significant" evidence related to Defendant Mehdizadeh's conduct while employed in various capacities at Medbox. The complaint stated that Defendant Mehdizadeh engaged in at least six instances of misconduct while serving at Medbox:

(1) engaged in manipulation of Medbox's revenue recognition and other financial disclosures;

(2) made public statements related to Medbox that contained false and/or misleading information;

(3) potentially violated numerous securities laws;

(4) engaged in what appear to be improper transactions involving third-party affiliates;

(5) made material misrepresentations to Medbox investors and/or potential investors; and

(6) ignored and/or attempted to hide significant accounting and other financial control and oversight issues existing at Medbox.

224. On February 6, 2015, Medbox filed a Form 8-K with the SEC that stated that the Company had replaced Q Accountancy as its independent auditor, with Marcum LLP – ***almost two years after*** it previously claimed to have replaced its troubled auditor.

225. On March 9, 2015 Medbox filed a Form 8-K, which provided the Company's results of its investigation of financial statements for 2012, 2013, and 2014. The relevant part of the Form 8-K read:

> ***As a result of certain errors described below, discovered in connection with such comprehensive review, the Audit Committee, upon management's recommendation, concluded on March 6, 2015 that, in addition to the restatements announced in the Original 8-K, the consolidated financial statements for the year ended December 31, 2012, together with all three, six and nine month financial information contained therein, and the quarterly information for the first two quarters of the 2013 fiscal year, should no longer be relied upon and will be restated to correct the errors. Therefore, all earnings press releases and similar prior communications issued by the Company as well as other prior statements made by or on behalf of the Company relating to financial reporting or results for those periods should not be relied upon.***
>
> Management and its professional advisor have completed the review of revenues recognized and related contracts for the years 2012 and 2013 and interim period for the nine months ended September 30, 2014. Conclusions thus far from the review include:
>
> 2) revenue on some contracts with customers was recognized before all required revenue recognition criteria were met, resulting in an overstatement of revenue in ranges of approximately $1,300,000 to $1,500,000, $3,000,000 to $3,200,000 and $600,000 to $900,000 for the years 2012, 2013 and the nine months ended September 30, 2014, respectively;
>
> 2) certain transactions with related parties in ranges of approximately $500,000 to $600,000 and $800,000 to $900,000, for 2012 and 2013, respectively were improperly recorded as revenue instead of additional paid in capital in stockholders' equity; and
>
> 3) certain inventory costs were capitalized improperly resulting in an understatement of cost of sales. Costs of approximately $600,000 and in a range of approximately $1,300,000 to $1,400,000, for 2013 and the nine months ended September 30, 2014, respectively previously reported in inventory in 2013 and 2014, respectively, will be recorded as cost of sales in the statement of operations for 2013 and the nine months ended September 30, 2014, respectively. These costs incurred prior to executing a contract with a customer, seeking licenses and locations and closing on real estate to operate a dispensary or cultivation center should have been recorded as current period expense.

226. On March 11, 2015 and March 16, 2015, Medbox filed multiple amendments to previous financial statements with the SEC. First, Medbox filed

a 10-12G/A (Form 10 Amendment No. 3) with the SEC, which amended the Form 10 the Company originally filed on January 21, 2014.

227. Second, the Company filed a Form 10-Q/A (Amendment No. 1) that amended the Form 10-Q Medbox had initially filed with the SEC on November 11, 2014.

228. Third, Medbox filed a Form 10-Q/A (Amendment No. 1) that amended the Form 10-Q that the Company had originally filed on August 14, 2014.

229. Lastly, Medbox filed a Form 10-Q/A (Amendment No. 3), which amended the Form 10-Q the Company filed originally back on May 15, 2014.

230. Indeed, the fallout has continued to haunt Medbox shareholders. As of July 27, 2015, the stock was trading at a paltry $.10 per share.

## XI. NO SAFE HARBOR

231. Medbox's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

232. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Medbox who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally most of the purported "Safe Harbor" warnings were themselves misleading because they

warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## XII. ADDITIONAL SCIENTER ALLEGATIONS

233. As alleged herein, Defendants acted with scienter in that Defendants either knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or their own name, were materially false and misleading, that such statements or documents would be issued or disseminated to the investing public, and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Medbox, their control over, and/or receipt of modification of Medbox's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Medbox, participated in the fraudulent scheme alleged herein.

234. Defendants knew, or with deliberate recklessness disregarded, that public documents and statements issued in the name of the Company were materially false and misleading; knew, or with deliberate recklessness disregarded, that such documents or statements would be issued or disseminated to the investing public; and substantially participated or acquiesced in the issuance or dissemination of such documents or statements as primary violators of the federal securities laws.

### A. Medbox is a Tiny Company With One Product

235. According to the Company's 2014 Form 10-K, filed with the SEC on or about March 26, 2015, as of December 31, 2014, Medbox had just five full-time employees and three independent contractors. That number was down from the seven full-time employees and 12 independent contractors reported in

the Company's 2013 amended Form 10-12G/A, filed on or about May 13, 2014. Accordingly, given the small size of the Company during the Class Period, the Individual Defendants were intimately aware of, and involved in, all core operations related to the Company's ***only product***, including the Company's business including sales, growth, projections, as well as participated in the drafting and issuance of the Company's press releases, financial statements, and SEC filings. Thus, the Individual Defendants each knew of the fraudulent acts alleged herein.

**B. Insider Trading**

236. With the writing on the wall as to Medbox's still bloated stock price, fraudulent accounting practices, and having caught the attention of both the SEC and DOJ, certain insiders, including Defendants Mehdizadeh, Bedrick, Lowe, and Siegel decided to unload more than $2.5 million worth of their personally held Medbox stock. Indeed, prior to June 2014, there had been ***no publicly reported sales*** of Medbox stock by ***any*** Medbox officer or director ***ever***.

237. Incredibly, as the chart below demonstrates, the vast majority of stock sales made by Defendants Mehdizadeh, Bedrick, Lowe, and Siegel occurred ***after*** the Company discovered that the DOJ had served grand jury subpoenas on Medbox's accountants. Specifically, between August 2014 (when the Company discovered the DOJ grand jury subpoenas were issued) and October 31, 2014 (when the Company finally disclosed the DOJ grand jury subpoenas to the public), Defendants Mehdizadeh, Bedrick, Lowe, and Siegel disposed of 102,991 shares for more than $1.0 million in proceeds.

238. The following charts identify the publicly reported insider trading of Medbox stock that occurred during the Class Period by certain insiders including Defendants Mehdizadeh, Bedrick, Lowe, and Siegel:

| Bedrick | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 9/2/2014 | 450 | $11.60 | $5,220.00 |
| | 9/3/2014 | 450 | $10.85 | $4,882.50 |
| | 9/4/2014 | 450 | $11.15 | $5,017.50 |
| | 9/5/2014 | 450 | $10.75 | $4,837.50 |
| | 9/8/2014 | 450 | $10.67 | $4,801.50 |
| | 9/9/2014 | 450 | $10.40 | $4,680.00 |
| | 9/10/2014 | 450 | $10.10 | $4,545.00 |
| | 9/11/2014 | 450 | $10.11 | $4,549.50 |
| | 9/12/2014 | 450 | $10.33 | $4,648.50 |
| | 9/15/2014 | 450 | $9.90 | $4,455.00 |
| | 9/16/2014 | 450 | $9.66 | $4,347.00 |
| | 9/17/2014 | 450 | $9.76 | $4,392.00 |
| | 9/18/2014 | 450 | $9.30 | $4,185.00 |
| | 9/19/2014 | 450 | $9.03 | $4,063.50 |
| | 9/22/2014 | 450 | $8.86 | $3,987.00 |
| | 9/23/2014 | 450 | $8.27 | $3,721.50 |
| | 9/24/2014 | 450 | $8.05 | $3,622.50 |
| | 9/25/2014 | 450 | $11.07 | $4,981.50 |
| | 9/26/2014 | 450 | $10.30 | $4,635.00 |
| | 9/29/2014 | 450 | $10.12 | $4,554.00 |
| | 9/30/2014 | 450 | $9.07 | $4,081.50 |
| | 10/1/2014 | 450 | $9.38 | $4,221.00 |
| | 10/2/2014 | 450 | $8.92 | $4,014.00 |
| | 10/3/2014 | 450 | $9.12 | $4,104.00 |
| | 10/6/2014 | 450 | $9.29 | $4,180.50 |
| | 10/7/2014 | 450 | $9.13 | $4,108.50 |
| | 10/8/2014 | 450 | $8.69 | $3,910.50 |
| | 10/9/2014 | 450 | $9.48 | $4,266.00 |
| | 10/10/2014 | 450 | $9.37 | $4,216.50 |
| | 10/13/2014 | 450 | $9.00 | $4,050.00 |
| | 10/14/2014 | 309 | $9.02 | $2,787.18 |
| | 10/14/2014 | 141 | $8.76 | $1,235.16 |

| **Bedrick** | **Date** | **Shares** | **Price** | **Proceeds** |
|---|---|---|---|---|
| | 10/15/2014 | 450 | $9.12 | $4,104.00 |
| | 10/16/2014 | 450 | $8.85 | $3,982.50 |
| | 10/17/2014 | 450 | $8.90 | $4,005.00 |
| | 10/20/2014 | 450 | $9.35 | $4,207.50 |
| | 10/21/2014 | 450 | $10.73 | $4,828.50 |
| | 10/22/2014 | 450 | $11.25 | $5,062.50 |
| | 10/23/2014 | 450 | $11.00 | $4,950.00 |
| | 10/24/2014 | 391 | $11.11 | $4,344.01 |
| | **Total:** | **17,491** | | **$170,784.85** |

| **PVM International, Inc.**[12] **(Mehdizadeh)** | **Date** | **Shares** | **Price** | **Proceeds** |
|---|---|---|---|---|
| | 6/13/2014 | 68,385 | $7.00 | $478,695.00 |
| | 6/30/2014 | 1,200 | $17.70 | $21,240.00 |
| | 9/4/2014 | 500 | $10.76 | $5,380.00 |
| | 9/5/2014 | 500 | $11.13 | $5,565.00 |
| | 9/8/2014 | 500 | $10.80 | $5,400.00 |
| | 9/9/2014 | 500 | $10.45 | $5,225.00 |
| | 9/10/2014 | 500 | $10.18 | $5,090.00 |
| | 9/11/2014 | 500 | $10.13 | $5,065.00 |
| | 9/12/2014 | 500 | $10.32 | $5,160.00 |
| | 9/15/2014 | 500 | $10.12 | $5,060.00 |
| | 9/16/2014 | 500 | $9.76 | $4,880.00 |
| | 9/17/2014 | 500 | $9.41 | $4,705.00 |
| | 9/18/2014 | 500 | $9.50 | $4,750.00 |
| | 9/19/2014 | 500 | $9.30 | $4,650.00 |
| | 9/22/2014 | 500 | $8.60 | $4,300.00 |
| | 9/23/2014 | 500 | $8.45 | $4,225.00 |
| | 9/24/2014 | 500 | $8.00 | $4,000.00 |
| | 9/25/2014 | 500 | $9.60 | $4,800.00 |
| | 9/26/2014 | 500 | $10.85 | $5,425.00 |
| | 9/29/2014 | 500 | $10.02 | $5,010.00 |
| | 9/30/2014 | 500 | $9.72 | $4,860.00 |

[12] PVM International, Inc. is owned by Mehdizadeh.

| PVM International, Inc.[12] (Mehdizadeh) | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 10/1/2014 | 500 | $9.35 | $4,675.00 |
| | 10/2/2014 | 500 | $9.11 | $4,555.00 |
| | 10/3/2014 | 500 | $9.01 | $4,505.00 |
| | 10/6/2014 | 500 | $9.20 | $4,600.00 |
| | 10/7/2014 | 500 | $9.16 | $4,580.00 |
| | 10/8/2014 | 500 | $8.88 | $4,440.00 |
| | 10/9/2014 | 500 | $9.01 | $4,505.00 |
| | 10/10/2014 | 500 | $9.45 | $4,725.00 |
| | 10/13/2014 | 500 | $8.51 | $4,255.00 |
| | 10/14/2014 | 500 | $8.97 | $4,485.00 |
| | 10/15/2014 | 500 | $8.57 | $4,285.00 |
| | 10/16/2014 | 500 | $8.75 | $4,375.00 |
| | 10/17/2014 | 500 | $8.79 | $4,395.00 |
| | 10/20/2014 | 500 | $8.89 | $4,445.00 |
| | 10/21/2014 | 500 | $10.48 | $5,240.00 |
| | 10/22/2014 | 500 | $11.34 | $5,670.00 |
| | 10/23/2014 | 500 | $11.06 | $5,530.00 |
| | 10/24/2014 | 500 | $11.20 | $5,600.00 |
| | 10/27/2014 | 500 | $11.40 | $5,700.00 |
| | 10/28/2014 | 500 | $12.32 | $6,160.00 |
| | 10/29/2014 | 500 | $13.51 | $6,755.00 |
| | 10/30/2014 | 500 | $13.20 | $6,600.00 |
| | 10/31/2014 | 500 | $13.95 | $6,975.00 |
| | 11/3/2014 | 500 | $13.85 | $6,925.00 |
| | 11/4/2014 | 500 | $12.46 | $6,230.00 |
| | 11/5/2014 | 500 | $11.75 | $5,875.00 |
| | 11/6/2014 | 500 | $9.43 | $4,715.00 |
| | 11/7/2014 | 500 | $10.37 | $5,185.00 |
| | 11/10/2014 | 500 | $10.75 | $5,375.00 |
| | 11/11/2014 | 500 | $9.95 | $4,975.00 |
| | 11/12/2014 | 500 | $9.72 | $4,860.00 |
| | 11/13/2014 | 500 | $9.20 | $4,600.00 |
| | 11/14/2014 | 500 | $10.05 | $5,025.00 |
| | 11/17/2014 | 500 | $9.08 | $4,540.00 |
| | 11/18/2014 | 500 | $8.90 | $4,450.00 |
| | 11/19/2014 | 500 | $8.82 | $4,410.00 |
| | 11/20/2014 | 500 | $8.76 | $4,380.00 |

| PVM International, Inc.[12] (Mehdizadeh) | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 11/21/2014 | 500 | $9.14 | $4,570.00 |
| | 11/24/2014 | 500 | $9.05 | $4,525.00 |
| | 11/25/2014 | 500 | $9.44 | $4,720.00 |
| | 11/26/2014 | 500 | $9.10 | $4,550.00 |
| | 11/28/2014 | 500 | $8.95 | $4,475.00 |
| | 12/1/2014 | 500 | $8.81 | $4,405.00 |
| | 12/2/2014 | 500 | $8.63 | $4,315.00 |
| | 12/3/2014 | 500 | $8.15 | $4,075.00 |
| | 12/4/2014 | 500 | $7.90 | $3,950.00 |
| | 12/5/2014 | 500 | $8.15 | $4,075.00 |
| | 12/8/2014 | 500 | $7.97 | $3,985.00 |
| | 12/9/2014 | 500 | $7.55 | $3,775.00 |
| | 12/10/2014 | 500 | $7.40 | $3,700.00 |
| | 12/11/2014 | 500 | $7.38 | $3,690.00 |
| | 12/12/2014 | 500 | $5.70 | $2,850.00 |
| | 12/15/2014 | 500 | $5.33 | $2,665.00 |
| | 12/16/2014 | 500 | $5.19 | $2,595.00 |
| | 12/17/2014 | 500 | $4.73 | $2,365.00 |
| | 12/18/2014 | 500 | $6.75 | $3,375.00 |
| | 12/19/2014 | 500 | $7.66 | $3,830.00 |
| | 12/22/2014 | 500 | $7.25 | $3,625.00 |
| | 12/23/2014 | 500 | $6.71 | $3,355.00 |
| | 12/24/2014 | 500 | $6.30 | $3,150.00 |
| | 12/29/2014 | 500 | $5.90 | $2,950.00 |
| | **Total:** | **109,585** | | **$871,655.00** |

| Vincent Chase, Inc.[13] (Mehdizadeh) | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 7/7/2014 | 11,500 | $18.00 | $207,000.00 |
| | 7/7/2014 | 42,857 | $7.00 | $299,999.00 |
| | 8/18/2014 | 7,500 | $7.50 | $56,250.00 |
| | **Total:** | **61,857** | | **$563,249.00** |

[13] Vincent Chase, Inc. is owned by Mehdizadeh.

| Siegel, Ned | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 9/8/2014 | 500 | $10.48 | $5,240.00 |
| | 9/9/2014 | 400 | $10.48 | $4,192.00 |
| | 9/10/2014 | 1100 | $10.13 | $11,143.00 |
| | 9/11/2014 | 1000 | $10.18 | $10,180.00 |
| | 9/12/2014 | 1000 | $10.23 | $10,230.00 |
| | 9/15/2014 | 800 | $9.92 | $7,936.00 |
| | 9/16/2014 | 800 | $9.58 | $7,664.00 |
| | 9/17/2014 | 800 | $9.57 | $7,656.00 |
| | 9/18/2014 | 800 | $9.36 | $7,488.00 |
| | 9/19/2014 | 800 | $8.88 | $7,104.00 |
| | 9/22/2014 | 800 | $8.67 | $6,936.00 |
| | 9/23/2014 | 800 | $8.23 | $6,584.00 |
| | 9/24/2014 | 800 | $8.61 | $6,888.00 |
| | 9/25/2014 | 800 | $10.95 | $8,760.00 |
| | 9/26/2014 | 800 | $10.23 | $8,184.00 |
| | 9/29/2014 | 1500 | $ 9.84 | $14,760.00 |
| | 9/30/2014 | 1500 | $9.26 | $13,890.00 |
| | 10/1/2014 | 400 | $9.22 | $3,688.00 |
| | 10/2/2014 | 300 | $8.83 | $2,649.00 |
| | 10/3/2014 | 300 | $9.24 | $2,772.00 |
| | 10/6/2014 | 700 | $9.27 | $6,489.00 |
| | 10/7/2014 | 700 | $8.94 | $6,258.00 |
| | 10/8/2014 | 700 | $8.82 | $6,174.00 |
| | 10/9/2014 | 700 | $9.51 | $6,657.00 |
| | 10/10/2014 | 700 | $9.15 | $6,405.00 |
| | 10/13/2014 | 700 | $8.95 | $6,265.00 |
| | 10/14/2014 | 700 | $8.79 | $6,153.00 |
| | 10/15/2014 | 700 | $8.96 | $6,272.00 |
| | 10/16/2014 | 700 | $8.79 | $6,153.00 |
| | 10/17/2014 | 700 | $8.94 | $6,258.00 |
| | 10/20/2014 | 700 | $9.59 | $6,713.00 |
| | 10/21/2014 | 700 | $10.96 | $7,672.00 |

| Siegel, Ned | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 10/22/2014 | 700 | $10.81 | $7,567.00 |
| | 10/23/2014 | 700 | $11.14 | $7,798.00 |
| | 10/24/2014 | 700 | $11.14 | $7,798.00 |
| | 10/27/2014 | 700 | $12.11 | $8,477.00 |
| | 10/28/2014 | 700 | $13.14 | $9,198.00 |
| | 10/29/2014 | 700 | $13.59 | $9,513.00 |
| | 10/30/2014 | 700 | $13.69 | $9,583.00 |
| | 10/31/2014 | 700 | $14.01 | $9,807.00 |
| | 11/3/2014 | 800 | $12.53 | $10,024.00 |
| | 11/4/2014 | 800 | $11.88 | $9,504.00 |
| | 11/5/2014 | 200 | $10.62 | $2,124.00 |
| | 11/6/2014 | 1400 | $10.22 | $14,308.00 |
| | 11/7/2014 | 800 | $10.80 | $8,640.00 |
| | 11/10/2014 | 800 | $10.23 | $8,184.00 |
| | 11/11/2014 | 800 | $9.75 | $7,800.00 |
| | 11/12/2014 | 800 | $10.17 | $8,136.00 |
| | 11/13/2014 | 800 | $9.68 | $7,744.00 |
| | 11/14/2014 | 800 | $9.35 | $7,480.00 |
| | 11/17/2014 | 800 | $9.04 | $7,232.00 |
| | 11/18/2014 | 800 | $8.89 | $7,112.00 |
| | 11/19/2014 | 800 | $8.75 | $7,000.00 |
| | 11/20/2014 | 800 | $9.08 | $7,264.00 |
| | 11/21/2014 | 800 | $9.04 | $7,232.00 |
| | 11/24/2014 | 800 | $9.26 | $7,408.00 |
| | 11/25/2014 | 800 | $9.11 | $7,288.00 |
| | 11/26/2014 | 800 | $8.96 | $7,168.00 |
| | 11/28/2014 | 600 | $8.87 | $5,322.00 |
| | 12/1/2014 | 700 | $8.72 | $6,104.00 |
| | 12/2/2014 | 300 | $8.61 | $2,583.00 |
| | **Totals** | **46000** | | **$456,811.00** |

| Lowe, Mitchell | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 9/10/2014 | 1100 | $10.13 | $11,143.00 |
| | 9/11/2014 | 1000 | $10.18 | $10,180.00 |
| | 9/12/2014 | 1000 | $10.23 | $10,230.00 |
| | 9/15/2014 | 800 | $9.92 | $7,936.00 |
| | 9/16/2014 | 800 | $9.58 | $7,664.00 |
| | 9/17/2014 | 800 | $9.36 | $7,488.00 |
| | 9/18/2014 | 800 | $9.57 | $7,656.00 |
| | 9/19/2014 | 800 | $8.88 | $7,104.00 |
| | 9/22/2014 | 800 | $8.67 | $6,936.00 |
| | 9/23/2014 | 800 | $8.23 | $6,584.00 |
| | 9/24/2014 | 800 | $8.61 | $6,888.00 |
| | 9/25/2014 | 800 | $10.95 | $8,760.00 |
| | 9/26/2014 | 800 | $10.23 | $8,184.00 |
| | 9/29/2014 | 500 | $9.84 | $4,920.00 |
| | 9/30/2014 | 300 | $9.26 | $2,778.00 |
| | 10/1/2014 | 600 | $9.22 | $5,532.00 |
| | 10/2/2014 | 700 | $8.83 | $6,181.00 |
| | 10/3/2014 | 700 | $9.24 | $6,468.00 |
| | 10/6/2014 | 400 | $9.27 | $3,708.00 |
| | 10/7/2014 | 400 | $8.94 | $3,576.00 |
| | 10/8/2014 | 300 | $8.82 | $2,646.00 |
| | 10/9/2014 | 700 | $9.51 | $6,657.00 |
| | 10/10/2014 | 700 | $9.15 | $6,405.00 |
| | 10/13/2014 | 700 | $8.95 | $6,265.00 |
| | 10/14/2014 | 700 | $8.79 | $6,153.00 |
| | 10/15/2014 | 700 | $8.96 | $6,272.00 |
| | 10/16/2014 | 700 | $8.79 | $6,153.00 |
| | 10/17/2014 | 700 | $8.94 | $6,258.00 |
| | 10/20/2014 | 700 | $9.59 | $6,713.00 |
| | 10/21/2014 | 700 | $10.96 | $7,672.00 |
| | 10/22/2014 | 700 | $10.81 | $7,567.00 |
| | 10/23/2014 | 700 | $11.14 | $7,798.00 |

| Lowe, Mitchell | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 10/24/2014 | 700 | $11.14 | $7,798.00 |
| | 10/27/2014 | 700 | $12.11 | $8,477.00 |
| | 10/28/2014 | 700 | $13.14 | $9,198.00 |
| | 10/29/2014 | 700 | $13.59 | $9,513.00 |
| | 10/30/2014 | 700 | $13.69 | $9,583.00 |
| | 10/31/2014 | 700 | $14.01 | $9,807.00 |
| | 11/3/2014 | 800 | $12.53 | $10,024.00 |
| | 11/4/2014 | 800 | $11.88 | $9,504.00 |
| | 11/5/2014 | 200 | $10.62 | $2,124.00 |
| | 11/6/2014 | 1400 | $10.22 | $14,308.00 |
| | 11/7/2014 | 800 | $10.80 | $8,640.00 |
| | 11/10/2014 | 800 | $10.23 | $8,184.00 |
| | 11/11/2014 | 800 | $9.75 | $7,800.00 |
| | 11/12/2014 | 800 | $10.17 | $8,136.00 |
| | 11/13/2014 | 800 | $9.68 | $7,744.00 |
| | 11/14/2014 | 800 | $9.35 | $7,480.00 |
| | 11/17/2014 | 800 | $9.04 | $7,232.00 |
| | 11/18/2014 | 800 | $8.89 | $7,112.00 |
| | 11/19/2014 | 800 | $8.75 | $7,000.00 |
| | 11/20/2014 | 800 | $9.08 | $7,264.00 |
| | 11/21/2014 | 800 | $9.04 | $7,232.00 |
| | 11/24/2014 | 800 | $9.26 | $7,408.00 |
| | 11/25/2014 | 800 | $9.11 | $7,288.00 |
| | 11/26/2014 | 800 | $8.96 | $7,168.00 |
| | 11/28/2014 | 600 | $8.87 | $5,322.00 |
| | 12/1/2014 | 700 | $8.72 | $6,104.00 |
| | 12/2/2014 | 300 | $8.61 | $2,583.00 |
| | **Totals** | **43000** | | **$427,555.00** |

| Feinstein, Matt | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 12/2/2014 | 12000 | $8.63 | $103,560.00 |
| | **Totals** | **12000** | | **$103,560.00** |

### 1. Defendant Mehdizadeh's Suspicious Stock Sales

239. Defendant Mehdizadeh's stock sales detailed in the above chart were suspicious in both timing and amount, and provide additional inference of scienter as to Defendant Mehdizadeh.

240. Specifically, Defendant Mehdizadeh's June 2014 stock sales (which he caused PVM to make) were his ***first such publicly reported sales*** of Medbox stock ***ever***.

241. Further, in just a six month period – from June 2014 through the end of the Class Period, December 29, 2014, Defendant Mehdizadeh (or the entities controlled by him) made an astounding 85 separate sale transactions, unloading 171,442 shares for proceeds of $1,434,904.00.

242. Indeed, Defendant Mehdizadeh's illicit stock proceeds of more than $1.4 million dwarfs the $168,625 in fees paid to Mehdizadeh in 2014, as reported by the Company in its 2014 Form 10-K, filed with the SEC on or about March 26, 2015.

243. Defendant Mehdizadeh's six month insider selling spree occurred at a time when he had actual knowledge of the wrongdoing alleged herein.

244. According to the complaint filed on behalf of the Company on January 16, 2015, in the Superior Court of California for the County of Los Angeles, significant evidence suggests that Defendant Mehdizadeh "while employed in various capacities at Medbox" engaged in manipulation of Medbox's revenue recognition and other financial disclosures, made public statements related to Medbox that contained false and/or misleading information, potentially violated numerous securities laws, engaged in what appear to be improper transactions involving third-party affiliates, made material misrepresentations to Medbox's investors and/or potential investors, and ignored and/or attempted to hide significant accounting and other financial control and oversight issues existing at Medbox.

245. Indeed, according to the January 16, 2015 complaint, Defendant Mehdizadeh knew "in or about August 2014" that the DOJ had served grand jury subpoenas on Medbox's accountants – Q Accountancy and Anguiana – seeking, among other things, all documents related to financial transactions involving Medbox.

**2. Defendant Bedrick's Suspicious Stock Sales**

246. Defendant Bedrick's stock sales detailed in the above chart were suspicious in both timing and amount, and provide additional inference of scienter as to Defendant Bedrick.

247. As an initial matter, Defendant Bedrick's September 2014 sales were his ***first publicly reported sales*** of Medbox stock ***ever***.

248. Further, Bedrick's stock sales are highly suspicious as all of Bedrick's sales occurred in just an 8 week window following his abrupt resignation as the Company's CEO in late July 2014.

249. Finally, the start of Bedrick's stock sales coincide with the discovery by the Company that Medbox's accountants received a federal grand jury document subpoenas courtesy of the DOJ in August 2014. Bedrick would have actual knowledge of the DOJ subpoenas since he remained on the Medbox Board until August 2014, and served as a consultant with the Company until October 31, 2014. Bedrick's well-timed stock sales conclude on or about October 24, 2014 – just one week prior to the Company's public disclosure of the DOJ subpoenas and the SEC investigation on October 31, 2014. Bedrick's consulting agreement was also terminated on October 31, 2014.

250. Thus, in just eight weeks, between his resignation as CEO and as a director of the Company and the termination of his "consulting" agreement with the Company, Defendant Bedrick managed to unloaded more than 17,000 shares of his personally-held Medbox stock at artificially-inflated prices for proceeds in

excess of $170,000 – an amount which exceeds his 2014 reported annual salary.[14]

### 3. Defendant Lowe's Suspicious Stock Sales

251. Defendant Lowe's stock sales detailed in the above chart were suspicious in both timing and amount, and provide additional inference of scienter as to Defendant Lowe.

252. As an initial matter, Defendant Lowe's September 2014 sales were his ***first publicly reported sales*** of Medbox stock ***ever***.

253. The timing of Lowe's stock sales are highly suspicious considering all of the sales took place after the Company was informed of the DOJ subpoena's in August 2014. As a Board member, Lowe would have actual knowledge of the DOJ subpoena. Indeed from September 2014, when his stock sales started, through October 31, 2014, when the Company finally disclosed the DOJ subpoenas, Lowe managed to dump 26,900 shares for proceeds of approximately $270,000, at fraud inflated prices ranging from $8.23 per share to $14.01 per share.

254. Further, Lowe's stock sales in November 2014 and December 2014, are also highly suspicious as they occurred at a time when he was a member of the purported special committee appointed to investigate whether any evidence of wrongdoing existed related to the allegations in the letter sent by a former employee of Medbox to the SEC and the DOJ federal grand jury document subpoenas sent to Medbox's accountants.

255. According to the January 16, 2015 Complaint, the special committee did in fact uncover wrongdoing including, among other things, manipulation of Medbox's revenues, the issuance of false and/or misleading information to the public, and potential violations of "numerous securities laws."

---

[14] Specifically, according to the Company's 2014 Form 10-K, filed with the SEC on or about March 26, 2015, prior to Bedrick's resignation on or about July 23, 2014, his annual salary was $120,000.

256. Yet, despite this knowledge of perverse and systemic wrongdoing, which was not disclosed yet publically, and its likely negative impact on Medbox, and more importantly its stock price, Lowe disposed of 16,000 shares of stock for proceeds totaling $155,657.00 at prices ranging from $8.61 to $12.53, in November 2014 and December 2014.

**4. Defendant Siegel's Suspicious Stock Sales**

257. Defendant Siegel's stock sales detailed in the above chart were suspicious in both timing and amount, and provide additional inference of scienter as to Defendant Siegel.

258. As an initial matter, Defendant Siegel's September 2014 sales were his ***first publicly reported sales*** of Medbox stock ***ever***.

259. The timing of Siegel's stock sales are highly suspicious considering all of the sales took place after the Company was informed of the DOJ subpoena's in August 2014. As a Board member, Siegel would have actual knowledge of the DOJ subpoena. Indeed from September 2014, when his stock sales started, through October 31, 2014, when the Company finally disclosed the DOJ subpoenas, Siegel managed to dump 30,000 shares for proceeds in excess of $301,000, at fraud inflated prices ranging from $8.23 per share to $14.01 per share.

260. Further, Siegel's stock sales in November 2014 and December 2014, are also highly suspicious as they occurred at a time when he was a member of the purported special committee appointed to investigate whether any evidence of wrongdoing existed related to the allegations in the letter sent by a former employee of Medbox to the SEC and the DOJ federal grand jury document subpoenas sent to Medbox's accountants. Siegel was also a member of the Company's two-person audit committee during this time.

261. According to the January 16, 2015 Complaint, the special committee did in fact uncover wrongdoing including, among other things,

manipulation of Medbox's revenues, the issuance of false and/or misleading information to the public, and potential violations of "numerous securities laws."

262. Yet, despite this knowledge of perverse and systemic wrongdoing, which was not disclosed yet publically, and its likely negative impact on Medbox, and more importantly its stock price, Siegel disposed of 16,000 shares of stock for proceeds totaling $155,657.00 at prices ranging from $8.61 to $12.53, in November 2014 and December 2014.

## XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

263. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to the extent the claims asserted herein are predicated upon omissions of material fact which there was a duty to disclose. Specifically, Plaintiffs are entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, the Defendants failed to disclose material information regarding (1) Defendant Mehdizadeh's past criminal conduct; (2) the true extent of Defendant Mehdizadeh's control over Medbox's day-to-day operations; (3) the significant deficiencies and reckless auditing practices of the Company's accounting firm, Q Accountancy and that, despite announcing in April 2013 that Q Accountancy was being replaced as the Company's auditor, in fact, Q Accountancy remained the Company's auditor until February 2015; (4) Medbox's lack of internal financial and corporate governance controls; (5) Medbox's misleading stock promotion tactics; and (6) the various investigations and subpoenas issued by the DOJ and SEC during the Class Period.

264. Plaintiffs are also entitled to a presumption of reliance under the fraud-on-the-market doctrine for Defendants' material misrepresentations, because the market for Medbox's publicly traded securities was open, well-developed, and efficient at all times. As a result of these materially false and

misleading statements, Medbox's publicly traded securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Medbox's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to Medbox, and have been damaged thereby.

265. At all relevant times, the markets for Medbox common stock were efficient for the following reasons, among others:

(a) Medbox filed periodic public reports with the SEC, claiming to be a "Fully Reporting Company" in July 2014;

(b) Medbox regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, and its founder and former COO Defendant Mehdizadeh, as well as former President and CEO Defendant Bedrick, regularly appeared on financial media news outlets and were quoted in significant financial media;

(c) On January 24, 2014, the Company issued a press release entitled "Medbox, Inc. Launches Proactive Investor Relations Program" which quoted Defendant Bedrick stating that the Company had "retain[ed] ***proven IR counsel to help [it] raise [its] visibility in the investment community, communicate [its] investment thesis and broaden [its] shareholder base.***"

266. As a result of the foregoing, the market for Medbox common stock promptly digested current information regarding Medbox from publicly available sources and reflected such information in Medbox's stock price.

267. Under these circumstances, all purchasers of Medbox common stock during the Class Period suffered similar injury through their purchase of Medbox common stock at artificially inflated prices, and a presumption of reliance applies.

268. At the times they purchased or otherwise acquired Medbox's securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies.

269. In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiffs and other members of the Class purchased Medbox common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

## XIV. LOSS CAUSATION

270. During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Medbox's business fundamentals and engaged in a scheme to deceive the market. Defendants knowingly misstated the Company's then-present business metrics in order to improve the market's perception of Medbox's worth.

271. Specifically, as detailed throughout and further herein, Defendants' fraudulent scheme artificially inflated Medbox's stock price by misrepresenting and concealing the truth regarding the following: (1) Defendant Mehdizadeh's past criminal conduct; (2) the true extent of Defendant Mehdizadeh's control over Medbox's day to day operations; (3) the significant deficiencies and reckless auditing practices of the Company's accounting firm, Q Accountancy and that, despite announcing in April 2013 that Q Accountancy was being replaced as the Company's auditor, in fact, Q Accountancy remained the Company's auditor until February 2015; (4) Medbox's lack of internal financial and corporate governance controls; (5) that Medbox was recognizing revenue before earned on certain customer contracts; (6) that due to its false financial reporting, Medbox was not complying with Generally Accepted Accounting Principles or SEC rules and regulations during the Class Period and, as such, was not eligible for listing on a national stock exchange; (7) that due to its financial misstatements, Medbox was not in compliance with its debt covenants; (8) Medbox's misleading stock promotion tactics; (9) the various investigations and subpoenas issued by the DOJ and SEC during the Class Period; and (10) as a result, Medbox was not on track to achieve its financial targets and stated business objectives during the Class Period.

272. Defendants' false and misleading statements and omissions, individually and collectively, concealed the true business prospects of the Company, resulting in Medbox's stock being artificially inflated until, as indicated herein, the relevant truth about Defendant Mehdizadeh, the Company's accounting and lack of internal financial and corporate governance controls, and government investigations was revealed. While each of these misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate Medbox's stock price and the image of its future business prospects to give the market the false notion that though

Medbox was operating in the burgeoning – and still illegal marijuana market – it stood above the competition as a legitimate, law abiding Company. In fact, the opposite was true.

273. These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period. Indeed, Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, Medbox's stock trading at artificially inflated levels, reaching as high as $93.50 per share during the Class Period.

274. The true picture about Medbox's business and financial condition was revealed: (a) on February 18, 2014, when *Citron Research* issued a report accusing Medbox of keeping three sets of books and stating, among other things, that "systemic fraud" and stock promotion had facilitated the Company's $1 billion market capitalization; (b) on October 31, 2014, when the Company disclosed that it had appointed a special board committee to investigate a letter from a former Company employee to the SEC "alleging wrongdoing by a former officer of the Company who [was] a consultant to the Company" and that "a federal grand jury document subpoena [had been] served in August 2014 on the Company's accountants by the U.S. Department of Justice…."; and (c) on December 30, 2014, when before the opening of trading, Medbox issued a press release disclosing that it would be forced to restate ***the past five quarters*** of financial reports and potentially its "financial statements for 2012 and for the first two quarters of 2013…as well." The Company further disclosed that the earnings restatement had triggered a default on its debt covenants that had forced it to seek forbearance from lenders. The release stated that the "steps [being taken were] part of the continued initiative of [Medbox's] new board of directors

and new management team to implement better controls and emphasize transparency."

275. When these revelations were made to the market on February 18, 2014, October 31, 2014, and December 30, 2014, it was an indication to the market that Defendants' prior Class Period statements were false and misleading.

**A. February 18, 2013 Disclosure**

276. The truth about the Company's shady accounting practices began to emerge on February 18, 2014, when investigative market watchdog *Citron Research* published a damning report about Medbox's financial manipulations, false and misleading public statements, and other undisclosed illegal activity committed by Defendants on behalf of the Company. The report accused Medbox of "systemic fraud throughout this company" propped up by "the stock promotion behind the fraud that has brought this worthless company to a $1 bil + market cap." The report charged, among other things discussed *supra* at ¶¶112-116, that Medbox maintained at least "two sets of financials," one artificially inflated set of financials for public consumption and a second, more sobering set for internal use.

277. The report observed that Defendants' would publish the more optimistic set of financial data in promotional press releases, only to bury significantly reduced amended financials months later in filings with no disclosure that an amendment had been made or an explanation for the change. For example, the report quoted the Company's April 15, 2013 press release stating that '"Medbox is proud to report that Q1 2013 was its highest revenue quarter in the company's history at more than $2 million booked as revenue . . .." One month later, on May 21, 2013, Medbox reported revenues for Q1 2013 were actually $1.7 million, but neither disclosed that an amendment had been made or explained the $300,000 difference. Then, on May 15, 2014, Defendants again restated Q1 2013 revenues without disclosure of the restatement or an

explanation. Instead, buried in the financial summary of Medbox for 2013, the Company simply stated: "Revenue $1,245,522." This revised number reflected a 40% drop in revenues from what was initially stated nine months earlier, during which time Defendants raised millions of dollars for Medbox through common stock issuances.

278. As a result of the information revealed to the market by the *Citron Research* report on February 18, 2014, Medbox's stock immediately dipped more than 10 percent that day, falling from an opening price of $33.42 on February 18, 2014, to a closing price of $29.80 that day, a drop of $3.62 per share, on unusually heavy trading volume (indeed, more shares were traded on February 18, 2014 than on any other day that month). Medbox stock closed lower still on February 19, 2014, dropping to $27.25 per share, again on heavy trading volume. The stock decline would have been more dramatic, however, had Defendants not immediately gone into damage control.

279. Specifically, Defendant Bedrick appeared on CNBC's Closing Bell program following the trading day on February 18, 2014, specifically rebuking the accusations in the *Citron Research* report unabashedly proclaiming that '"[w]e believe that there's absolutely no basis in fact for any of the charges"' and assuring the public that '"[a]ll of our accounting has been essentially audited and submitted to the SEC and we will let it stand for what it is[.]"' Bedrick continued, stating that '"[e]verybody is trying to take a pot shot at us…With billions of dollars of potential, um, and knowing that ultimately when this grows up into its childhood and ultimate adolescence there's only going to be a few Yahoos and Googles that are going to make it, and Medbox is posed to do that[.]"'

280. Then, on February 19, 2014, Defendant Mehdizadeh, through his wholly-owned company, Vincent Chase, Inc., issued an open letter to "Medbox Shareholders" via a press release disseminated on PRNewswire. The February

19, 2014 press release, among other things, states that the "[*Citron Research* report] as to a culture of civil and criminal disobedience by Medbox officers is patently false and unjustified. . . [and the report's] comments as to the company's ethical practices are untenable and completely unwarranted."

281. The rapid decline in Medbox's stock price on February 18, 2014, was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's allegedly fraudulent accounting practices, which had been concealed or misrepresented by Defendants' scheme and misstatements. This decline would have been even more significant, however, had Defendants not specifically rebuked the *Citron Research* report while falsely assuring the market that "'[a]ll of our accounting has been essentially audited and submitted to the SEC and we will let it stand for what it is'" and otherwise touting the virtues of Medbox and its management.

282. After extracting general market and industry conditions, the stock price decline on February 18, 2014, had statistical significance to the disclosure alleged. The timing and magnitude of Medbox's stock price decline on February 18, 2014, negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

**B. October 31, 2014 Disclosure**

283. The truth about Defendant Mehdizadeh, the Company's accounting and lack of internal financial and corporate governance controls, and government investigations was further revealed on October 31, 2014, following market close, when Medbox disclosed via a Form 8-K with the SEC that on October 27, 2014, the Board had appointed a special board committee to investigate a letter from a former Company employee to the SEC "alleging wrongdoing by a former officer of the Company who [was] a consultant to the Company" and that "a federal

grand jury document subpoena [had been] served in August 2014 on the Company's accountants by the U.S. Department of Justice…."

284. As a result of the information revealed to the market on October 31 2014, Medbox's stock immediately dropped, falling $1.50 or 10.8% per share from their October 31, 2014 closing price of $13.95 to close at $12.45 per share on November 3, 2014, on heavy volume. Shares fell another $3.25 per share on November 5, 2014, closing at $9.20 per share that day, again on heavy volume, as the financial media reported on the ensuing SEC investigation and the market impacted the full import of the disclosures.

285. The rapid decline in Medbox's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding Defendant Mehdizadeh, the Company's accounting and lack of internal financial and corporate governance controls, and government investigations, which had been concealed or misrepresented by Defendants' scheme and misstatements. However, the price of Medbox stock would remain artificially inflated as Defendants had yet to disclose the full extent of Defendants' scheme and misstatements.

286. After extracting general market and industry conditions, the stock price decline on November 3, 2014 and November 5, 2014, had statistical significance to the disclosure alleged. The timing and magnitude of Medbox's stock price decline from November 3, 2014 to November 5, 2014, negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

**C. December 30, 2014 Disclosure**

287. Weeks later, on December 30, 2014, before the opening of trading, Medbox issued a press release disclosing that it would be forced to restate ***the past five quarters*** of financial reports and potentially its "financial statements for

2012 and for the first two quarters of 2013…as well." The Company further disclosed that the earnings restatement had triggered a default on its debt covenants that had forced it to seek forbearance from lenders. The release stated that the "steps [being taken were] part of the continued initiative of [Medbox's] new board of directors and new management team to implement better controls and emphasize transparency."

288. As a result of the information revealed before market open on December 30, 2014, Medbox stock declined, trading as low as $4.50 per share during intraday trading on December 30, 2014, and ultimately closing at $5.58 per share on December 31, 2014, down from its closing price of $5.98 per share on December 29, 2014, on unusually heavy trading volume.

289. The rapid decline in Medbox's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's Class Period financial and other disclosures, which had been concealed or misrepresented by Defendants' scheme and misstatements.

290. After extracting general market and industry conditions, the stock price declines between December 29, 2014 and December 31, 2014, had statistical significance to the disclosure alleged. The timing and magnitude of Medbox's stock price decline from December 29, 2014 and December 31, 2014, negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

291. In sum, the rapid declines in Medbox's stock price following the disclosures made on February 18, 2014, October 31, 2014, and December 30, 2014, were the direct result of the nature and extent of the revelations made to investors and the market regarding, among other things, Defendant Mehdizadeh, the Company's fraudulent accounting practices and lack of internal financial and corporate governance controls, and government investigations, all of which had

been concealed or misrepresented by Defendants' scheme and misstatements. Thus, the revelations of truth following the close of the Class Period, as well as the resulting clear market reaction, support a reasonable inference that the market understood that Medbox's prior statements were false and misleading. In short, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiffs were damaged, suffering true economic losses.

292. Accordingly, the economic loss, *i.e.*, damages, suffered by Plaintiffs were a direct and proximate result of Defendants' scheme and misrepresentations and omissions that artificially inflated Medbox's stock price and the subsequent significant decline in the value of Medbox's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## COUNT I

## For Violation of Section 10(b) of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

293. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

294. Throughout the Class Period, Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Medbox common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

295. During the Class Period, Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Medbox common

stock; (b) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (c) cause Plaintiffs and other members of the Class to purchase Medbox common stock at inflated prices; and (d) cause them losses when the truth was revealed. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

296. In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Medbox's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

297. Medbox and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

298. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Medbox common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Medbox common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by

Medbox and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiffs and other members of the Class purchased Medbox stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

299. Had Plaintiffs and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Medbox and the Individual Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Medbox shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

300. By virtue of the foregoing, Medbox and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.F.R. §240.10-5.

**COUNT II**

**For Violation of §10(b) of The Exchange Act and Rule 10b-5 Against Defendants Mehdizadeh, Bedrick, Siegel, and Lowe**

301. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

302. During the Class Period, Defendants Mehdizadeh, Bedrick, Lowe, and Siegel occupied positions within Medbox that allowed access to confidential information concerning the Company, its operations, finances, financial condition, and future business prospects. Defendants' public representations on these subjects set forth herein were materially false or misleading.

303. Notwithstanding their duty to refrain from trading in Medbox securities unless they disclosed the material adverse facts alleged herein, and in violation of their fiduciary duties to Plaintiffs and other members of the Class,

Defendants Mehdizadeh, Bedrick, Lowe, and Siegel collectively sold millions of dollars worth of Medbox securities during the Class Period.

304. Defendants Mehdizadeh, Bedrick, Lowe, and Siegel sold their shares of Medbox common stock, as alleged herein, at market prices artificially inflated by the nondisclosure and misrepresentations of material adverse facts in the public statements released during the Class Period.

305. Defendants Mehdizadeh, Bedrick, Lowe, and Siegel knew that they were in possession of material adverse information that was not known to the investing public, including Plaintiffs and other members of the Class. Before selling their stock to the public, they were obliged to disclose such information to Plaintiffs and other Class members.

306. By reason of the foregoing, Defendants Mehdizadeh, Bedrick, Lowe, and Siegel directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business, which operated as a fraud or deceit upon members of the investing public who purchased Medbox common stock.

307. Plaintiffs and other members of the Class who purchased shares of Medbox common stock: (1) have suffered substantial damages because they relied upon the integrity of the market and paid artificially inflated prices for Medbox common stock as a result of the violations of §10b and Rule 10b-5 alleged herein; and (2) would not have purchased Medbox common stock at the prices they paid, or at all, had they been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and concealment. At the time of the purchases by Plaintiffs and members of the Class, the fair and true value of Medbox common stock was substantially less than the prices paid by members of the Class.

308. As a direct and proximate result of the wrongful conduct of Defendants Mehdizadeh, Bedrick, Lowe, and Siegel, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Medbox common securities during the Class Period.

**COUNT III**

**For Violation of §20(A) of The Exchange Act Against Defendants Mehdizadeh, Bedrick, Siegel, and Lowe**

309. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

310. Count III is brought pursuant to §20A of the Exchange Act against Defendants Mehdizadeh, Bedrick, Siegel, and Lowe on behalf of Plaintiffs and the other members of the Class who were damaged by Defendants Mehdizadeh's, Bedrick's, Siegel's, and Lowe's insider trading.

311. As detailed herein, Defendants Mehdizadeh, Bedrick, Siegel, and Lowe were in possession of material, non-public information concerning Medbox. Defendants Mehdizadeh, Bedrick, Siegel, and Lowe took advantage of their possession of material, non-public information regarding Medbox to obtain, collectively, millions of dollars in insider trading profits during the Class Period.

312. Defendants Mehdizadeh's, Bedrick's, Siegel's, and Lowe's sales of Medbox securities were made contemporaneously with Plaintiffs' purchases of Medbox common stock during the Class Period.

313. For example, on September 25, 2014, Defendant Bedrick sold 450 shares of Medbox common stock at $11.07 per share for proceeds of $4,981.50, Defendant Mehdizadeh executed or caused to be executed the sale of 500 shares of Medbox common stock at $9.60 per share for proceeds of $4,800.00, and Defendants Siegel and Lowe each sold 800 shares of Medbox common stock at $10.95 per share for proceeds of $8,760.00, respectively. On that same date, Plaintiff Phan made three purchases of Medbox common stock –

100 shares at $11.45 per share, 113 shares at $11.45 per share, and 287 shares at $11.50 per share, spending a total of $5,739.35.

314. Defendant Bedrick also executed a sale of Medbox stock on September 19, 2014, selling 450 shares at $9.03 per share for total proceeds of $4,063.50. On that same day, Plaintiff Poon purchased 100 shares and 400 shares of Medbox stock for $8.92 and $8.95 per share, respectively, spending a total of $4,472.00.

315. Defendant Mehdizadeh executed or caused to be executed the following additional sales of Medbox common stock between October 2014 and December 2014:

1) October 27, 2014: 500 shares, $11.40 per share, $5,700.00 in total proceeds;
2) October 28, 2014: 500 shares, $12.32 per share, $6,160.00 in total proceeds;
3) October 29, 2014: 500 shares, $13.51 per share, $6,755.00 in total proceeds;
4) October 30, 2014: 500 shares, $13.20 per share, $6,600.00 in total proceeds;
5) December 4, 2014: 500 shares, $7.90 per share, $3,950.00 in total proceeds; and
6) December 18, 2014: 500 shares, $6.75 per share, $3,375.00 in total proceeds.

316. Plaintiffs made numerous purchases throughout the Class Period contemporaneously with sales executed by Defendant Mehdizadeh, including the following:

1) October 27, 2014: Plaintiff Phan purchased a total of 4,800 shares at prices ranging from $11.58 per share to $12.25 per share for a total cost of $57,303.00;

2) October 28, 2014: Plaintiff Phan purchased a total of 4,500 shares at prices ranging from $12.60 per share to $12.94 per share for a total cost of $58,050.00;

3) October 29, 2014: Plaintiff Poon purchased a total of 1480 shares at prices ranging from $13.47 per share to $13.85 per share for a total cost of $20,296.60;

4) October 30, 2014: Plaintiff Poon purchased a total of 500 shares at prices ranging from $13.60 per share to $13.65 per share for a total cost of $6,819.00;

5) December 4, 2014: Plaintiff Poon purchased a total of 198 shares at prices ranging from $8.18 per share to $8.20 per share for a total cost of $1,620.20; and

6) December 18, 2014: Plaintiff Phan purchased a total of 888 shares at prices ranging from $6.83 per share to $6.97 per share for a total cost of $6,158.49.

317. Defendant Siegel executed the following, additional sales of Medbox common stock between September 2014 and November 2014:

1) September 19, 2014: 800 shares, $8.88 per share, $7,104.00 in total proceeds;

2) October 27, 2014: 700 shares, $12.11 per share, $8,477.00 in total proceeds

3) October 28, 2014: 700 shares, $13.14 per share, $9,198.00 in total proceeds;

4) October 29, 2014: 700 shares, $13.59 per share, $9,513.00 in total proceeds;

5) October 30, 2014: 700 shares, $13.69 per share, $9,583.00 in total proceeds; and

6) November 5, 2014: 200 shares, $10.62 per share, $2,124.00 in total proceeds.

318. Plaintiffs Phan and Poon made numerous purchases throughout the Class Period contemporaneously with sales executed by defendant Siegel, including the following:

1) September 19, 2014: Plaintiff Poon purchased a total of 500 shares at prices ranging from $8.92 per share to $8.95 per share for a total cost of $4,472.00;

2) October 27, 2014: Plaintiff Phan purchased a total of 4,800 shares at prices ranging from $11.58 per share to $12.25 per share for a total cost of $57,303.00;

3) October 28, 2014: Plaintiff Phan purchased a total of 4,500 shares at prices ranging from $12.60 per share to $12.94 per share for a total cost of $58,050.00;

4) October 29, 2014: Plaintiff Poon purchased a total of 1480 shares at prices ranging from $13.47 per share to $13.85 per share for a total cost of $20,296.60;

5) October 30, 2014: Plaintiff Poon purchased a total of 500 shares at prices ranging from $13.60 per share to $13.65 per share for a total cost of $6,819.00; and

6) November 5, 2014: Plaintiff Phan purchased a total of 220 shares at prices ranging from $9.95 per share to $10.00 per share for a total cost of $2,195.00 and Plaintiff Poon purchased a total of 950 shares at prices ranging from $10.47 per share to $10.54 per share for a total cost of $9,997.00.

319. Defendant Lowe executed the following, additional sales of Medbox common stock between September 2014 and November 2014:

1) September 19, 2014: 800 shares, $8.88 per share, $7,104.00 in total proceeds;
2) October 27, 2014: 700 shares, $12.11 per share, $8,477.00 in total proceeds
3) October 28, 2014: 700 shares, $13.14 per share, $9,198.00 in total proceeds;
4) October 29, 2014: 700 shares, $13.59 per share, $9,513.00 in total proceeds;
5) October 30, 2014: 700 shares, $13.69 per share, $9,583.00 in total proceeds; and
6) November 5, 2014: 200 shares, $10.62 per share, $2,124.00 in total proceeds.

320. Plaintiffs Phan and Poon made numerous purchases throughout the Class Period contemporaneously with sales executed by Defendant Lowe, including the following:

1) September 19, 2014: Plaintiff Poon purchased a total of 500 shares at prices ranging from $8.92 per share to $8.95 per share for a total cost of $4,472.00;
2) October 27, 2014: Plaintiff Phan purchased a total of 4,800 shares at prices ranging from $11.58 per share to $12.25 per share for a total cost of $57,303.00;
3) October 28, 2014: Plaintiff Phan purchased a total of 4,500 shares at prices ranging from $12.60 per share to $12.94 per share for a total cost of $58,050.00;
4) October 29, 2014: Plaintiff Poon purchased a total of 1480 shares at prices ranging from $13.47 per share to $13.85 per share for a total cost of $20,296.60;

5) October 30, 2014: Plaintiff Poon purchased a total of 500 shares at prices ranging from $13.60 per share to $13.65 per share for a total cost of $6,819.00; and

6) November 5, 2014: Plaintiff Phan purchased a total of 220 shares at prices ranging from $9.95 per share to $10.00 per share for a total cost of $2,195.00 and Plaintiff Poon purchased a total of 950 shares at prices ranging from $10.47 per share to $10.54 per share for a total cost of $9,997.00.

321. Plaintiffs Phan and Poon, who purchased shares of Medbox common stock contemporaneously with sales by Defendants Mehdizadeh, Bedrick, Siegel, and Lowe suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealments alleged herein.

## COUNT IV

### For Violation of §20(a) of The Exchange Act Against the Individual Defendants

322. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

323. The Individual Defendants had control over Medbox and made the material false and misleading statements and omissions on behalf of Medbox within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their controlling shareholder statuses, executive positions, board memberships, and stock ownerships, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including

the content and dissemination of the various statements which Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

324. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

325. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays for judgment as follows:

A. Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: July 27, 2015

**JOHNSON & WEAVER, LLP**
FRANK J. JOHNSON (174882)
SHAWN E. FIELDS (255267)

*s/ Frank J. Johnson*
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
frankj@johnsonandweaver.com
shawnf@johnsonandweaver.com

*Lead Counsel for Plaintiffs*

**POMERANTZ LLP**
JEREMY A. LIEBERMAN
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com

*Additional Counsel for Plaintiffs*