LINK:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 15-00426-BRO (JEMx)** | Date | November 14, 2016 |
| Title | **JOSH CRYSTAL V. MEDBOX, INC. ET AL.** | | |

| | | |
|---|---|---|
| Present: The Honorable | **BEVERLY REID O'CONNELL, United States District Judge** | |
| Renee A. Fisher | Not Present | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** (IN CHAMBERS)

# ORDER RE: MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT [94] AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES [95]

## I. INTRODUCTION

Pending before the Court are two motions filed by Lead Plaintiffs Peter Phan and Paul Poon ("Lead Plaintiffs"), individually and on behalf the Settlement Class: (1) Motion for Final Approval of Class Action Settlement, (Dkt. No. 94 (hereinafter, "Final Appr. Mot.")); and, (2) Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, (Dkt. No. 95 (hereinafter, "Fees Mot.")). After considering the papers filed in support of the instant unopposed Motions, the arguments advanced at the final fairness hearing held on October 17, 2016, and the entirety of the record, the Court **GRANTS** Plaintiffs' Motion for Final Approval of Class Action Settlement and **GRANTS in part** Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

On or after January 21, 2015, three cases were commenced in the U.S. District Court for the Central District of California. On January 21, 2015, Plaintiff Josh Crystal filed the first action against Medbox, Inc., Pejman Vincent Mehdizadeh, Bruce Bedrick, Thomas Iwanski, Guy Marsala, and Douglas Mitchell ("Defendants") with this Court, in

which he sought to represent all individuals who purchased or otherwise acquired Medbox common stock between November 20, 2013 and December 29, 2014. (*Crystal v. Medbox, Inc., et al.* No. CV-15-00426-BRO-JEM ("*Crystal*"), Dkt. No. 1.) One week later, Plaintiff Ervin Gutierrez filed a substantially similar complaint, which was initially assigned to the Honorable Michael W. Fitzgerald. (*Gutierrez v. Medbox, Inc., et al.*, No. CV-15-00636-MWF-FFM ("*Gutierrez*"), Dkt. No. 1). And on January 29, 2015, Plaintiff Matthew Donnino filed the third lawsuit, which was assigned to the Honorable Dolly M. Gee. (*Donnino v. Medbox, Inc. et al.*, No. CV-15-00683-BRO-JEM (*Donnino*), Dkt. No. 1).

The *Gutierrez* and *Donnino* matters were then transferred to this Court as related cases on March 26, 2015. On April 23, 2015, pursuant to the Private Securities Class Action Reform Act of 1995, 15 U.S.C. §§ 78u-4 *et seq* (the "PSLRA"), the Court entered an order consolidating for all purposes these related actions under the caption *Crystal v. Medbox, Inc., et al.* No. CV-15-00426-BRO (JEMx). (Dkt. No. 33 ("the Action").) The Court appointed Lead Plaintiffs as the class representatives, Johnson & Weaver LLP as lead counsel for the class ("Lead Counsel"), and Strategic Claims Services ("SCS") as claims administrator. (Dkt. No. 93 ¶¶ 5, 10.)

On July 27, 2015, the Lead Plaintiffs, on behalf of the consolidated class filed the Consolidated Complaint for Violations of the Federal Securities Laws. (Dkt. No. 48, Consolidated Complaint ("Compl.").) After the Lead Plaintiffs and the above-named Defendants negotiated the Settlement, this Court entered the Preliminary Approval of Class Action Settlement Order on February 3, 2016. (Dkt. No. 93.) On April 11, 2016, Lead Plaintiffs filed the instant Motion for Final Approval of Class Action Settlement, (Dkt. No. 94), along with their instant Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, (Dkt. No. 95).

### B. Factual Background

Defendant Medbox is a company founded in 2010 by co-Defendant Pejman Vincent Mehdizadeh that, "through its subsidiary Medicine Dispensing Systems, sells its patented vending machines that dispense medical marijuana, software and consulting services to pharmacies, alternative medicine dispensaries and local governments in the United States." (Compl. ¶ 2.) According to the Complaints, the Financial Industry

Regulatory Authority ("FINRA") issued an advisory concerning risks related to investing in marijuana-related stocks such as Medbox in January 2014. (*See* Compl. ¶ 110.) The FINRA advisory warned that such companies are suspected of engaging in "pump and dump" schemes, in which "fraudsters lure investors with aggressive, optimistic—and potentially false and misleading—statements or information designed to create unwarranted demand for shares of a small, thinly traded company with little or no history of financial success (the pump)," and "[o]nce share prices and volumes reach a peak, the cons behind the scam sell off their shares at a profit, leaving investors with worthless stock (the dump)." (Compl. ¶ 110.) Plaintiffs alleged that Medbox responded to this advisory by issuing several press releases touting the company's financial accountability and sound management. (*See* Compl. ¶ 281.)

On February 18, 2014, Citron Research issued a report titled "Busting Medbox," which accused Medbox of keeping three sets of books and stated that "systemic fraud" and stock promotion had facilitated Medbox's $1 billion capitalization. (Compl. ¶ 175.) Medbox responded with a press release that called the report "deceptive and misleading"; nevertheless, the report caused Medbox's share price to fall. (Compl. ¶¶ 176–77.) Medbox continued to issue press releases in an attempt to mitigate the impact from the negative press it had received, announcing that it had become a "Fully Reporting Public Company" and that Defendant Marsala, who had "a track record of driving exceptional results in both public and private companies by implementing Fortune 500 company best practices at early stage and middle market companies," would be stepping in as Chief Executive Officer. (*See* Compl. ¶¶ 187, 200.) Medbox also announced that it was replacing its Chief Financial Officer (Defendant Iwanski), (Compl. ¶ 208), that it had appointed a special board committee to investigate a letter from a former Medbox employee to the SEC "alleging wrongdoing by a former officer of the Company who is currently a consultant to the Company," and that "a federal grand jury document subpoena [had been] served in August 2014 on the Company's accountants by the U.S. Department of Justice, to ascertain what implications, if any, the subpoena or the letter may have with respect to the Company," (Compl. ¶ 209).

Finally, on the morning of December 30, 2014, Medbox issued a press release disclosing that, after the culmination of its internal accounting investigation, it would need to restate the past five quarters of financial reports. (Compl. ¶ 217.) As a result of these events, Plaintiffs alleged that the price of Medbox common stock declined

significantly, from a Class Period-high price of $93.50 per share to a low of $4.50 per share (and a closing price of $6.39 per share on December 30, 2014). (Compl. ¶ 129.)

Plaintiffs in each of these actions sought to represent "all purchasers" of the common stock of Medbox between November 20, 2013 and December 29, 2014 (the "Class Period"). (*Donnino*, Dkt. No. 1 ¶ 1; *Crystal*, Dkt. No. 1 ¶ 1; *Gutierrez*, Dkt. No. 1 ¶ 1.) In each of the three related actions, Plaintiffs alleged that Defendants violated section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), in addition to SEC Rule 10b-5, by making material misrepresentations regarding the financial results of Defendant Medbox for the fiscal year ending on December 31, 2013 by recognizing revenue on customer contracts before it had been earned. (*Donnino*, Dkt. No. 1 at 36, 40; *Crystal*, Dkt. No. 1 at 31, 33; *Gutierrez*, Dkt. No. 1 at 13, 17.) Plaintiffs alleged that, as a result of these false statements, Medbox's stock traded at artificially inflated prices during the Class Period, reaching a peak price of $93.50 on January 8, 2014. (*See, e.g.*, Compl. ¶ 6.) After the misrepresentations became public, Plaintiffs suffered significant losses through a reduction in the artificially inflated share price of Medbox stock. (*See* Compl. ¶ 307.)

### C. The Settlement

The parties reached a settlement after Lead Counsel's (1) factual investigation into Medbox's history and Defendants' misconduct, (2) technical investigation regarding relevant Generally Accepted Accounting Principles ("GAAP"), (3) consultation with a damages expert on the issues of loss causation and damages, (4) the filing of a Consolidated Complaint ("Complaint"), (5) review of applicable Director and Officer insurance policies, and ultimately, (6) settlement negotiations conducted with the aid of mediator the Honorable Layn R. Phillips. (Final Appr. Mot. at 1.) On December 17, 2015, the parties executed the Stipulation and Agreement of Settlement. (Dkt. No. 88-3 (the "Settlement Agreement").)

The Settlement Agreement defines the "Class" or "Class Members" as "all Persons who purchased or otherwise acquired Medbox common stock between April 2, 2013 and December 29, 2014, inclusive, and who were damaged thereby." (Settlement Agreement, Ex. 1 at 8 ¶ 1.5.) Excluded from the Class are: "(a) Persons or entities who submit valid and timely requests for exclusion from the Class in accordance with the requirements set

forth in the Mailed Notice and Rule 23 of the Fed. R. Civ. P.; and (b) Defendants and their families, the officers and directors of the Company, at all relevant times, members of their families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest." (Settlement Agreement, Ex. 1 at 8 ¶ 1.5.)

Pursuant to the Settlement Agreement, Defendant Medbox shall pay one hundred fifty thousand United States Dollars (USD $150,000.00) in cash into escrow on behalf of itself, and its insurers were to pay one million seven hundred thousand United States Dollars (USD $1,700,000.00) in cash into escrow on behalf of defendants Pejman Vincent Mehdizadeh, Bruce Bedrick, Thomas Iwanski, Guy Marsala, C. Douglas Mitchell, J. Mitchell Lowe, Ned Siegel, Timothy Quintanilla, and Q Accountancy Corporation (the "Individual Defendants"). (Settlement Agreement at 11–12 ¶ 2.1.) The Settlement Agreement further provides that Medbox shall transfer 2,000,000 shares of its common stock into a settlement brokerage account maintained by the escrow agent on behalf of Lead Plaintiffs and the Class. (Settlement Agreement at 12 ¶ 2.2.) Likewise, Defendant Bedrick shall transfer 300,000 shares of his common stock into the settlement brokerage account.[1] (*Id.*)

The Settlement Agreement also provides for distributions from the Settlement Fund to Lead Counsel for: (a) an award of attorneys' fees; plus (b) reimbursement of actual costs and expenses, including experts or consultants, incurred in connection with prosecuting the Class Action plus any interest on such attorneys' fees, costs and expenses at the same rate and for the same periods as earned by the Settlement Fund (until paid) as may be awarded by the Court. (Settlement Agreement at 24–25 ¶ 6.1.)

Based on Lead Counsel's calculations and assertions, the Settlement Fund is estimated to recover approximately $1,852,530.00 (composed of the cash and stock, as of October 17, 2016[2]) of the Class's estimated $73.7 million of *maximum* damages. (Final Appr. Mot. at 6.)

[1] The cash amounts and settlement shares together constitute the "Settlement Fund."

[2] At the final fairness hearing, Lead Counsel explained that between December 17, 2015 and October 17, 2016, the combined value of 2,300,000 Medbox shares dropped from $32,200 to approximately

### D. Notice to Class Members and Class Response to the Settlement

Lead Plaintiffs timely filed their Motion for Preliminary Approval of Class Action Settlement on December 18, 2015. (Dkt. No. 88.) On February 3, 2016, the Court granted Lead Plaintiffs' Motion for Preliminary Approval and conditionally certified, for settlement purposes only, the Settlement Class. (Dkt. No. 93.) In accordance with the Court's preliminary approval of the parties' proposed settlement, Lead Counsel prepared a Notice Packet, which contained the mailed Notice of Proposed Class Action Settlement and the Proof of Claim and Release. (Dkt. No. 100 at 1–2.) The Notice Packet informed the Class Members of the terms of the Settlement, the claims at issue, the releases, the process for objecting and opting out of the Settlement, how to make a claim, all pertinent deadlines,[3] and the time, date, and place of the Final Approval hearing. (Shillady Decl. ¶ 3.)

SCS mailed the Notice Packet to 39,060 potential settlement class members ("Settlement Class Members") on March 3, 2016. (Final Appr. Mot. at 5.) Summary Notices were published in *Investor's Business Daily* and distributed over *GlobalNewsWire* on March 10, 2016. (Final Appr. Mot. at 5, 19 (citing Dkt. No. 97 ("Shillady Decl.") ¶¶ 5–7).) As of April 11, 2016, SCS deemed 542 Notice Packets undeliverable. (Shillady Decl. ¶ 6.) The deadline to object or request exclusion from the Settlement Class was April 25, 2016, (Dkt. No. 100 at 1); as of September 8, 2016, eight[4] Class Members requested exclusion, (Dkt. No. 103-1 ("Third Bravata Decl.") ¶ 3). And

$2,530. Thus, as of October 17, 2016 the value of the Settlement Fund is approximately $1,852,530.00. Further, Medbox changed its name to Notis Global, Inc., on or about February 23, 2016. (*See* Fees Mot. at 1; *see also* Dkt. No. 105, Ex. B.)

[3] The deadline to submit a valid Proof of Claim form was June 1, 2016. (*See* Dkt. No. 97, Ex. A at 7.)

[4] Seven requests for exclusion were timely postmarked before the April 25, 2016 deadline. The eighth request for exclusion, from Mr. Hardey Gaynes, was emailed to SCS on May 12, 2016. (*See* Dkt. No. 102 ("Second Bravata Decl.") ¶ 4.)

no Class Member objected to the Settlement, Plan of Allocation, or any other aspect of the Settlement.[5] (Third Bravata Decl. ¶ 4.)

## III. LEGAL STANDARD

There is a strong judicial policy favoring settlement agreements, "particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Nevertheless, when reviewing a proposed class action settlement, district courts "have the responsibility of ensuring fairness to all members of the class." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). A district court may not approve a class settlement unless the court determines that the "proposed settlement is fundamentally fair, adequate, and reasonable." *Id.* (internal quotation marks omitted).

### A. Class Certification Under Rule 23(a) and (b)

A Rule 23 class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). Certification is the process by which a named party may begin representing a class of individuals who are not named and do not otherwise participate in the litigation. Pursuant to Rule 23, a class may be certified only if four requirements are satisfied: (1) the class is so numerous that joinder would be impracticable—numerosity; (2) there are questions of law or fact that are common to the class as a whole—commonality; (3) the representative parties have claims or defenses typical of those of the class—typicality; and, (4) the representative parties will fairly and adequately protect the class's interests—adequacy. Fed. R. Civ. P. 23(a). Additionally, a class may be certified only if one of Rule 23(b)'s requirements is met.

The party seeking class certification bears the burden of establishing the requirements of Rules 23(a) and 23(b). *See Wal–Mart Stores Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with [] Rule [23].") When ruling on a motion for certification, a court

[5] At the final fairness hearing on October 17, 2016, Lead Counsel confirmed that no Class Member had objected.

generally must accept as true the allegations in the complaint, especially when "the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). Nevertheless, "sometimes it may be necessary for the court to probe behind the pleadings" when considering certification. *Id.* A court's analysis should be rigorous and may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal–Mart*, 564 U.S. at 351.

### B. Final Approval of a Class Action Settlement Under Rule 23(e)

As discussed, under Rule 23(e), the "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). District courts must follow a two-step process when deciding whether to approve a proposed class action settlement. *See McKenzie v. Fed. Express Corp.*, No. CV 10-02420-GAF, 2012 WL 2930201, at *2 (C.D. Cal. July 2, 2012). "First, the court must determine whether the proposed settlement deserves preliminary approval." *Id.* (citing *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004)). Second, once the class members receive notice of the proposed settlement, the court must hold a fairness hearing and determine whether final approval is warranted. *Id.* (citing *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 525).

Under Rule 23(e), a district court may not finally approve a class settlement unless the court determines that the "proposed settlement is fundamentally fair, adequate, and reasonable." *Staton*, 327 F.3d at 959 (internal quotation marks omitted). The very circumstances of settlement negotiations raise "incentives for the negotiators to pursue their own self-interest and that of certain class members." *Id.* at 960. Thus, a district court must review a proposed class action settlement not only for actual fraud, overreaching, or collusion, but also with an eye to whether the terms are fair, adequate, and reasonable to the class as a whole. *Id.*

In determining whether a proposed settlement meets the fundamental standard of fairness, adequacy, and reasonableness, a district court may consider the following factors: (1) "the strength of [the] plaintiffs' case"; (2) "the risk, expense, complexity, and likely duration of further litigation"; (3) "the risk of maintaining class action status throughout the trial"; (4) "the amount offered in settlement"; (5) "the extent of discovery

completed, and the stage of the proceedings"; (6) "the experience and views of counsel"; (7) "the presence of a governmental participant"; and, (8) "the reaction of the class members to the proposed settlement." *Id.* at 959 (internal quotation marks omitted); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).

A district court's role in evaluating a proposed settlement is "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable[,] and adequate to all concerned." *Officers for Justice v. Civ. Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982). Accordingly, a district court should neither judge the merits of the claims in dispute, nor compare the proposed settlement "against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Id.* "Ultimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations[,] and rough justice." *Id.* (internal quotation marks omitted).

### C. Attorneys' Fees Under Rule 23(h)

In any certified class action, a district court may award reasonable attorneys' fees and nontaxable costs as authorized by law or the parties' agreement. Fed. R. Civ. P. Rule 23(h). Where a proposed class action settlement contains a fee provision, the provision is subject to the inquiry into whether the settlement is fair, adequate, and reasonable. *Staton*, 327 F.3d at 963 (explaining that "[t]here is no exception in Rule 23(e) for fees provisions contained in proposed class action settlement agreements"). A district court must "carefully assess" the reasonableness of a fee provision. *Id.* The mere fact that the defendant agrees to pay the fees "does not detract from the need to carefully scrutinize the fee award." *Id.* at 964. This is because the allocation between the class award and the attorneys' fees "is of little or no interest to the defense." *Id.* (internal quotation marks omitted).

"[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a

whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). This doctrine is known as the "common fund" doctrine. As the Supreme Court explained:

> The [common fund] doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Id.* (internal citations omitted). Thus, the common fund doctrine permits a district court to award attorneys' fees from the total monetary fund recovered by the class to ensure that each class member "contributes proportionately to the payment of attorneys' fees." *Staton*, 327 F.3d at 967.

The Supreme Court has set forth three criteria for obtaining an award of attorneys' fees from a common fund. First, the class of persons benefiting from the fund must be "easily identifiable." *Van Gemert*, 444 U.S. at 478–79. Second, the court must be able to accurately trace the benefits from the fund to the class beneficiaries. *Id.* at 479. Finally, the court must be able to shift the fee from the fund to those benefiting from it "with some exactitude." *Id.* Generally, these three criteria are satisfied "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Id.*

In the Ninth Circuit, a district court presiding over a common fund case may award attorneys' fees based on one of two methods: the lodestar method or the percentage method. *Staton*, 327 F.3d at 967–68; *see also Hanlon*, 150 F.3d at 1029. If the court adopts the lodestar method, it may apply a risk multiplier to increase or decrease the fee award based on various factors, including the risk involved and the length of the proceedings. *Staton*, 327 F.3d at 968. If the court adopts the percentage method, "the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee." *Hanlon*, 150 F.3d at 1029.

Although a court has discretion to apply either method, the "use of the percentage method in common fund cases appears to be dominant." *In re Omnivision Techs., Inc.*,

559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *Paul, Johnson, Alston, & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)). In applying the percentage method, the court "must show why [the chosen] percentage and the ultimate award are appropriate based on the facts of the case. *Omnivision*, 559 F. Supp. 2d at 1046 (explaining that the court may not "arbitrarily apply a percentage"). The "benchmark" for percentage-method fee awards in the Ninth Circuit is twenty-five percent of the common fund. *Hanlon*, 150 F.3d at 1029. Notwithstanding this benchmark, the percentage should be adjusted "when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers*, 904 F.2d at 1311.

The ultimate goal under either the lodestar method or the percentage method is to "reasonably compensate counsel for their efforts in creating the common fund." *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046 (citing *Paul, Johnson*, 886 F.2d at 271–72). In considering the overall fairness and reasonableness of a fee award, a court should consider the following factors: "(1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden on class counsel; and (5) awards made in similar cases." *Id.* (citing *Vizcaino*, 290 F.3d at 1048–50).

# IV. DISCUSSION

## A. Lead Plaintiffs' Request for Final Certification of Class

This Court preliminarily certified the Settlement Class, (*see* Dkt. No. 93), as set forth in the Settlement Agreement, (Dkt. No. 88-3), for purposes of settlement. At this juncture, Lead Counsel requests that the Court finally certify the Settlement Class for the purpose of administering the Settlement. (Final Appr. Mot. at 19.)

### 1. Ascertainability and Class Definition

Most courts addressing ascertainability describe the concept as an additional or implied requirement outside of Rule 23. *See, e.g.*, *Doyle v. Chrysler Grp. LLC*, No.

SACV 13–00620 JVS, 2014 WL 7690155, at *5 (C.D. Cal. Oct. 9, 2014) ("In addition to more precisely articulated provisions of Rule 23(a) and (b), there is the implied prerequisite that the class be sufficiently definite and ascertainable.") (citing *Xavier v. Philip Morris USA Inc.*, 787 F.Supp.2d 1075, 1089–90 (N.D. Cal. 2011)); *McCrary v. Elations Co., LLC*, No. EDCV 13–00242 JGB OP, 2014 WL 1779243, at *3 (C.D. Cal. Jan. 13, 2014) ("Although not mentioned in Rule 23(a), the moving party must also demonstrate that the class is ascertainable.") (citing *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 521 (C.D. Cal. 2012)).

"'Ascertainability is needed for properly enforcing the preclusive effect of final judgment. The class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment, that is, who gets the benefit of any relief and who gets the burden of any loss . . . . Indeed, courts of appeal have found class certification to be inappropriate where ascertaining class membership would require unmanageable individualized inquiry.'" *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-5693 PSG (RZX), 2015 WL 4776932, at *6 (C.D. Cal. May 27, 2015) (citations omitted).

In this Court's view, the Plaintiffs' Settlement Class is readily ascertainable. Courts in this District counsel that "[a]n ascertainable class exists if it can be identified 'by reference to objective criteria.'" *Steven Ades & Hart Woolery v. Omni Hotels Mgmt. Corp.*, No. 2:13–CV–02468–CAS (MANx), 2014 WL 4627271, at *6 (C.D. Cal. Sept. 8, 2014) (quoting *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 593 (C.D. Cal. 2008)). "In [the Ninth] Circuit, it is enough that the class definition describes 'a set of common characteristics sufficient to allow' a prospective plaintiff to 'identify himself or herself as having a right to recover based on the description.'" *See McCrary*, 2014 WL, at *8 (quoting *Moreno v. AutoZone, Inc.*, 251 F.R.D. 417, 421 (N.D. Cal. 2008) (citation and internal quotations omitted)).

Here, the Settlement Class consists of all persons who purchased or otherwise acquired Medbox securities between April 2, 2013 and December 29, 2014, inclusive, who incurred damages. (Settlement Agreement, Ex. 1 at 8 ¶ 1.5.) Excluded from the Settlement Class are Defendants, members of Defendants' families, any entity in which Defendants have a controlling interest, entities that are a parent or subsidiary of Medbox, and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors,

and assigns of Defendants. (Settlement Agreement, Ex. 1 at 8 ¶ 1.5.) The class can be identified by reference to an individual's objective status as a purchaser/acquirer of Medbox securities in a defined time-frame. No individualized inquiry is necessary. The Court finds that the Settlement Class is ascertainable.

### 2. Rule 23(a)

#### a. Numerosity

This requirement is met if the class is so large that joinder of all members is impracticable. Fed. R. Civ. P. 23(a). Plaintiffs are not required "to state the exact number and identity of every class member because to do so would frustrate the purpose of class actions when recoveries may be numerous but small." *In re U.S. Fin. Sec. Litig.*, 69 F.R.D. 24, 34 (S.D. Cal. 1975) (citing *Herbst v. Able*, 278 F. Supp. 664 (S.D.N.Y. 1967)). "Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Orantes–Hernandez v. Smith*, 541 F. Supp. 351, 370 (C.D. Cal. 1982).

Here, "Medbox's securities were listed on a national exchange and widely traded." (Final Appr. Mot. at 20.) SCS mailed over 39,000 copies of the Notice Packet to potential Settlement Class Members. (Final Appr. Mot. at 20 (citing Dkt. No. 96 ("Fields Decl.") ¶ 6; Shillady Decl. ¶ 5).) As Lead Counsel argues, thousands of Settlement Class Members exist and joinder of all the members would be impracticable. Thus, this Court finds that the numerosity requirement is met.

#### b. Commonality

The commonality requirement is met if there are "questions of law and fact common to the class." Fed. R. Civ. P. 23(a). "Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008); *see also Wal–Mart*, 564 U.S. at 350 ("What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."). Wal–Mart recently clarified that "[c]ommonality requires the plaintiff to demonstrate the

class members 'have suffered the same injury.'" *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

Here, the class members have all suffered the same injury—monetary damages as a result of purchase/acquisition of Medbox common stock. Moreover, common questions exist, including: (1) whether Defendants' acts as alleged in the Complaint violated the Exchange Act; (2) whether Defendants' press releases, SEC filings, and other public statements failed to accurately reflect Medbox's financial health and corporate governance; and, (3) whether the revelation of true facts to the investing public resulted in a decline in Medbox's common stock price. (*See* Final Appr. Mot. at 21.)

### c. Typicality

To demonstrate typicality, the putative class must show that the named parties' claims are typical of the class. Fed. R. Civ. P. 23(a)(3). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; [but] they need not be substantially identical." *Flo & Eddie*, 2015 WL 4776932, at *9 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

Here, Lead Plaintiffs alleged that "Defendants' misrepresentations related to Medbox's revenues and executive governance resulted in artificial price inflation of Medbox securities that Lead Plaintiffs purchased, and that upon disclosure of the alleged misrepresentations, the value of the securities purchased by Lead Plaintiffs declined." (Final Appr. Mot. at 21.) Other class members similarly would claim damages resulting from the same misrepresentations and loss of value. Lead Counsel adds that Lead Plaintiffs will receive the same *pro rata* share of the Settlement Fund as the rest of the Class. (*Id.*) Thus, Lead Plaintiffs' claims are typical of the class.

#### d. Adequacy

Rule 23(a)(4) requires plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Representation is adequate when the class representative and counsel do not have any conflicts of interest with other class members, and the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class. *Flo & Eddie,* 2015 WL 4776932, at *10 (citing *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012)).

As Lead Counsel indicates,

> Lead Plaintiffs and Lead Counsel have prosecuted this Action, negotiated with Defendants, and have obtained a proposed settlement that represents a significant percentage of the losses suffered by Settlement Class Members. Lead Plaintiffs have regularly communicated with Lead Counsel throughout this Action, timely produced documents, and has [sic] thus fairly and adequately protected and advanced the interests of the Settlement Class.

(Final Appr. Mot. at 22.) The Court has no evidence that Lead Plaintiffs and Lead Counsel in any way failed to prosecute the Action vigorously on behalf of the class. Further, no conflicts of interest are apparent between Lead Plaintiffs and other class members. The adequacy requirement is satisfied for the Settlement Class.

### 3. Rule 23(b)

#### a. Common Questions Predominate

Rule 23(b) can be satisfied in one of three ways. In cases like this one, where Plaintiffs assert individualized monetary claims, certification is properly considered under Rule 23(b)(3). *Wal–Mart*, 564 U.S. at 361. To certify a class under Rule 23(b)(3), a court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

The predominance test gauges:

> whether proposed classes are sufficiently cohesive to warrant adjudication by representation . . . [and] focuses on the relationship between the common and individual issues. 'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis.'

*Flo & Eddie,* 2015 WL 4776932, at *10 (citing *Hanlon*, 150 F.3d at 1022). "[P]redominance does not require plaintiffs to prove that every element of a claim is subject to class wide proof: they need only show that common questions predominate over questions affecting only individual class members." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013).

"For purposes of class certification, it is sufficient that the alleged material misstatement and omission was part of a common advertising scheme to which the entire class was exposed...."). *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 486 (S.D. Cal. 2013) (quoting *O'Shea v. Epson Am., Inc.*, No. CV 09-8063 PSG CWX, 2011 WL 4352458, at *11 (C.D. Cal. Sept. 19, 2011), aff'd sub nom. *Rogers v. Epson Am., Inc.*, 648 F. App'x 717 (9th Cir. 2016)). [C]ommon issues predominate when plaintiffs are exposed to common set of representations about a product. *Waller*, 295 F.R.D. at 486 (citing *In re Ferrero Litig.*, 278 F.R.D. 552, 560 (S.D. Cal. 2011)).

Here, the central issues in each class member's claim relate to Defendants' public statements and Medbox's stock price reaction to the revelation of the alleged fraud. The alleged misrepresentations were made by Medbox in the form of public, false financial reports to which all its shareholders have access. As such, the entire Class was exposed to the alleged misrepresentations. Lead Plaintiff has explained that a given claimant's pro rata share is calculable by the "Recognized Loss Formula," which accounts for the particular date and price at which the claimant purchased/acquired its Medbox common stock.[6] (*See* Settlement Agreement, Ex. 1 at 73.) This formula is applicable on a

[6] The Plan of Allocation "is based on the premise that the decrease in the price of Medbox's securities occurring upon the revelation of the truth about Defendants' alleged misrepresentations to the investing

classwide basis and involves only limited individual inquiry as to the date a given Class Member purchased their security interest. And in view of the lack of need for individualized inquiry in this case, these central issues predominate over other questions affecting individual class members.

### d. Superiority

Rule 23(b)(3) also requires courts to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In the superiority analysis, courts consider the following non-exhaustive factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and, (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

Here, Lead Counsel posits that individual members suffered losses that are "not sufficiently large to justify the expense of individual actions. (Final Appr. Mot. at 22.) As a result, Lead Counsel argues that "it is desirable to concentrate the prosecution of the claims in this forum and in a single, more cost-effective class action." (Final Appr. Mot. at 22–23.) And class members have no unusually important interest in controlling the prosecution of their claim as a separate action, particularly in view of the expense of individual litigation. Further, Lead Plaintiffs have already proceeded with investigation, mediation, and settlement discussions with regard to a typical claim. This particular forum is satisfactory for concentration of the claims; Defendant Medbox is headquartered within the Central District of California, in West Hollywood, CA. Finally, as Lead Counsel maintains, settlement of the Action does not present unusual management difficulties. The Court agrees that these factors favor classwide resolution of Plaintiffs' claims. In view of the foregoing, the Court hereby finally certifies the Settlement Class for purposes of administration of the Settlement Fund.

---

public may be used to measure the alleged artificial inflation in the price of Medbox's securities prior to such revelations." (Fields Decl. ¶ 23.)

## B. Plaintiffs' Motion for Final Approval of Class Action Settlement

A district court may only approve a class settlement after a hearing and upon a finding that the settlement is fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2). The Court held a final approval hearing on October 17, 2016. (*See* Dkt. No. 110.) For the reasons discussed below, the Court concludes that the Settlement here meets Rule 23(e)'s requirements and therefore **GRANTS** Plaintiffs' Motion for Final Approval of Class Action Settlement.

### 1. The Strength of Plaintiffs' Case

The first fairness factor considers the strength of Plaintiffs' case. *See Staton*, 327 F.3d at 959. In assessing the strength of the case, a district court need not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of [the] outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice*, 688 F.2d at 625.

In analyzing the strength of Plaintiffs' case, Lead Counsel identifies several risks inherent in further litigation of Plaintiff and the Class Members' claims. Lead Counsel "recognize[s] that this Action might be dismissed on the pleadings, might not be certified for treatment as a class action, or might succumb at the summary judgment stage to attacks regarding loss causation, scienter, liability, or damages." (Final Appr. Mot. at 8–9.)

In weighing this fairness factor, courts look to whether a plaintiff properly accounted for his likelihood of success. *See Franco v. Ruiz Food Prods.*, No. 1:10-CV-02354-SKO, 2012 WL 5941801, at *11 (E.D. Cal. Nov. 27, 2012) ("Plaintiffs' likelihood of success appears to have been properly accounted for in the settlement amount."). Based on Lead Counsel's analysis of the strength of Plaintiffs' case, the Court concludes Lead Counsel has accounted for the class's likelihood of success in the settlement amount. This factor therefore weighs in favor of approval.

### 2. The Risk, Expense, Complexity, and Likely Duration of Further Litigation

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 526 (internal quotation marks omitted).

Lead Counsel argues that "a heightened level of risk existed because this Action is subject to the provisions of the PSLRA . . . which makes it more difficult for investors to successfully prosecute securities class actions." (Final Appr. Mot. at 9.) Moreover, Lead Counsel explains that "[o]btaining a favorable jury finding on the element of scienter is hardly a foregone conclusion" because "[p]roof of such scienter likely would have to be based upon circumstantial evidence." (*Id.*) Lead Counsel continues that the "circumstances . . . strongly suggest scienter, [but] Lead Plaintiffs and Lead Counsel are aware of the challenges of proving it." (*Id.*) Further, Lead Counsel predicts a significant challenge in "[p]roving that the misstatements caused a significant loss for investors and that the Class suffered damages as a result of Defendants' misconduct" because "disentangling the market's reaction to various pieces of news would have required complicated expert testimony and use of methodologies that are debated among economists."[7] (Final Appr. Mot. at 10.)

Next, Lead Counsel submits that the "claims at the heart of this case involved technical issues . . . proof of which would require costly and complex financial and accounting expertise." (Final Appr. Mot. at 11 (citing Fields Decl., ¶ 40).) Lead Counsel anticipates that discovery would require review of millions of pages of documents, many depositions, as well as expert discovery including expensive and complex expert testimony to prove loss causation and damages. (*Id.*) In view of these anticipated expenses and the present value of a certain recovery at this time, Lead Counsel argues that approval of the settlement eliminates the expense and delay of continued litigation, as well as the risk that the Class could receive no recovery. (Final Appr. Mot. at 12.)

[7] Lead Counsel cites to *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 716 (11th Cir. 2012) to support its position that vigorous challenges to loss causation and damages can pose a significant risk to the Class at summary judgment, trial, and on appeal. (*See* Final Appr. Mot. at 10.)

Finally, Lead Counsel explains that settlement would eliminate the risk that the corporate Defendant could suffer financial distress and cease operations—thus becoming judgment-proof. (Final Appr. Mot. at 12.) In support, Lead Counsel presents a market analysis reflecting that "Medbox has a 95% chance of experiencing financial distress in the next two years of operations." (Final Appr. Mot. at 12 (citing MacroAxis, Probability of Bankruptcy Analysis).) This Court is convinced that the time- and cost-intensive discovery, as well as Defendant Medbox's risk of bankruptcy weigh heavily in favor of approval of the Settlement Agreement.

### 3. The Risk of Maintaining Class Action Status Throughout the Trial

Lead Counsel explains that "[b]ut for this Settlement, Defendants likely would have strongly contested any motion for class certification and sought any opportunity to have a certified class de-certified." (Final Appr. Mot. at 13.) Lead Counsel believes that Defendants would contest that the market for Medbox stock was efficient, which would make it difficult to show actual reliance, and consequently certification of the Action through trial is not guaranteed. This risk, Lead Counsel posits, supports approval of the settlement.

The uncertainty surrounding class certification favors approval of the Settlement here, especially given that "there are doubts concerning the viability of the class." *In re Toys R Us-Del., Inc.–Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 452 (C.D. Cal. 2014) ("Avoiding the risk of decertification, especially where there are doubts concerning the viability of the class, favors approval of the settlement.").

### 4. The Amount Offered in Settlement

When considering the overall fairness of a settlement, a court should view "the complete package taken as a whole, rather than the individual component parts." *Officers for Just.*, 688 F.2d at 628. Lead Plaintiffs' estimated maximum recovery for the Settlement Class is $73.7 million. (Dkt. No. 94-1 at 14.) The $1.882 million Settlement

Fund[8] thus equates to approximately 2.5 per cent of the total *maximum* potential recovery estimated by Plaintiff. A proposed settlement may be fair, adequate, and reasonable, even though greater recovery might be available to the class members at trial. *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998); *Officers for Just.*, 688 F.2d at 628 ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair."). Further, the Ninth Circuit has long deferred to the parties' private, consensual decisions. *See Hanlon*, 150 F.3d at 1027.

Lead Counsel claims that the Settlement is an "objectively good recovery" given Defendants' liability insurance coverage issues[9] and the precarious financial condition of Medbox. (Final Appr. Mot. at 14 (citing Fields Decl. ¶¶ 14 n.5, 45); *see also* Dkt. No. 98 ("Phillips Decl.") ¶ 8.) And Lead Counsel adds that the "percentage of recovery in proportion to the maximum estimated recoverable damages is in line with the average approved securities class action settlement. (Fields Decl. ¶ 20.)

Lead Counsel adds that settlements at lower percentages of possible damages are routinely approved. (Final Appr. Mot. at 14 (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 241 (3d Cir. 2001).) Further, Lead Counsel argues that "[i]f a jury chooses to credit Defendants' damages and loss causation experts over Lead Plaintiff's experts . . . damages could substantially be reduced or eliminated." (Final Appr. Mot. at 15.) Finally, Lead Counsel argues that the Settlement reached in this case is even more valuable when compared to the present value of the damages plaintiffs would recover if successful (appropriately discounted for the risk of not prevailing): a recovery of a substantial sum certain today in view of a long, arduous process of litigation, weighs in favor of the Settlement. (Final Appr. Mot. at 15.) Based on the foregoing, this factor weighs in favor of approving the settlement.

---

[8] Again, as of April 8, 2016 the Settlement Fund would approximate $1,873,000.00. This valuation still equates to approximately 2.5% of the total maximum potential recovery.

[9] Medbox only had insurance coverage starting February 2014; as such, the insurer initially denied coverage to most of the Defendants, and with respect to Medbox itself, is defending under a reservation of rights. (Fields Decl. at 4 n.4.)

### 5. The Extent of Discovery Completed and the Stage of the Proceedings

The extent of discovery may be indicative of the parties' knowledge of the case and is therefore relevant to determining the overall fairness of a settlement. *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 527. Where the parties have conducted extensive discovery, this factor favors final approval "because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Id.* (internal quotation marks omitted). "A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." *Id.* at 528.

The Parties in this case have "conducted an extensive investigation in this Action, providing them with unique insight to be able to evaluate the fairness of the Settlement." (Final Appr. Mot. at 15–16 (citing Fields Decl. ¶ 48).) Lead Plaintiffs and Lead Counsel (1) reviewed and analyzed Medbox's Class Period and pre-Class Period public filings, annual reports, and press releases; (2) collected and reviewed analyst reports on Medbox; (3) reviewed and analyzed stock trading data relating to Medbox; (4) located and interviewed witnesses; (5) reviewed Lead Plaintiffs' qualifications to serve as a class representatives; (6) researched and analyzed publicly-available materials related to Medbox's products, services, and the emerging marijuana market; (7) researched and analyzed publicly available materials relating to Medbox's history; (8) researched and analyzed Defendant Mehdizadeh's criminal history; (9) performed an investigation regarding GAAP; (10) retained an expert on the GAAP and revenue recognition, as well as Medbox's actions with respect to its accounting manipulations; (11) drafted the initial Complaint and Consolidated Complaint in a manner that complied with the falsity and scienter requirements under the PSLRA; (12) consulted with economic experts in the areas of loss causation, market efficiency, and damages; (13) prepared for and participated in full-day mediation; and, (14) prepared the Settlement, motion papers, and related documents necessary to provide notice of the Settlement to Class Members and to obtain preliminary and final approval of the Settlement. (Final Appr. Mot. at 16–17 (citing Fields Decl. ¶ 48).)

Given Lead Counsel's investigation into Plaintiffs' claims and Defendant's potential defenses prior to the Settlement, as well as the involvement of a neutral mediator, the Court finds that both parties have a broad understanding of the strengths

and weakness of their respective cases. As such, this factor weighs in favor of approval. *See Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 527.

### 6. The Experience and Views of Lead Counsel

"Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Lead Counsel and defense counsel are composed of "experienced and well-respected" securities litigation attorneys. (Final Appr. Mot. at 17 (citing Fields Decl. Ex. 1).) Moreover, Lead Counsel achieved this Settlement with the aid of a nationally-regarded mediator, Judge Phillips. (Fields Decl. ¶¶ 48, 50.) Judge Phillips describes Lead Counsel as "highly skilled and experienced," "a firm [Phillips] know[s] and respect[s]," and "a law firm which [Phillips] count[s] among the finest shareholder rights advocates." (Phillips Decl. ¶¶ 13–14.)

After the Settlement in principle was reached, the parties engaged in further negotiations over the course of several weeks. And Lead Counsel submits that because "this Action was hard-fought at every stage by experienced counsel" the Court should find that the Settlement is fair and reasonable. (Final Appr. Mot. at 18; *see also* Phillips Decl. ¶ 8.)

In view of Lead Counsel's collective experience as evidenced in their papers, the attached firm resumes, Judge Phillips's Declaration, and Lead Counsel's views regarding the Settlement Agreement, this factor also weighs in favor of approval.

### 7. The Presence of a Governmental Participant

No government entity participated in this case. (Final Appr. Mot. at 18.) This factor is therefore neutral.

### 8. The Reaction of the Class Members to the Proposed Settlement

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms . . . are favorable to the class members." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529; *see also Barbosa v.*

*Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 448 (E.D. Cal. 2013) ("Where a settlement agreement enjoys overwhelming support from the class, this lends weight to a finding that the settlement agreement is fair, adequate, and reasonable."). In accordance with the Court's preliminary approval of the proposed settlement, the Claims Administrator prepared a Notice Packet, which it mailed to 39,060 potential Settlement Class Members on March 3, 2016.[10] (Final Appr. Mot. at 5.) Summary Notices were published in *Investor's Business Daily* and distributed over *GlobalNewsWire* on March 10, 2016. (Final Appr. Mot. at 5, 19 (citing Shillady Decl. ¶¶ 5–7).)

As of August 1, 2016, no Class Member objected to the Settlement, Plan of Allocation, or any other aspect of the Settlement, and eight Class Members requested exclusion.[11] (Third Bravata Decl. ¶¶ 3–4.) Further, no Class Member appeared at the final fairness hearing to object to the settlement. Given the relatively low number of requests for exclusion[12] and the absence of any objections to the terms or conditions of the Settlement, the class response appears "favorable," as Lead Counsel suggests. (*See* Final Appr. Mot. at 19.) Accordingly, this factor also weighs in favor of approval.

### 9. The Method of Distribution

A district court must also find that a proposed settlement's plan for allocation among the class members is fair and reasonable before granting final settlement approval. *See Class Plaintiffs*, 955 F.2d at 1284–85. "A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable." *See In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001).

The Court finds that the proposed method of distribution here will fairly compensate class members according to their injuries. Pursuant to the Settlement, each similarly situated authorized claimant will receive an equal pro rata share of the

[10] Of the 39,060 Notice and Claim forms mailed, 542 were returned as undeliverable. (Shillady Decl. ¶ 6.)

[11] Lead Counsel reaffirmed these assertions at the final fairness hearing on October 17, 2016.

[12] Only eight objections were received, while over 39,000 Notice Packets were sent by SCS to potential Class Members. (Third Bravata Decl. ¶ 3.)

Settlement Fund. (Final Appr. Mot. at 24; Settlement Agreement, Ex. 1 at 71.) A given claimant's pro rata share is calculable by the "Recognized Loss Formula," which accounts for the particular date and price at which the claimant purchased/acquired its Medbox common stock.[13] (*See* Settlement Agreement, Ex. 1 at 73.) Moreover, "[t]o the extent a claimant had a trading gain or 'broke even' from his, her or its overall transactions in Medbox shares during the Class Period, the value of the Recognized Claim will be zero . . . ." (*See* Settlement Agreement, Ex. 1 at 75.)

Further, Lead Counsel argues that it developed the plan for fair and reasonable reimbursement of Settlement Class Members in consultation with damages experts, and as such the Court need only find a reasonable rational basis for the allocation plan. (Final Appr. Mot. at 24 (citing *In re Glob. Crossing Sec. & ERISA Litig.*, 224 F.R.D. 436, 462 (S.D.N.Y. 2004).) The Court finds this method of distribution fair and reasonable, and accordingly this factor weighs in favor of final approval.

In summary, the fairness factors weigh in favor of approving the settlement agreement. As such, the Court concludes that the proposed settlement is fair, adequate, and reasonable. *See Staton*, 327 F.3d at 959. The Court therefore **GRANTS** Plaintiffs' Motion for Final Approval of Class Action Settlement.

### C. Motion for Attorneys' Fees and Costs, and Class Representative Payment

Lead Counsel seeks a percentage fee award based on the $1,850,000.00 and 2,300,000 shares of stock gross settlement sum, (Fees Mot. at 1), as well as $44,608.08 in unreimbursed expenses, (Fees Mot. at 5). Because the monetary value of the settlement is determinable, the percentage method is properly used in awarding fees. *See In re Oracle Securities Litig.*, 852 F. Supp. 1437, 1449, n. 5 (N.D. Cal. 1994) ("Because there were no nonmonetary benefits conferred on upon Oracle by this derivative suit, common fund principles are particularly pertinent"). Moreover, using the percentage method is

[13] The Plan of Allocation "is based on the premise that the decrease in the price of Medbox's securities occurring upon the revelation of the truth about Defendants' alleged misrepresentations to the investing public may be used to measure the alleged artificial inflation in the price of Medbox's securities prior to such revelations." (Fields Decl. ¶ 23.)

proper in a securities fraud case. The PSLRA states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." *See* 15 U.S.C. § 78u–4(a)(6); 15 U.S.C. § 77z–1(a)(6). By using this language, "Congress plainly contemplated that percentage-of-recovery would be the primary measure of attorneys' fees awards in federal securities class actions." *In re Telik, Inc. Securities Litig.*, 576 F.Supp.2d 570, 586 (S.D.N.Y. 2008); *see also In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) ("[T]he percentage-of-recovery method was incorporated in the [PSLRA]").

The Court will first determine whether an award of attorneys' fees from the gross settlement fund is appropriate, and will then decide whether Lead Counsel's requested fee is fair and reasonable. The Court will also apply the lodestar method as a "cross-check" on the reasonableness of a percentage-based fee award.

**1. Whether an Award of Attorneys' Fees from the Gross Settlement Fund is Appropriate**

As discussed above, an award of attorneys' fees from a common fund is appropriate only where the court can: "(1) sufficiently identify the class of beneficiaries; (2) accurately trace the benefits; and (3) shift the fee to those benefitting with some exactitude." *Staton*, 327 F.3d at 972 (citing *Van Gemert*, 444 U.S. at 478–79). "'[T]he criteria are satisfied when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf,' whereas they are not satisfied when 'litigants simply vindicate a general social grievance.'" *Id.* (quoting *Van Gemert*, 444 U.S. at 479). These criteria are satisfied here; the Settlement indicates how each Settlement Class Member will receive his or her share of the net fund value. (*See* discussion *supra* Section IV.B.9.) Based on the method of apportionment, the Court can accurately trace the benefits of the settlement to the 1593 Class Members.[14] (*See* Dkt. No. 108-1.) Class Members and shift the fee with some exactitude, as the method for apportioning each Class Members' benefit is readily

[14] Class Membership as of May 25, 2016. The deadline to submit a valid claim was June 1, 2016. (*See* Dkt. No. 97, Ex. A at 7.)

calculable.[15] Thus, a percentage-method fee award based upon the Settlement Fund here is appropriate; the Court therefore approves Lead Counsel's request to base the fee award upon the $1,850,000.00/2,300,000 shares gross settlement sum. *See Van Gemert*, 444 U.S. at 479.

### 2. Whether Lead Counsel's Requested Fee is Fair and Reasonable

The Court next considers whether the particular fee request is fair and reasonable. Here, Lead Counsel requests a twenty-five percent fee award, which, based on the Settlement Fund, would total approximately $462,500.00 and 575,000 shares of stock.[16] The Ninth Circuit has set a twenty-five percent benchmark for percentage-method fee recovery. *See Hanlon*, 150 F.3d at 1029.

In considering the overall fairness and reasonableness of a fee award, a court should consider the following factors: "(1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden on class counsel; and (5) awards made in similar cases." *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046 (citing *Vizcaino*, 290 F.3d at 1048–50).

#### a. The Results Achieved

"The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award." *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046. When considering the fairness and reasonableness of a fee request, a district court should also recognize the value of non-monetary relief, *see Vizcaino*, 290 F.3d at 1049, and may

---

[15] The Notice of Claim mailed to potential Class Members indicated that "if Class Members submit claims for 100% of the shares eligible for distribution under the Plan of Distribution . . . the estimated average value of the distribution per share of common stock will be $0.21 per share, before deduction of Court-approved fees and expenses, including the cost of notifying Class Members and settlement administration and any attorneys' fees and expenses awarded by the Court to counsel for Lead Plaintiffs . . . ." (Dkt. No. 97, Ex. A at 6.) During the Class Period an estimated 9.0 million shares were retained or traded. (Fields Decl. at 5 ¶ 18 n.5.)

[16] At the final fairness hearing on October 17, 2016, Lead Counsel submitted that the 2,300,000 Medbox shares equated to approximately $2,530.00.

increase an award "to reflect the benefits to the public flowing from th[e] litigation," *see Bebchick v. Wash. Metro. Area Transit Comm'n*, 805 F.2d 396, 408 (D.C. Cir. 1986).

Here, Lead Counsel obtained a total Settlement Fund of $1,850,000.00 cash and 2,300,000 shares of Medbox stock, (Fees Mot. at 1), to be distributed among 1593 Class Members. Lead Counsel asserts that this is an "excellent recovery" because it is "well within the range of . . . settlements approved by courts" and the results were achieved "in a legally and factually complex case." (Fees Mot. at 10–11.) The Court finds that these results support attorneys' fees in the amount of twenty-five percent of the Settlement Fund.

**b. The Risks of Litigation**

The risk that further litigation might result in no recovery is a "significant factor" in assessing the fairness and reasonableness of an award of attorneys' fees. *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046–47; *see also Vizcaino*, 290 F.3d at 1048 (discussing that "[r]isk is a relevant circumstance" in determining an attorney fee award in a common fund case). In evaluating the risk of the litigation, a court may consider the complexity of the legal issues involved. *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046–47.

As discussed above, there are some risks involved in further litigation of this case. (*See* discussion *supra* Sections IV.B.2, IV.B.3.) Defendant could potentially prevail at the class certification stage, the summary judgment stage, or at trial. Lead Counsel highlights that the Action settled for 2.5 per cent of the Class Period damages before Lead Plaintiffs demonstrated that the Consolidated Complaint was well-pleaded under the heightened pleadings standard of the PSLRA. On balance, the Court finds this factor supports the reasonableness of a twenty-five percent award.

**c. The Skill Required and the Quality of Lead Counsel's Work**

The Court may also consider the skill required to prosecute and manage this litigation, as well as Lead Counsel's overall performance. *See In re Omnivision Techs.*, 559 F. Supp. 2d at 1047. Complex class actions "require[] unique legal skills and abilities." *Id.* (internal quotation marks omitted). The difficulty of securities litigation

generally—particularly the challenges presented by the PSLRA's pleading requirements—requires skilled counsel familiar with the relevant statutes and case law. *In re Am. Apparel, Inc. S'holder Litig.*, No. CV1006352MMMJCGX, 2014 WL 10212865, at *22 (C.D. Cal. July 28, 2014).

Here, Lead Counsel's firm resumes and Judge Phillips's Declaration show Lead Counsel's collective experience, skill level, and the quality of its efforts in negotiating the settlement. Lead Counsel argue that only "skilled counsel who applied themselves diligently could have obtained such a favorable discovery" given the issues of market efficiency, loss causation, scienter, and damages issues. (Fees Mot. at 12.) Lead Counsel add that "[t]he quality of opposing counsel is also important in evaluating the quality of th work done by Lead Counsel." (Fees Mot. at 13 (citing *In re Equity Funding Corp. of Am. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal 1977); *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976)).) According to Lead Counsel, opposing counsel Manatt, Phelps & Phillips, LLP is "a prominent national law firm that frequently defends public companies in securities class actions." (Fees Mot. at 13.)

In view of mediator Judge Phillips's evaluation of Lead Counsel's performance, the data provided by Lead Counsel concerning recent trends in securities litigation settlements, the quality of opposing counsel, and the complexity of securities litigation, this Court finds that this factor weighs in favor of a fee award of 25% of the Settlement Fund.

#### d. The Contingent Nature of the Fee and the Financial Burden Carried by Lead Counsel

The contingent nature of the representation bears on the overall fairness and reasonableness of a fee request. *See In re Omnivision Techs.*, 559 F. Supp. 2d at 1047. The risk that counsel will not recover, as well as the financial burden accompanying the contingent nature of the representation, may justify a higher percentage fee award. *See id.* at 1049; *see also Vizcaino*, 290 F.3d at 1048–50.

Lead Counsel has litigated this case for over fifteen months and received no compensation. (Fees Mot. at 14.) Lead Counsel also "incurred significant litigation expenses for the benefit of the Class" with "no guarantee of recovery." (Fees Mot. at 14,

18.) Lead Counsel collectively devoted 1,298 hours of time to this action and asserts a total lodestar of $603,710.00. (Fees Mot. at 16.) This is a significant investment of time and resources. The Court finds that an attorneys' fees award in line with the Ninth Circuit benchmark of twenty-five percent of the Settlement Fund is appropriate here.

**e. Awards Made in Similar Cases**

Various district courts in the Ninth Circuit have found a twenty-five percent fee reasonable. *See, e.g.*, *Ontiveros v. Zamora*, 303 F.R.D. 356, 368, 375 (E.D. Cal. 2014) (finding that a twenty-five percent fee was reasonable when the attorneys spent approximately 900 hours on the case and incurred an estimated lodestar of $323,005.75); *Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283-SBA, 2013 WL 5402120, at *6 (N.D. Cal. Sept. 26, 2013) (finding that a fee of twenty-five percent of the common fund was reasonable to compensate class counsel who obtained a $600,000 award for the class members); *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 459, 462 (E.D. Cal. 2013) (finding a twenty-five percent fee reasonable when the attorneys worked over 335 hours and incurred a lodestar of approximately $130,000). This factor supports Lead Counsel's request for fees equating to twenty-five percent of the Settlement Fund.

**f. The Reaction of the Class**

Finally, the reaction of the class is relevant in determining the overall fairness and reasonableness of an award of attorneys' fees. *In re Heritage Bond Litig.*, No. 02-ML-1475-DT (RCX), 2005 WL 1594389, at *15 (C.D. Cal. June 10, 2005) ("The presence or absence of objections from the class is also a factor in determining the proper fee award."). As discussed above, there has been no objection by the Class Members. (*See* discussion *supra* Section IV.B.8.) Lead Counsel confirmed at oral argument that while 1593 shareholders filed valid claims, no objections and only eight requests for exclusion were filed. Thus, this factor weighs in favor of granting the Fees Motion.

**g. Balancing the Factors**

Lead Counsel recovered an award for the Class Members and took a risk by litigating this case on a contingency fee basis, which required incurring attorneys' fees and paying litigation expenses and costs with no guarantee of recovering those fees and

costs. And this case involves highly complex issues; Lead Counsel negotiated the settlement amount in the face of risk that further litigation could lead to an unfavorable result for the Class Members. Given these facts, the Court concludes that Lead Counsel's quality of representation warrants an attorneys' fees award equal to twenty-five percent of the Settlement Fund.

The Court accordingly awards to Lead Counsel twenty-five per cent of the $1,850,000.00 cash portion of the Settlement Fund and twenty-five per cent of the shares of stock contributed by Defendants to the Settlement Fund, payable from the Settlement Fund. *See also Staton*, 327 F.3d at 972 ("[T]he agreement as a whole does not stand or fall on the amount of fees. Instead, after the court determines the reasonable amount of attorneys' fees, all the remaining value of the fund belongs to the class rather than reverting to the defendant.").

### 3. The Lodestar Method Cross-Check

Courts may apply the lodestar method as a "cross-check" on the reasonableness of a percentage-based fee award. *Vizcaino*, 290 F.3d at 1050. The lodestar "is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). A court may adjust the lodestar figure upward or downward by an appropriate multiplier to reflect "a host of 'reasonableness' factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id.* at 941–42 (internal quotation marks omitted). Here, Lead Counsel does not seek an upward multiplier to be applied to its lodestar.

Where the attorney's investment of time in the litigation is minimal, such as in the case of an early settlement, the lodestar calculation may favor a lower percentage. *Vizcaino*, 290 F.3d at 1050. "The lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee, since the lodestar method does not reward early settlement." *Id.* at 1050 n.5.

Johnson & Weaver, LLP has calculated its lodestar to be $603,710.00, based upon 1,298 hours of professional time expended on the Action. (Fields Decl. ¶ 69.) Specifically, Lead Counsel Johnson & Weaver, LLP spent 1178.7 hours of professional time on the Action for a lodestar of $536,423.50,[17] while Pomerantz LLP spent 119.3 hours on the Action for a lodestar of $67,277.50.[18] (Fields Decl. at 22–23 n.7.) As such, Lead Counsel asserts a total lodestar of $603,710.00. (Fees Mot. at 16.)

While Lead Counsel did not provide the Court with evidence that their hourly rates are reasonable and comparable with hourly rates charged by other law firms that handle similar class action litigation in California, other courts in this district have approved similar rates in complex class action litigation. *See Toys R Us*, 295 F.R.D. at 462 (approving rates of between $595 and $600 for partners, $220 to $595 for other attorneys and associates, and $95 to $195 for paralegals); *Kearney v. Hyundai Motor America*, No. SACV 09–1298–JST (MLGx), 2013 WL 3287996, *8 (C.D. Cal. June 28, 2013) (approving hourly rates between $650 and $800 for class counsel in a consumer class action); *Parkinson v. Hyundai Motor America*, 796 F. Supp. 2d 1160, 1172 (C.D. Cal. 2010) (approving hourly rates between $445 and $675 for class counsel in a consumer class action); *see also POM Wonderful, LLC v. Purely Juice, Inc.*, No. CV 07–2633, 2008 WL 4351842, *4 (C.D. Cal. Sept. 22, 2008) (finding rates of $475 to $750 for partners and $275 to $425 for associates reasonable in a consumer class action).

Under the Court's application of the twenty-five percent figure, the attorneys' fee award would total $463,132.50,[19] which is approximately seventy-seven percent of the calculated lodestar. "Thus, the requested fee award results in a so-called negative multiplier, which suggests that the percentage of the fund amount is reasonable and fair."

---

[17] $536,423.50 over 1178.7 hours equates to an average hourly rate of $455.10.

[18] $67,277.50 over 119.3 hours equates to an average hourly rate of $563.94.

[19] Comprised of $462,500 in cash, and the value of 575,000 shares of Medbox common stock contributed by Defendants to the Settlement Fund. (*See* Fees Mot. at 1–2.) As of October 17, 2016, 575,000 shares of Medbox common stock are worth approximately $632.50.

*Rosetta Stone*, 2013 WL 5402120, at *6 ("The $150,000 fee award requested by Class Counsel is approximately 25% of the lodestar.").

### 4. Lead Counsel's Request for Reimbursement of Costs and Expenses

Lead Counsel also requests reimbursement for the $44,608.08[20] they advanced in out-of-pocket costs and expenses incurred as a result of litigating this matter. Lead Counsel incurred these expenses "largely in conjunction with mediation fees and the engagement of expert witnesses in the areas of market efficiency, loss causation, and damages." (Fees Mot. at 18.) These un-reimbursed expenses may be reasonable and recoverable. *See Rutti v. Lojack Corp.*, No. CV 06-00350-DOC, 2012 WL 3151077, at *12 (C.D. Cal. July 31, 2012) ("Expenses such as reimbursement for travel, . . . lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, documents scanning, and visual equipment are typically recoverable."). But at this time, Lead Counsel has not provided the Court with an itemized report of the various expenses that Lead Counsel incurred in conjunction with mediation, the engagement of expert witnesses, or otherwise. Thus, the Court **DENIES without prejudice** Lead Counsel's request for reimbursement in the amount of $44,608.08 from the Settlement Fund.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Final Approval of Class Action Settlement. The Court **GRANTS in part** Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Costs. Accordingly, the Court awards to Lead Counsel attorneys' fees in the amount of twenty-five per cent of the $1,850,000.00 cash portion of the Settlement Fund and twenty-five per cent of the shares of Medbox stock contributed by Defendants to the Settlement Fund.

**IT IS SO ORDERED.**

[20] Specifically, Johnson & Weaver, LLP and Pomerantz LLP incurred $33,111.23 and $11,496.85 in expenses, respectively. (Fields Decl. ¶ 72 n.8.)